## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| NEIL EINHORN, Individually and On Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>      v.<br><br>AXOGEN, INC, KAREN ZADEREJ, PETER J. MARIANI, GREGORY G. FREITAG, JAMIE M. GROOMS, ROBERT J. RUDELIUS, MARK GOLD, JOHN HARPER, JOE MANDATO, GUIDO NEELS, AMY WENDELL, LEERINK PARTNERS LLC, CANTOR FITZGERALD & CO., JMP SECURITIES LLC, JEFFERIES LLC, and WILLIAM BLAIR & COMPANY, L.L.C.,<br><br>                Defendants. | Case No.:<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Neil Einhorn ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by AxoGen, Inc. ("AxoGen" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by AxoGen; and (c) review of other publicly available information concerning AxoGen.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that: a) purchased or otherwise acquired AxoGen securities pursuant and/or traceable to the Company's false and/or misleading registration statement and prospectus (collectively, the "November 2017 Registration Statement") issued in connection with the Company's November 2017 secondary public offering ("November SPO" or the "November Offering"); and/or b) purchased or otherwise acquired AxoGen securities pursuant and/or traceable to the Company's false and/or misleading registration statement and prospectus (collectively, the "May 2018 Registration Statement") issued in connection with the Company's May 2018 secondary public offering ("May SPO" or the "May Offering"); and/or c) purchased or otherwise acquired AxoGen securities between August 7, 2017 and December 18, 2018, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants, under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.      AxoGen purports to provide surgical solutions for physical damage or discontinuity to peripheral nerves. Its products include nerve allografts and extracellular matrices.

3.      On November 16, 2017, the Company filed its prospectus on Form 424B5 with the SEC, which forms part of the November 2017 Registration Statement. In the November SPO,

the Company sold 805,000 shares of common stock at a price of $21.00 per share. The Company received proceeds of approximately $15.4 million from the November Offering, net of underwriting discounts and commissions. The proceeds from the November SPO were purportedly to be used for general corporate purposes.

4.     On May 7, 2018, the Company filed its prospectus on Form 424B5 with the SEC, which forms part of the May 2018 Registration Statement. In the May SPO, the Company sold 3,450,000 shares of common stock at a price of $41.00 per share. The Company received proceeds of approximately $132.46 million from the May Offering, net of underwriting discounts and commissions. The proceeds from the May SPO were purportedly to be used for long term facilities and capacity expansion, as well as general corporate purposes.

5.     On December 18, 2018, Seligman Investments published a report stating, among other things, that former employees allege channel stuffing and backdating of revenue, that the number of active accounts may be overstated by a factor of ten, that the Company's "growth [i]s driven by unsustainable, aggressive price increases," that the payments to physicians relative to revenue creates "elevated risks relating to pay-to-play and anti-kickback laws."

6.     On this news, the Company's share price fell $6.17 per share, or nearly 22%, to close at $21.36 per share on December 18, 2018, on unusually high trading volume. The share price continued to decline over the course of the next three trading sessions, dropping $1.53 on December 19, 2018, $1.94 on December 20, 2018, and $0.80 on December 21, 2018, to close at $17.09 per share on December 21, 2018. The total decline over the course of these three trading sessions was $4.27, or nearly 20%.

7.     The Registration Statements were false and misleading and omitted to state material adverse facts. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company aggressively increased prices to mask lower sales; (2) that the Company's pricing alienated customers and threatened the Company's future growth; (3) that ambulatory

surgery centers form a significant part of the market for the Company's products; (4) that such centers were especially sensitive to price increases; (5) that the Company was dependent on a small number of surgeons whom the Company paid to generate sales; (6) that the Company's consignment model for inventory was reasonably likely to lead to channel stuffing; (7) that the Company offered purchase incentives to sales representatives to encourage channel stuffing; (8) that the Company's sales representatives were encouraged to backdate revenue to artificially inflate metrics; (9) that the Company lacked adequate internal controls to prevent such channel stuffing and backdating of revenue; (10) that the Company's key operating metrics, such as number of active accounts, were overstated; and (11) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). The Company has offices in this district.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities

exchange.

## **PARTIES**

13. Plaintiff Neil Einhorn, as set forth in the accompanying certification (attached hereto as "Exhibit 1"), incorporated by reference herein, purchased AxoGen securities during the Class Period, pursuant and/or traceable to the Registration Statement issued in connection with the Company's November and/or May SPO, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14. Defendant AxoGen is incorporated under the laws of Minnesota with its principal executive offices located in Alachua, Florida. AxoGen's common stock trades on the NASDAQ exchange under the symbol "AXGN."

15. Defendant Karen Zaderej ("Zaderej") was, at all relevant times, the Chief Executive Officer and a Director of the Company, and signed or authorized the signing of the Company's Registration Statements filed with the SEC on November 5, 2015 and on May 7, 2018.

16. Defendant Peter J. Mariani ("Mariani") has been the Chief Financial Officer of the Company since March 2016, and signed or authorized the signing of the May 2018 Registration Statement filed with the SEC.

17. Defendants Zaderej and Mariani, (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from,

the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

18.    Defendant Gregory G. Freitag ("Freitag") was the Chief Financial Officer from September 2011 to May 2014 and August 2015 to March 2016. He has been a Director of the Company at all relevant times, and signed or authorized the signing of the Company's Registration Statements filed with the SEC on November 5, 2015 and on May 7, 2018.

19.    Defendant Jamie M. Grooms ("Grooms") was a director of the Company and signed or authorized the signing of the Company's Registration Statements filed with the SEC on November 5, 2015 and on May 7, 2018.

20.    Defendant Robert J. Rudelius ("Rudelius") was a director of the Company and signed or authorized the signing of the Company's Registration Statements filed with the SEC on November 5, 2015 and on May 7, 2018.

21.    Defendant Mark Gold ("Gold") was a director of the Company and signed or authorized the signing of the Company's Registration Statements filed with the SEC on November 5, 2015 and on May 7, 2018.

22.    Defendant John Harper ("Harper") was a director of the Company and signed or authorized the signing of the Company's Registration Statements filed with the SEC on November 5, 2015.

23.    Defendant Joe Mandato ("Mandato") was a director of the Company and signed or authorized the signing of the Company's Registration Statements filed with the SEC on November 5, 2015.

24.    Defendant Guido Neels ("Neels") was a director of the Company and signed or authorized the signing of the Company's Registration Statements filed with the SEC on November 5, 2015 and on May 7, 2018.

25.    Defendant Amy Wendell ("Wendell") was a director of the Company and signed or authorized the signing of the Company's Registration Statements filed with the SEC on May

7, 2018.

26.     Defendants Zadarej, Mariani, Freitag, Grooms, Rudelius, Gold, Harper, Mandato, Neels, and Wendell are collectively referred to hereinafter as the "Securities Act Individual Defendants."

27.     Defendant Leerink Partners LLC ("Leerink") served as an underwriter for the Company's November and May Offerings.

28.     Defendant Cantor Fitzgerald & Co. ("Cantor") served as an underwriter for the Company's November Offering.

29.     Defendant JMP Securities LLC ("JMP") served as an underwriter for the Company's November and May Offerings.

30.     Defendant Jefferies LLC ("Jefferies") served as an underwriter for the Company's May Offering.

31.     Defendant William Blair & Company, L.L.C. ("William Blair") served as an underwriter for the Company's May Offering.

32.     Defendants Leerink, Cantor, JMP, Jefferies, and William Blair are collectively referred to hereinafter as the "Underwriter Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

33.     AxoGen purports to provide surgical solutions for physical damage or discontinuity to peripheral nerves. Its products include nerve allografts and extracellular matrices.

34.     On November 16, 2017, the Company filed its prospectus on Form 424B5 with the SEC, which forms part of the November 2017 Registration Statement. In the November SPO, the Company sold 805,000 shares of common stock at a price of $21.00 per share. The Company received proceeds of approximately $15.4 million from the November Offering, net of underwriting discounts and commissions. The proceeds from the November SPO were purportedly to be used for general corporate purposes.

35.     On May 7, 2018, the Company filed its prospectus on Form 424B5 with the SEC, which forms part of the May 2018 Registration Statement. In the May SPO, the Company sold 3,450,000 shares of common stock at a price of $41.00 per share. The Company received proceeds of approximately $132.46 million from the May Offering, net of underwriting discounts and commissions. The proceeds from the May SPO were purportedly to be used for long term facilities and capacity expansion, as well as general corporate purposes.

36.     Under applicable SEC rules and regulations, the Registration Statements were required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

### Materially False and Misleading
### Statements Issued During the Class Period

37.     The Class Period begins on August 2, 2017. On that day, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2017 (the "2Q17 10-Q"). Therein, the Company reported revenue of $15.17 million and net loss of $2.06 million.

38.     As to active accounts and their role in revenue growth, the 2Q17 10-Q stated, in relevant part:

> We have experienced that surgeons initially are cautious adopters for nerve repair products. Surgeons typically start with a few cases and then wait and review the results of these initial cases which can take from six to twelve months, or longer. Active accounts are usually past their initial wait period and have developed some level of product reorder. These active accounts have typically gone through their buying committee approval process, have at least one surgeon who has converted a portion of his or her treatment algorithms of nerve repair so as to use at least one of AxoGen's products and have ordered such product(s) at least six times within the last twelve months prior to the review date. The number of active accounts at the end of the second quarter of 2017 were approximately 510, representing an increase of 36% compared to the second quarter of 2016.

> As such, revenue growth is primarily due to increased purchases from active accounts, followed by revenue growth from new accounts. Each new period of measurement is thus benefited from growth in active accounts which may include those that were new accounts in the prior measurement period. We have continued to broaden our sales and marketing focus which we expect to have a continuing positive contribution to our revenue growth in the long term.

39.     Regarding controls and procedures, the 2Q17 10-Q stated that the Company had made changes to its internal controls to address material weaknesses regarding quarterly cycle count procedures related to consigned inventories, which had been identified in the Company's annual report for the period ended December 31, 2016. The Company stated, in relevant part:

> During the three months ended June 30, 2017, the Company made the following changes to the design of its internal controls over financial reporting:
>
> - Improved procedures to test, evaluate and document the assumptions utilized in significant estimates; and
>
> - Enhanced the scope and procedures of the testing an documentation of quarterly cycle counts of consignment inventory.
>
> We believe these changes in internal controls over financial reporting address the material weaknesses relating to the design and operation of key controls around the use of judgment and calculations of significant estimates, as well as quarterly cycle count procedures related to consigned inventories, described in our 2016 Annual Report. Although these changes have been made, the material weaknesses or deficiencies will not be considered remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively.   Weaknesses or deficiencies in our internal control over financial reporting may be identified when we assess the effectiveness of the Company's internal control over financial reporting as of December 31, 2017, or during the audit by our independent registered public accounting firm of the Company's internal control over financial reporting as of December 31, 2017.

40.     On November 1, 2017, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2017. Therein, the Company reported revenue of $16.05 million, net loss of $2.15 million, and 563 active accounts.

41.     On November 20, 2017, the Company's November Offering closed. Regarding the price of its products, the November 2017 Registration Statement stated:

> **AxoGen's operating results will be harmed if it is unable to effectively manage and sustain its future growth or scale its operations.**
>
> There can be no assurance that AxoGen will be able to manage its future growth efficiently or profitably. Its business is unproven on a large scale and actual revenue and operating margins, or revenue and margin growth, may be less than expected. If AxoGen is unable to scale its production capabilities efficiently or maintain pricing without significant discounting, it may fail to achieve expected

operating margins, which would have a material and adverse effect on its operating results. Growth may also stress AxoGen's ability to adequately manage its operations, quality of products, safety and regulatory compliance. If growth significantly decreases it will negatively impact AxoGen's cash reserves, and it may be required to obtain additional financing, which may increase indebtedness or result in dilution to shareholders. Further, there can be no assurance that AxoGen would be able to obtain additional financing on acceptable terms if all at.

42.    Regarding the Company's customers' dependence on reimbursements, the November 2017 Registration Statement stated:

> ***AxoGen's revenues depend upon prompt and adequate reimbursement from public and private insurers and national health systems.***
>
> Political, economic and regulatory influences are subjecting the healthcare industry in the U.S. to fundamental change. The ability of hospitals to pay fees for AxoGen's products depends in part on the extent to which reimbursement for the costs of such materials and related treatments will continue to be available from governmental health administration authorities, private health coverage insurers and other organizations. Major third party payers of hospital services and hospital outpatient services, including Medicare, Medicaid and private healthcare insurers, annually revise their payment methodologies which can result in stricter standards for reimbursement of hospital and/or surgeon charges for certain medical procedures or the elimination of reimbursement. Further, Medicare, Medicaid and private healthcare insurer cutbacks could create downward price pressure on AxoGen's products.

43.    On February 28, 2018, the Company filed its annual report on Form 10-K with the SEC for the period ended December 31, 2017 (the "2017 10-K"). Therein, the Company reported revenue of $60.43 million, net loss of $10.45 million, and 591 active accounts.

44.    Regarding controls and procedures, the 2017 10-K stated that management had effectively remediated previously-reported material weaknesses. The Company stated, in relevant part:

> As a result of [an] evaluation, management determined the Company had effectively remediated the material weaknesses in its internal controls that existed as of December 31, 2016 relating to the design and operation of key controls around the use of judgment and calculations of significant estimates, as well as quarterly cycle count procedures related to consigned inventories, and that as of December 31, 2017, our internal control over financial reporting was effective.

45.    On April 30, 2018, the Company filed its quarterly report on Form 10-Q for the

period ended March 31, 2018. Therein, the Company reported revenue of $17.26 million, net loss of $5.64 million, and 604 active accounts.

46.     On May 11, 2018, the Company's May Offering closed. Regarding the price of its products and reimbursement, the May 2018 Registration Statement repeated the statements identified in ¶¶41-42. It further stated reimbursement coding and coverage for nerve repair and grafting approved by regulatory authorities and that "[m]edicare reimbursement for hospital in-patient ranges from approximately $11,514 - $22,948."

47.     On August 1, 2018, the Company filed its quarterly report on Form 10-Q for the period ended June 30, 2017. Therein, the Company reported revenue of $20.58 million, net loss of $7.43 million, and 634 active accounts.

48.     On October 29, 2018, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2018. Therein, the Company reported revenue of $22.66 million, net loss of $4.10 million, and 679 active accounts.

49.     The above statements identified in ¶¶37-48 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that the Company aggressively increased prices to mask lower sales; (2) that the Company's pricing alienated customers and threatened the Company's future growth; (3) that ambulatory surgery centers form a significant part of the market for the Company's products; (4) that such centers were especially sensitive to price increases; (5) that the Company was dependent on a small number of surgeons whom the Company paid to generate sales; (6) that the Company's consignment model for inventory was reasonably likely to lead to channel stuffing; (7) that the Company offered purchase incentives to sales representatives to encourage channel stuffing; (8) that the Company's sales representatives were encouraged to backdate revenue to artificially inflate metrics; (9) that the Company lacked adequate internal controls to prevent such channel stuffing and backdating of revenue; (10) that the Company's key operating metrics, such as number of active accounts, were overstated; and (11) that, as a result of the foregoing,

Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

50.     On December 18, 2018, Seligman Investments published a report stating, among other things, that former employees allege channel stuffing and backdating of revenue, that the number of active accounts may be overstated by a factor of ten, that "new customer acquisition is falling," that its "growth has driven by unsustainable, aggressive price increases," that the payments to physicians relative to revenue creates "elevated risks relating to pay-to-play and anti-kickback laws."

51.     Regarding pricing, the report stated that former representatives indicated routine price increases by as much as 20%, a practice that alienated hospitals and surgeons, leading them to seek AxoGen's competitors. The report stated, in relevant part:

> "We've been removed from accounts after price increases and then negotiated our way back in. **Axogen is not a friend at the largest institutions. There is disdain toward the company.** Most institutions have issues with consistent high price increases and the lack of contract incentives. Axogen rarely writes contract over one year. They won't guarantee pricing. **Hospitals and IDN's have taken notice.** Hospitals are used to 50% discounts and when they get only a 5-15% discount for significant volume, they're taken aback relative to other medical markets. **Sensitivity to Axogen's price increases is now higher. Negotiations are getting more intense every year.** Price increases will have to get close to 3-4%/year vs. double digit every year. The annual price increase over the product line is 10-15% every March." – Former sales manager

> "I worked with [a large hospital system] to try and get a contract and they wouldn't finalize it. **Axogen's new price increase may lead [them] to say remove your protectors and connectors. Some of my surgeons have moved over to Integra recently**. I have a hard time with Axogen's board and decision making." – Former independent distributor

52.     According to the report, the aggressive price increases especially affected the Company's relationship with a key sector of the market—ambulatory surgery centers, which depend on reimbursements to cover costs. The report stated, in relevant part:

> ***Price sensitivity in the ambulatory surgery center ("ASC") channel poses a critical threat to Axogen's business. ASC's are non-hospital outpatient surgery centers, which comprise a large and growing share of procedure volumes in***

*AXGN's core market. Surgeons often own these facilities and have a vested interest in diverting volumes away from hospitals. Former AXGN employees as well as surgeons indicate that Axogen is shut out of this market due to aggressive pricing and lack of reimbursement, and is therefore dependent on a small number of level 1 trauma centers – typically academic centers willing to eat the cost of AXGN's product themselves.*

• Former sales reps and other ex-employees we spoke to universally pointed to lack of acceptance by ASC's as a significant vulnerability in AXGN's business, with ASC's owning 40-65% or more of the procedure volumes in territories we queried.

*"It's much more difficult to be doing Axogen in ASC's. Axogen is priced out. Doctors like to do fingers at ASC's.They can do more cases per day and they own the center. Even if you say use Axogen for two cases per month, the business manager will say you can't use it. Occasionally you can get workers comp. In my territory, easily 65% of hand surgeries were done in ASC's." – Former sales rep*

*"Axogen has a very concentrated customer base in trauma centers. The business may move to surgery centers as doctors line their pockets. Then they can't get an Avance graft there because it's a premium product […] Surgery centers are different. They have a set fee, so they have to pay the bill [for Axogen] from one charge. They can't eat up $1,400 [procedure fee] with $10,000 of Axogen products." - Former independent distributor*

*"A lot of hand surgery is done in outpatient clinics but they're not friendly to expensive implants. Our cheapest product is $1500 and it's a hard sell in a surgery center. Try telling a surgeon he has to schlep to a major hospital to get reimbursed. We were getting booted out of surgery centers all the time. They'd say I'm only using it for the worst cases and at a hospital." – Former employee*

*"Axoguard products are not priced for private surgery centers, which was the bulk in my state. They had no buy in. Doctors say that the cost of Axoguard is more than the cost of reimbursement for the procedure. They only used us in the rarest of circumstances like workers comp." – Former sales rep*

*"An orthopedic hand surgeon can do 5-6 cases per day at a center. Every year I was there Axogen would say they'd get a code for ASC's. 40% of the market was surgery centers when I was there. Surgery centers are the most sensitive about price. They stop doing it if you keep raising the price. Axogen has talked about reimbursement codes for years." – Former sales rep*

*"On reimbursement, most patients are inpatients at trauma centers. The cost is part of the global payment, whether commercial or medicare, so trauma facilities are the sweet spot for Axogen. In an outpatient scenario, Axogen's world changes. Docs are trying to move procedures to outpatient facilities, to hospital owned surgery center or outpatient discharge. There are three types of care: in-*

> *patient, with a global bundled payment; hospital outpatient or hospital owned*
> *ambulatory, where rates are higher than ambulatory but less than bundled; and*
> *then ASC's which have the lowest carrier reimbursement. They just get a*
> *procedure fee. **Very few ASC's have implant carve outs. Axogen isn't usually***
> ***available there**." – Former sales manager*

53.     The report alleged that the Company dependent on a small number of high

volume surgeons that the Company pays to elicit sales. The report stated, in relevant part:

> "**I've called on [this academic center] for a number of years. [It] is one of**
> **Axogen's largest accounts. They don't come right out and say we'll only use**
> **your product if you do a trial with us. They'll say, "If you want to do a lot of**
> **business, it's good to have our staff speaking about your product and doing**
> **research**. I suggest you have the company do more research with us." You find
> out that they do speaking and research for those companies where they do a lot of
> business. Axogen used [this account] for studies. **We provided money for their**
> **programs. All this was viewed very favorably. Axogen wouldn't get near as**
> **much business if they didn't give them this money."** – Former sales rep

> "**15-20% of Axogen's revenue** is from centers doing the trial." – Former
> independent distributor

> * * *

> OpenPayments lists the top ten physicians receiving payments from AXGN, for
> the five years through 2017. The data indicates that these doctors received 44% of
> AXGN's total reported general payments of $1.6MM in 2017, indicating a high
> risk that AXGN's sales volumes may be concentrated at a relatively small number
> of surgeon groups. A former sales rep estimated that one of the surgeons in the list
> may be a $2MM "if not $3MM" account. Given that AXGN's LTM revenues are
> only $78MM, the risk of dependence on a small number of high volume surgeons
> who receive large payments from AXGN is self-evident.

54.     Moreover, the report stated that the Company engaged in channel-stuffing to

boost metrics based on a consignment model with little internal controls. The report stated, in

relevant part:

> Former sales reps state either indirectly or bluntly that the company has engaged
> in channel stuffing. Axogen uses a consignment model where company-owned
> inventory of nerves is stored in fridges at medical facilities. The company offers
> incentives to reps and customers for one-time, bulk purchases of the inventory on
> site, creating obvious potential for abuse ahead of quarters. We note the potential
> for control issues, as each fridge has to be checked at regular intervals to
> determine usage and billing for each period.

> "**I'm sure some channel stuffing went on.**" – Former sales rep

**"A lot of channel stuffing is happening."** – Former sales rep

"I did a lot of consignment. Property is retained by Axogen but is stored by the facility. Axogen has incentives for direct reps to convert accounts to owned where hospitals purchase the inventory. **The company incentivizes accounts for bulk purchase**.

With heavy price increases, the consignment list price is 15-20% more expensive if it's consigned vs. owned by the facility. **Reps try to convert consignment to purchase inventory. […] This happens mostly in March with the annual price increase. Axogen has been doing bulk purchase incentives aggressively for 3-4 years."** - Former sales manager

"I used to consign and consign. We switched because consignment was costing a fortune because reps puts tons of inventory at the facility. The company asked us to convert to purchase, and set a higher price for consignment. **They would offer a one time incentive to buy $50k plus of inventory."** – Former sales rep

"A lot of hardware [nerve grafts] is on loan or consignment. Customers agree to take proper care of it. Axogen supplies x amount of inventory. **It's pay as you go. Reps are responsible for checking inventory or billing. […] You'd see spikes in revenue when reps sell the inventory."** – Former sales manager

55.    The report also alleged that employees were encouraged to backdate revenue, stating in relevant part:

**"The only shady thing is the close of months. Axogen extends the close of the month. They count contracts that went out after the end of the month. Previously end of the month was a relative term [laughing].** Any product delivered for surgery but not invoiced at the end of the month had a stub period to count it in the previous month. **They tried stopping that […] I'm not sure how successful that was.** It's usually 7-10 days into the following month." – Former sales manager

"If I did a case on consignment or shipped for a big case and a train wreck came, and the hospital said ship us seven each of these sizes, we'd bill for whatever they use and ship the rest back. **We had 7 days for purchase orders for procedures into the last month. A lot of channel stuffing is happening. Every month I had one week to shore up purchase orders from the previous month. Seven business days. So if its seven days after Labor Day, I would have had until Sep 13th to clean up August. Always within a day or two, you could sneak a case one way or the other.** Just shipping some of September sales back into August. Or hold the purchase order for September vs. August." – Former sales rep

56.    Several key operating metrics had been overstated to mask the Company's growth. According to the report, total active accounts has been overstated by a factor of ten, and

sales were not growing organically. The report stated, in relevant part:

> However, a former sales rep in a key metropolitan area indicated a potential 10:1 reduction in the number of actual accounts, as in his territory "30 active accounts" were comprised by just 3-5 hospital systems. The rep stated that contracts were at the IDN level, yet the company counted individual sites within the same IDN as separate accounts. (IDN's are "Integrated Delivery Networks" . . .)

> "I had 30 active accounts that ordered regularly or fairly regularly. 5-10 were sporadic. We didn't define what was active. An account is an individual hospital. [A large IDN, name redacted] was 8 hospitals. **There were 3-5 IDN's in my market. All major. They comprised almost all of my 30 active accounts. [...] If I collapsed Axogen's 5-600 accounts like in my territory, [the reduction from accounts to IDN's] would be similar. Even though we have IDN-level agreements, each hospital was its own decision-maker."** – Former sales rep

> • Other former employees pointed to questionable practices around other metrics, particularly around the lack of "same-store" sales growth.

> **"Growth wasn't coming from repeat sales**. It came from expansion like picking up another hospital. The company was spending more than $1 to get $1 of sales. **Sales weren't growing organically** [...] We wanted to mask it. Most of the growth was coming from adding new territories and reps." – Former employee

> **"After 10,000 patients, the company stopped reporting on these numbers publicly."** – Former employee

57.    On this news, the Company's share price fell $6.17 per share, or nearly 22%, to close at $21.36 per share on December 18, 2018, on unusually high trading volume. The share price continued to decline over the course of the next three trading sessions, dropping $1.53 on December 19, 2018, $1.94 on December 20, 2018, and $0.80 on December 21, 2018, to close at $17.09 per share on December 21, 2018. The total decline over the course of these three trading sessions was $4.27, or nearly 20%.

## CLASS ACTION ALLEGATIONS

58.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired AxoGen securities: a) issued in connection with the Company's November 2017 SPO; and/or b) issued in connection with the Company's May 2018 SPO; and/or c) between August 2, 2017 and December 18, 2018, inclusive, and who were damaged thereby

(the "Class").   Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

59.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, AxoGen's common shares actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of AxoGen common stock were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by AxoGen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

60.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

61.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

62.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of AxoGen; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

63.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

64.      The market for AxoGen's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, AxoGen's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired AxoGen's securities relying upon the integrity of the market price of the Company's securities and market information relating to AxoGen, and have been damaged thereby.

65.      During the Class Period, Defendants materially misled the investing public, thereby inflating the price of AxoGen's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about AxoGen's business, operations, and prospects as alleged herein.

66.      At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about AxoGen's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an

unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

67.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

68.     During the Class Period, Plaintiff and the Class purchased AxoGen's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

69.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding AxoGen, their control over, and/or receipt and/or modification of AxoGen's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning AxoGen, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

**(FRAUD-ON-THE-MARKET DOCTRINE)**

70.     The market for AxoGen's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, AxoGen's securities traded at artificially inflated prices during the Class Period.  On July 23, 2018, the Company's share price closed at a Class Period high of $55.90 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of AxoGen's securities and market information relating to AxoGen, and have been damaged thereby.

71.     During the Class Period, the artificial inflation of AxoGen's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about AxoGen's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of AxoGen and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

72.     At all relevant times, the market for AxoGen's securities was an efficient market for the following reasons, among others:

(a)     AxoGen shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, AxoGen filed periodic public reports with the SEC and/or the NASDAQ;

(c)     AxoGen regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the

national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     AxoGen was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

73.     As a result of the foregoing, the market for AxoGen's securities promptly digested current information regarding AxoGen from all publicly available sources and reflected such information in AxoGen's share price. Under these circumstances, all purchasers of AxoGen's securities during the Class Period suffered similar injury through their purchase of AxoGen's securities at artificially inflated prices and a presumption of reliance applies.

74.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

75.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when

made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of AxoGen who knew that the statement was false when made.

**FIRST CLAIM**
**Violation of Section 11 of the Securities Act**
**(Against All Defendants)**

76.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

77.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Defendants.

78.     The Registration Statements for the November SPO and May SPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

79.     AxoGen is the registrant for the November SPO and May SPO.  The Defendants named herein were responsible for the contents and dissemination of the Registration Statements.

80.     As issuer of the shares, AxoGen is strictly liable to Plaintiff and the Class for the misstatements and omissions.

81.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading.

82.     By reasons of the conduct herein alleged, each Section 11 Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

83.     Plaintiff acquired AxoGen shares pursuant and/or traceable to the Registration Statement for the November SPO and/or for the May SPO.

84.     Plaintiff and the Class have sustained damages.  The value of AxoGen common stock has declined substantially subsequent to and due to the Defendants' violations.

**SECOND CLAIM**
**Violation of Section 15 of the Securities Act**
**(Against the Securities Act Individual Defendants)**

85.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

86.     This count is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act.

87.     The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of AxoGen within the meaning of Section 15 of the Securities Act.  The Securities Act Individual Defendants had the power and influence and exercised the same to cause AxoGen to engage in the acts described herein.

88.     The Securities Act Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

89.     By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**THIRD CLAIM**
**Violation of Section 10(b) of The Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**
**(Against AxoGen and the Individual Defendants)**

90.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

91.     During the Class Period, the Company and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase AxoGen's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Company and the Individual Defendants, and each of them, took the actions set forth herein.

92.     the Company and the Individual Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for AxoGen's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  The Company and the Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

93.     The Company and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about AxoGen's financial well-being and prospects, as specified herein.

94.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of AxoGen's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about AxoGen  and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

95.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

96.     The Company and the Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing AxoGen's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by the Company and the Individual Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, these defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

97.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of AxoGen's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Company and the Individual Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Company and the Individual Defendants, but not disclosed in public statements by these defendants during the Class Period, Plaintiff and the other members of the Class acquired AxoGen's securities during the Class Period at artificially high prices and were damaged thereby.

98.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that AxoGen was experiencing, which were not disclosed by the Company and the Individual Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their AxoGen  securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

99.     By virtue of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

100.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**FOURTH CLAIM**
**Violation of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

101.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

102.    The Individual Defendants acted as controlling persons of AxoGen within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various

statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

103.   In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

104.   As set forth above, AxoGen and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)   Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: January 9, 2019                    Respectfully submitted,

                                          */s/ Leo W. Desmond*
                                          Leo W. Desmond, Esquire
                                          Florida Bar Number 0041920
                                          **DESMOND LAW FIRM, P.C.**
                                          5070 Highway A1A, Suite D
                                          Vero Beach, Florida 32963
                                          Telephone: 772.231.9600
                                          Facsimile: 772.231.0300
                                          lwd@desmondlawfirm.com

                                          **GLANCY PRONGAY & MURRAY LLP**

                                          Lionel Z. Glancy
                                          Robert V. Prongay
                                          Lesley F. Portnoy
                                          Charles H. Linehan
                                          Pavithra Rajesh
                                          1925 Century Park East, Suite 2100
                                          Los Angeles, CA 90067
                                          Telephone:  (310) 201-9150
                                          Facsimile:  (310) 201-9160

                                          **LAW OFFICES OF HOWARD G. SMITH**
                                          Howard G. Smith
                                          3070 Bristol Pike, Suite 112
                                          Bensalem, PA 19020
                                          Telephone: (215) 638-4847
                                          Facsimile: (215) 638-4867

                                          *Attorneys for Plaintiff Neil Einhorn*