**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

v. Case No.: 8:19-cv-69-T-60AAS

AXOGEN, INC, KAREN ZADEREJ; PETER J. MARIANI; GREGORY G. FREITAG; JAMIE M. GROOMS; ROBERT J. RUDELIUS; MARK GOLD; GUIDO NEELS; AMY WENDELL; LEERINK PARTNERS LLC; JMP SECURITIES LLC; JEFFERIES LLC; and WILLIAM BLAIR & COMPANY, L.L.C.,

Defendants.
_______________________________________ /

**ORDER GRANTING "DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT"**

This matter is before the Court on "Defendants' Motion to Dismiss the Amended Class Action Complaint," filed on July 22, 2019. (Doc. 74). Plaintiff filed a response in opposition on August 12, 2019. (Doc. 81). This Court held a hearing on the motion on December 4, 2019. (Doc. 102). Upon review of the motion, response, court file and record, the Court finds as follows:

## Background

***Nature of the Case***

This putative class action asserts claims for damages and other relief under the 1933 Securities Act, the 1934 Securities Exchange Act, and Rule 10b-5. Plaintiff is an institutional investor who purchased stock in Defendant Axogen, Inc. ("Axogen"). The other named Defendants are executives and board members of Axogen and underwriters of the stock offerings challenged in this suit. Plaintiff's amended complaint alleges that Defendants in public offering materials and by other means made false or misleading statements relating to the market for Axogen's products.

***Allegations of the Amended Complaint***

Axogen and its Products

Plaintiff's 108-page amended complaint, which includes 330 separately numbered paragraphs, alleges as follows: Axogen Corporation was founded in 2002 as a privately held Florida corporation, and was dissolved and reestablished in 2006 as a Delaware corporation. (Doc. 58 at ¶ 31). After a series of mergers involving an existing public corporation, Axogen emerged. (*Id.* at ¶ 32). Defendant Karen Zederej, who had been CEO of Axogen Corporation, became CEO of Axogen. (*Id.* at ¶ 33). In 2013, Axogen's stock began trading on the NASDAQ. (*Id.* at ¶ 35).

Axogen develops and markets surgical products used in the treatment of peripheral nerve injuries ("PNI"). (*Id.* at ¶¶ 31, 38-39). Axogen's most important product is Avance, a segment of human nerve tissue harvested from human

cadavers and used by surgeons to repair PNIs that involve significant gaps in the nerve. (*Id.* at ¶¶ 36-40). In addition to "allograft" products such as Avance, surgeons may use other products and methods to repair severed nerves, including suturing the nerves, using hollow tube conduits, or using "autografts," which are segments of nerve tissue drawn from elsewhere in the patient's body. (*Id.* at ¶¶ 40-41).

Following its transition to a publicly held company in 2011, Axogen embarked on a program of heavy spending in pursuit of growth. (*Id* at ¶ 43). Its revenues rose, but its expenses rose much faster. (*Id.* at ¶¶ 43-44). By the end of 2016, nine years after introducing Avance, Axogen still operated at a loss. (*Id.* at ¶ 44).

<u>Axogen's Stock Offerings and Representations</u>

Given the nature of the legal issues presented by Plaintiff's 108-page amended complaint and Defendants' motion, it is necessary to set forth the alleged false or misleading statements in some detail here, with further detail set forth in the Court's legal analysis.

Beginning in November 2017, Axogen sought to raise capital from investors by conducting a secondary public offering of its common stock. (*Id.* at ¶ 47). In connection with this effort, Axogen made representations about the market for its products. Axogen referred to a $1.8 to $2 billion market variously as a "market opportunity," "addressable market opportunity," or the "total addressable market" ("TAM"). (*Id.* at ¶¶ 45-46). Axogen based these amounts on, among other things,

its estimates of 900,000 PNI procedures annually, including approximately 700,000 extremity trauma procedures. (*Id.* at ¶ 46). Defendants made these and the other representations to investors, both in public offering materials and by other means, during 2017 and 2018.

In connection with its public offering in 2017, for example, Axogen represented that it believed, based on its estimates, that the TAM for its products was $1.8 to $2 billion, and it estimated the extremity portion of this market, served by its leading product, Avance, was $1.5 billion. (*Id.* at ¶¶ 57-58, 60). Axogen's 2016 10K stated that these estimates were based on several cited sources, specifically a United States Department of Health and Human Services ("HHS") report, an analysis prepared by Kurt Brattain, M.D., and an article by James Noble. (*Id.* at ¶¶ 59-60; Doc. 75-1 at 8). Purporting to rely on these sources, Axogen provided an estimate of the total market, based on estimates of the number of PNI surgeries annually, the portion of those surgeries it could service with its products, and the prices it could charge for its products. (*Id.*).

Plaintiff alleges that Axogen made similar representations regarding the TAM in earnings calls in connection with its filing of quarterly 10Q statements. For example, in an earnings call on August 2, 2017, Zaderej announced a change to Axogen's "addressable market opportunity to $2 billion due to expanded use of the Axogen product portfolio in oral and maxillofacial procedures …" She continued, "We believe this additional application of our product portfolio moves the current

addressable market opportunity to $2 billion in our current markets of trauma, upper extremity, and oral and maxillofacial surgery." (Doc. 58 at ¶ 223).

Zaderej also stated that there "are more than 900,000 nerve repair surgeries annually in the U.S, pointing to a market opportunity of over $2 billion for Axogen's products," and that of the 5,100 centers where these procedures were mostly being performed, 510 had active Axogen accounts. (*Id.* at ¶ 225). "Most of these active accounts," she stated, "are still at an early stage of penetration and provide additional opportunities for growth. As a result, we believe we are just scratching the surface of our available market potential." (*Id.*).

Zaderej stated that Axogen was "building awareness" of its products and "expanding usage" with "early adopter surgeons," and was "excited to be moving towards developing the middle adopters who are the major segment of the nerve repair market." (*Id.* at ¶ 224). She stated that "surgeons are initially cautious adopters for nerve repair products. They typically start with a few cases and wait and see the results." (*Id.*).

In a 2018 call, Zederej stated that Axogen believed it had a "very thoughtful model that shows continued growth for the long term." (*Id.* at ¶ 268). She continued, "So, it is with quite a bit of thought and looking at what we've learned over the last many years in the peripheral nerve repair market that we've put together the guidance and think that would be a good guidance for you in setting your model." (*Id.*).

Axogen made similar statements in presentations at investor conferences. On September 25, 2017, for example, Zederej gave a slide-show presentation claiming that Axogen's target market was $2 billion, and that the extremity portion of the market, addressable by Avance, represented $1.5 billion of this total. (*Id.* at ¶ 229). The presentation asserted that Axogen's market encompassed over 900,000 procedures annually, 719,000 of them involving extremity trauma. (*Id.* at ¶ 230). In support of these statements, Axogen cited the article by James Noble as having been published in 2008, rather than its actual publication date, 1998. (*Id.* at ¶ 232). At a presentation in November 2018, Axogen continued to cite the Noble article, among other sources, but did not cite the HHS report or the Brattain article. (*Id.* at ¶¶ 207, 273).

Plaintiff alleges that the foregoing and other similar representations relating to the TAM in 2017 and 2018 allowed Axogen to raise of more than $170 million from investors. (*Id.* at ¶ 4).

<u>The Seligman Report</u>

On December 18, 2018, Seligman Investments, a "short seller," which stood to gain by a drop in the price of Axogen stock, released a report scrutinizing Axogen's claims and concluding that the market for Axogen's products was a fraction of what Axogen estimated. (*Id.* at ¶¶ 6, 75, 81-91; Doc. 75-3 at 1). The Seligman report "reveal[ed] critical flaws" in Axogen's claims, "based on recent scientific literature, authoritative data sources and extensive interviews with neurosurgeons and former Axogen employees." (*Id.* at ¶ 6).

The Seligman report noted that the Noble article cited by Axogen discussed the number of PNI's at only one regional trauma center in Canada and asserted that the percentage of trauma injuries involving PNI could not be extrapolated from that center to the population of the United States. (*Id.* at ¶ 82). The report noted also that Axogen's calculations had used a PNI prevalence rate (4.76%) that was higher than the 2.8% reported in the Noble article. (*Id.*). The Seligman report relied on "more robust and more recent studies" directly addressing the prevalence of PNI in U.S. trauma patients, reporting significantly lower PNI rates than those relied on by Axogen. (*Id.* at ¶¶ 83, 84-86).

The report also noted that many PNI cases can be repaired without any kind of graft, and in cases where grafts are used, many surgeons prefer to perform autografts rather than allografts using products such as Avance. (*Id.* at ¶ 87). It concluded that many PNI cases were not, in fact, within Axogen's "addressable" market, and that even applying an "aggressive and unrealistic assumption" that allografts could be used in 50% of PNI cases, the TAM for Avance in the trauma market was only $52 million, as compared to the $976 million estimated by Axogen in connection with its 2018 offering. (*Id.* at ¶¶ 60,63 87).

The Seligman report further supported its analysis with interviews of unidentified former Axogen employees, including sales representatives, area sales managers, and executives, as well as distributors and surgeons. These sources expressed opinions that Axogen's market figures were overstated, that there are far

fewer nerve cases than reflected in Axogen's estimates, and that many surgeons were aware of and already used Axogen products. (*Id.* at ¶¶ 89-91).

Following release of the Seligman report, Axogen's stock price declined more than 38 percent over a short period of trading, resulting in investor losses of over $390 million. (*Id.* at ¶ 6).

<u>This Lawsuit</u>

Plaintiff, a retirement system with over $3 billion in assets under management, brought this putative class action on behalf of itself and other purchasers of Axogen stock during the Class Period from August 2, 2017, to December 18, 2018. (*Id.* at ¶¶ 1, 12).

Plaintiff alleges that Defendants misrepresented the size of the market for Axogen's products, pointing to the analysis in the Seligman report. The amended complaint also reflects the opinions of an unidentified "Expert Firm" retained by Plaintiff. (*Id.* at ¶ 69). Based on its review of "authoritative, reliable, and publicly available data," the Expert Firm calculated the "true magnitude of the market" for Axogen's core products in the area of trauma and oral-maxillo facial ("OMF") surgery as only $112 million, or only 5% to 6.9% of the market claimed by Axogen. (*Id.* at ¶¶ 69-70).

The Expert Firm also calculated that Axogen's "serviceable market," the portion that Axogen "might be able to service in light of competition and other circumstances," as being only $56 million or $84 million. (*Id.* at ¶¶ 72-73). The

Expert Firm also found that Axogen's calculations overstated the prices that Axogen "is capable of charging in the medium and long term." (*Id.* at ¶ 77).

The amended complaint also relies on allegations of interviews with a former Axogen sales representative and territory manager, identified only as "CW 1." (*Id.* at ¶ 79). CW 1 opines that Axogen's market claims were unsupported and "pretty farfetched," noting that Axogen's revenues were only a small fraction of the claimed market. (*Id.* at ¶ 80).

Based on the foregoing sources and allegations, the amended complaint asserts that Defendants made a number of false or misleading representations in violation of the Securities Act of 1933 and the Securities Exchange Act of 1934.

In its claims under the 1933 Securities Act, Plaintiff alleges that in public offering materials, Defendants: (1) overstated the size of the market for Axogen's four core nerve repair products, (2) misleadingly claimed that Axogen's market estimates were supported by "legitimate scientific literature and data," specifically the HHS report, the Brattain article and the Noble article, and (3) misleadingly represented that Axogen "could actually service this vast market," despite the limited number of surgeries for which its products were suited as well as competition from other companies and products. (*Id.* at ¶¶ 68, 92, 93-114, 115-121).

In its claims under the 1934 Securities Exchange Act, brought against Axogen and defendants Zederej and Peter Mariani (the "Individual Defendants"), Plaintiff alleges the same misrepresentations described in (1), (2) and (3) above. Plaintiff also alleges that Defendants, in offering materials, earnings calls and

presentations to investors: (4) misrepresented the number of nerve repair surgeries performed annually (including the portion relating to extremity trauma and OMF injury), (5) misrepresented that Axogen was in the "early stages" of penetrating the market, (6) misrepresented that "surgeon caution" was the reason its sales were not greater than they were, (7) misrepresented the price Axogen could charge for its products in the medium and long term, (8) misrepresented that the date of the Noble article was 2008, rather than 1998, and (9) failed to mention that the Brattain article was based on research funded by Axogen. (*Id.* at ¶¶ 228, 232, 237, 238, 242, 246, 251, 254, 256, 261, 266, 271, 275).

<u>The Motion to Dismiss</u>

Defendants have moved to dismiss the amended complaint with prejudice. (Doc. 74). Defendants argue that: (1) the challenged statements are non-actionable statements of opinion and that Plaintiff has failed to allege facts relating to the bases for the opinions sufficient to state a claim under *Omnicare v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015), (2) the challenged statements are forward-looking statements protected by the safe harbor provisions of the Private Securities Litigation Reform Act ("PSLRA"), (3) Plaintiff has failed to plead any material misstatements or omissions because the information on which Plaintiff relies is either unreliable or was already in the public domain, (4) the amended complaint demonstrates the absence of loss causation, (5) the 1933 Securities Act claims are time-barred under the applicable statute of limitation, and (6) the claims under the 1934 Securities Exchange Act fail because Plaintiff has

failed to adequately plead the required level of scienter under the PSLRA. Plaintiff opposes dismissal and has responded to each of these arguments. (Doc. 81).

The Court held a hearing on Defendants' motion on December 4, 2019 (Doc. 102), and the matter is ripe for decision. Because the Court finds Defendants' arguments based on the PSLRA's safe harbor and scienter provisions to be well-taken and require dismissal, the Court will not address Defendants' other arguments, but Defendants may raise them to the extent appropriate in the event Plaintiff files a second amended complaint.

## Governing Legal Standards

### *Standard for Dismissal*

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a). "Although Rule 8(a) does not require 'detailed factual allegations,' it does require 'more than labels and conclusions'; a 'formulaic recitation of the cause of action will not do.'" *Young v. Lexington Ins. Co.*, No. 18-62468, 2018 WL 7572240, at *1 (S.D. Fla. Dec. 6, 2018), *report and recommendation adopted*, No. 18-62468-CIV, 2019 WL 1112274 (S.D. Fla. Jan. 9, 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). In order to survive a motion to dismiss, factual allegations must be sufficient "to state a claim for relief that is plausible on its face." *Twombly,* 550 U.S. at 555. When reviewing a complaint for facial sufficiency, a court "must accept [a] [p]laintiff's well pleaded facts as true, and

construe the [c]omplaint in the light most favorable to the [p]laintiff. *Id.* (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

In cases involving fraud, including securities fraud, Rule 9(b) requires that the complaint state with particularity the circumstances constituting the fraud, setting forth the challenged statements and the documents or oral representations where they were made, their time and place, and the person responsible for them, the content of the statements, how they misled the plaintiff, and what the defendant received as a result of the fraud. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). Rule (9)(b) provides that the complaint may allege intent, knowledge, and other conditions of the defendant's mind generally.

***PSLRA Requirements***

In 1995, Congress enacted the PSLRA as a check on abusive litigation by private parties. *Id.* at 1237-38. The PSLRA, made two changes to the securities laws relevant to Defendants' motion. First, the Act provides a "safe harbor" for forward-looking statements; second, it requires allegations of fact sufficient to support a "strong inference" that the defendant acted with the requisite state of mind or scienter. 15 U.S.C. § 78u-5; 15 U.S.C. § 78u-4(b)(2)(A).

<u>Safe Harbor for Forward-Looking Statements</u>

As the Eleventh Circuit has explained, "Congress enacted the safe harbor provision in order to loosen the 'muzzling effect' of potential liability for forward-looking statements, which often kept investors in the dark about what management foresaw for the company." *Harris v. Ivax Corp.*, 182 F.3d 799, 806 (11th Cir. 1999)

(citing H.R. Conf. Rep. 104-369, at 42 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 741).

The safe harbor provisions, set forth in 15 U.S.C. § 78u-5, define a forward-looking statement to mean, among other things, (A) a statement containing a projection of revenues, income, earnings per share "or other financial items;" (B) a statement of management's plans and objectives for future operations, including plans or objectives relating to the issuer's products or services; (C) a statement of future economic performance; and (D) "any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B) or (C)." 15 U.S.C. § 78u-5(i)(1).

No liability attaches for an alleged untrue statement, whether written or oral, where the statement is forward-looking and one of the following conditions is met: (1) the statement is identified as forward-looking and accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement;" or (2) the statement is immaterial, or (3) regardless of whether any of the foregoing conditions is met, the plaintiff fails to prove that the statement was made with actual knowledge that it was false or misleading. 15 U.S.C. § 78u-5(c)(1).

The Eleventh Circuit has provided guidance for the application of these provisions that is directly relevant here.

First, the Eleventh Circuit in *Harris* held that the PSLRA limits consideration of supposedly false statements to those specified in the complaint, and

that a determination whether an issuer's statements are forward-looking must generally be made on a statement-by-statement basis. *Harris*, 182 F. 3d at 804. While the parties have addressed the statements at issue with a fairly broad brush, *Harris* requires that the Court consider each alleged statement individually.

Second, classifying a statement as forward-looking does not turn on whether the statement is framed grammatically in the present or future tense. *Id.* at 805. Instead, a court must examine the substance of the statement, read in context, the key inquiry being whether its truth or falsity was discernible only after it was made. *Id.* For example, a company's statement that certain problems "*are* now behind us," while grammatically framed in the present tense, inherently involves a prediction of the future that can only be verified after the fact. *Id.*; *see also Ehlert v. Singer*, 245 F.3d 1313, 1318 n.5 (11th Cir. 2001) (fact that statement was in present tense did not render it non-forward-looking where the statement had "forward-looking connotations").

Third, mixed statements that have interwoven forward-looking and present-sense elements are treated as forward-looking. This is true, for example, of the just quoted statement that problems "*are* now behind us." *Id.* The same is true of a statement that a company "*is* certainly very well positioned." *Id.* Both of these statements are deemed forward-looking even though they are framed in the present tense and convey information about the present state of things as well. *See id.*

In *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1329 (11th Cir. 2019), the Eleventh Circuit further discussed statements containing inextricable past or

present and forward-looking elements. As *Carvelli* noted, "It would be illogical to bar forward-looking statements from protection simply because they implicitly communicate information about the present – indeed, many plans and projections are conveyed in just this way." *Id.* Thus, when a forward-looking statement by its nature "rolls in present circumstances," it remains within the safe harbor. *Id.* For example, a statement that the company would "continue to provide strong servicing results" implies that servicing results currently are strong, but also promises to deliver such results in the future. *Id.*

Fourth, where an explanation underlying a forward-looking statement contains a mixture of historical statements and assumptions about the future, and the explanation is alleged to be misleading by omission, the entire explanation is treated as forward-looking. *Harris*, 182 F.3d at 807.

Finally, it should be noted that *Harris* and *Carvelli* affirmed dismissals based on the safe harbor provisions, thereby making clear that safe harbor issues are appropriately considered at the motion to dismiss stage. Indeed, the PSLRA itself provides that the court, on any motion to dismiss under the safe harbor, "shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant." 15 U.S.C. § 78u-5(e).[1]

[1] Courts deciding motions to dismiss securities fraud cases may also take judicial notice of the contents of relevant public documents filed with the SEC. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276-80 (11th Cir. 1999). More generally, courts may consider at the motion to dismiss stage undisputed documents that are central to the complaint. *Harris*, 182 F.3d at 802 n.2 (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997)).

Consistent with this provision, numerous other decisions in this Circuit have applied the safe harbor when ruling on motions to dismiss. *See, e.g., Phil. Fin. Mgt. Plan at San Francisco, LLC v. DJSP Enterp., Inc.*, 572 F. App'x 713, 714-16 (11th Cir. 2014); *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1273-80 (S.D. Fla. 2017); *Barr v. Metria Healthcare, Inc.*, 324 F. Supp. 2d 1369, 1377-83 (N.D. Ga. 2004); *Ehlert v. Singer*, 85 F. Supp. 2d 1269, 1271-75 (M.D. Fla. 1999), *aff'd in relevant part and remanded*, 245 F.3d 1313 (11th Cir. 2001).

Stringent Requirements for Pleading Scienter

A second major change effected by the PSLRA relates to the pleading of scienter – the requisite knowledge or intent required to establish liability. In the typical fraud case, intent and knowledge may be alleged generally, but in securities fraud class actions, the plaintiff must allege facts showing the required scienter and must do so with particularity. 15 U.S.C. § 78u-4(b)(2)(A). The alleged facts must be sufficient to give rise, not merely to a plausible or reasonable inference of scienter, but to a "strong inference." *Id.* The PSLRA pleading requirements for scienter are discussed in more detail below in connection with Plaintiff's claims under the 1934 Act.

## Analysis

### ***Plaintiff's Claims under the 1933 Securities Act***

Plaintiff asserts claims under Sections 11 and 12(a)(2) of the Securities Act. Section 11 provides for liability where a registration statement, including a prospectus, "contained an untrue statement of a material fact or omitted to state a

material fact required to be stated therein or necessary to make the statements therein not misleading …" 15 U.S.C. § 77k(a). Section 11 extends liability to the issuer, the issuer's directors, the underwriters of the offering, and any accountants who prepared or certified the registration statement. *Miyahara v. Vitacost.com, Inc.*, 715 F.3d 1257, 1265 (11th Cir. 2013).

Section 12(a)(2) similarly provides for liability on the part of persons who offer or sell a security by means of a communication "which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading…." *Id.*; 15 U.S.C. § 77*l*(a)(2). Section 12(a)(2) imposes liability for material misrepresentations or omissions in any prospectus or oral communication used to solicit the sale of a registered security and reaches anyone who transfers title to the security and who successfully solicits a purchase. *Miyahara*, 715 F.3d at 1265.

In its claims under the 1933 Act, Plaintiff has identified three allegedly false representations. (Doc. 58 at ¶ 68). For the reasons set forth below, the Court finds these statements to be within the protection of the PSLRA safe harbor provisions.

<u>Forward-Looking Statements</u>

*Market Size*

Plaintiff first and principally challenges the assertions by Defendants that the market or TAM for Axogen's products was $1.8 billion to over $2 billion, that the

market relating to extremity trauma was at least $1.5 billion, and that the market for Avance was $668 and $976 million. (Doc. 58 at ¶¶ 57-58, 63, 68, 92).

These statements regarding the market, read in context, were estimates of the maximum revenue the company might achieve if its sales and marketing efforts were successful (which, as the cautionary statements in Axogen's 10K told investors, might not happen). [2] The notion of a "market" in the context presented here is inherently a future-oriented abstraction of where and to whom goods might be sold, rather than a present, observable fact. *Black's Law Dictionary* defines a market as including "A geographic area or demographic segment considered as a place of demand for particular goods or services, especially *prospective* purchasers of goods wherever they are . . . [or] The *opportunity* of buying and selling goods or services; the extent of economic demand." *Black's Law Dictionary* 1113 (10th ed. 2014) (emphasis added).

The statements as to market size also incorporated underlying estimates of how many PNI and PNI surgeries occur, how many of those "would be" treated, or were "addressable by," Axogen products, and what prices Axogen could charge "in the medium and long term." *See* (Doc. 58 at ¶¶ 57-58, 60, 63, 65, 77, 116, 117, 121). As such, these statements were forward-looking because they involved a "projection of revenues," "plans and objectives of management for future operations," and "a

---

[2] Plaintiff for the most part identifies Axogen's statements regarding the "market" as expressed in dollar terms. *See, e.g.*, (Doc. 58 at ¶¶ 3, 4, 6, 92). To the extent that the alleged false statements of the "market" include statements as to the number of PNI surgeries, those statements are also forward-looking for the reasons discussed below in connection with Plaintiff's claims under the 1934 Securities Exchange Act. *See* (*Id.* at ¶ 46).

statement of future economic performance." 15 U.S.C. § 78u-5(i)(1). Whether these results could be achieved could only be determined to be true or false with the passage of time and the outcome of events. *See Harris*, 182 F.3d at 805.

In *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432 (S.D.N.Y. 2005), the court addressed a similar statement of "market potential" for a medical product used to treat inflammation of the mucosa in the mouth, a condition afflicting chemotherapy patients. *Id.* at 435-36. The manufacturer in a press release stated that, based on estimates of the number of patients afflicted with the condition, "the estimated U.S. oncology market potential for Mucotrol sales are [sic] between $75 million and $300 million per annum and the estimated global market is between $250 million and $ 1 billion per annum." *Id.* at 437-38, 447. The plaintiffs alleged that this "materially overstated" the market for the product, which the plaintiffs estimated to be only $1.2 million. *Id.* at 437-38.

The court held that the statement of market potential was forward-looking and protected by the safe harbor. "Fairly read as a statement of potential revenues Mucotrol might garner, the market potential statement qualifies as a forward-looking statement under the PSLRA, thereby warranting protection as long as it meets one of the three statutory conditions." *Id* at 448;[3] *see also Gregory v. Pronai*

---

[3] Because the *GeoPharma* plaintiffs had failed to allege the defendants made the forward-looking statement with actual knowledge of its falsity, the statement was non-actionable. *Id.* In dismissing the complaint, the court rejected the plaintiffs' argument that at any given point, "market potential of a product is a fixed number – whether or not knowable with certainty," and therefore a statement of historical fact. *Id.* at 448. The only way one could read the market potential statement as being something other than a revenue projection for the specific product in question would be to interpret it as a market estimate for all products that treated the condition, and interpreted that way the plaintiffs had not alleged it to be false. *Id.* Here, Defendants' market estimates are framed as

*Therapeutics Inc.*, 297 F. Supp. 3d 372, 410 (S.D.N.Y.) (company's claims of market potential for drug, which plaintiffs alleged the company knew from internal studies could never be as large as claimed, were forward-looking), *aff'd*, 757 F. App'x 35 (2d Cir. 2018). The same is true here.

Plaintiffs cite *In re QLT Inc. Sec. Litig.*, 312 F. Supp. 2d 526 (S.D.N.Y. 2004), for the proposition that the truth or falsity of a statement is not appropriate for determination on a motion to dismiss. (Doc. 81 at 10 n.11). The *QLT* court also ruled that allegedly false statements regarding the number of macular degeneration patients who could be treated with a particular medical product, which the court characterized as statements "regarding the size of the existing market," were statements that "concern existing facts" and therefore were not forward-looking. *Id.* at 532. The court, however, devoted only one sentence to this ruling, offered no further analysis, and ultimately dismissed the complaint with prejudice on other grounds. *Id.* at 536-37. Accordingly, the Court finds the analysis in *GeoPharma* more persuasive and applicable to the allegations here.

For the reasons set forth above, the challenged statements regarding the market for Axogen's products are forward-looking, and therefore non-actionable if the other requirements for safe harbor protection are met.

*Axogen's Ability to Service the Market*

Plaintiff challenges statements concerning the portion of the market "addressable" by or that "could" or "would" be serviced by Axogen's products, or that

---

estimates for Axogen's products, based on the extent to which they "would address" the relevant medical conditions and on the prices that could be charged by Axogen.

the "market opportunity" was one that Axogen "was capable of actually servicing." (Doc. 58 at ¶¶ 68, 115-121). These statements, too, are forward-looking. The statements are future-oriented estimates of the potential size of Axogen's sales, if its sales and marketing efforts were successful. Plaintiff alleges that Axogen could not sell its products to the extent claimed, due in part to competition it would experience from other surgical procedures and products. (*Id.* at ¶ 118-120). Whether Axogen would achieve its goals and the extent to which it could service the market could only be determined after the fact as events developed.

*Support for Defendants' Market Claims*

Finally, Plaintiff challenges alleged assertions by Axogen that its claims concerning the size of the market were supported by "legitimate scientific literature and data." (*Id.* at ¶ 68). Plaintiff alleges this assertion was false because the documents cited by Defendants (the HHS report, the Brattain article, and the Noble article) do not support Defendants' market claims. (*Id.* at ¶¶ 68, 93-114).

Axogen's filings, however, did not expressly state that these documents constituted "scientific literature and data" or that they "support" or "reasonably" support Axogen's claims. Axogen simply stated that its estimates were "based on" the cited materials, without any express statement as to how or what extent Axogen relied on them. *See* (*Id.* at ¶¶ 59, 65; Doc. 75-1 at 8). Plaintiff does not allege that Axogen did not, in fact, rely on these sources, but that the sources do not support Axogen's claims and that Axogen could not reasonably rely on them. *See* (*Id.* at ¶¶ 93, 101, 132). Any implied assertion by Axogen regarding the nature of the sources

or how they support the market estimates was inextricably interwoven with and inseparable from the forward-looking estimate itself. *See, e.g.*, *Carvelli,* 934 F.3d at 1329 (statement that company would "continue to provide strong servicing results" was forward-looking notwithstanding the implied representation that servicing results currently are strong).

If such implied statements were actionable, then the PSLRA's protections for forward-looking statements would be gutted. That result would "hamper the communication that Congress sought to foster." *Harris*, 182 F.3d at 806-07. As such, the Court finds the citations to these sources, and any implied representation as to the "support" they afford for Axogen's market estimates, to be forward-looking.

<u>Cautionary Statements</u>

Forward-looking statements cannot give rise to liability if (1) the statements were identified as forward-looking and accompanied by appropriate cautionary language, or (2) were immaterial, or (3) the plaintiff fails to plead the statements were made with actual knowledge of their falsity. 15 U.S.C. § 78u-5(c)(1).

It appears undisputed that Axogen identified the statements as forward-looking. In sections titled "Forward-Looking Statements" at the outset of the 10K for 2016 and the 10K for 2017, Axogen stated that the 10Ks would contain forward-looking statements and that such statements would be identified for the reader by words such as "believe" or "estimates," and "may include, without limitation, statements regarding… our growth … product potential … financial performance, sales growth, product adoption [and] market acceptance of our products." (Docs. 75-

1 at 4; 75-2 at 4). The specific statements challenged by Plaintiff are identified by such language. *See, e.g.*, (Docs. 58 at ¶¶ 57, 58, 60, 65; 75-1 at 8).

Further, the safe harbor statement at the outset of each of the 10K's advised that such forward-looking statements should be viewed with caution and in the context of specific risks set forth in the 10K. (Doc. 75-1 at 4). These risks included:

- Axogen had not achieved positive cash flow from operations and whether this would change would depend on increasing sales of its products, which might not be achievable. Sales might not increase as anticipated and Axogen might not be able to increase sales to existing customers or attract new customers.

- Market acceptance would depend on Axogen's ability to show its products are an attractive alternative to existing nerve reconstruction treatment options, which turns on surgeon evaluations; a small portion of medical community has lingering suspicions.

- Axogen might not be able to manage and sustain future growth plans or scale operations. Its business was unproven on a large scale; it might not be able to avoid reduction in prices in order to achieve sales.

- Technological change could reduce demand for its products, which compete with autographs and other treatments that a significant number of practitioners prefer.

*See* (*Id*. at 37-41).

To protect forward-looking statements, accompanying cautionary language need not warn of the specific factor that ultimately causes the forward-looking statement not to come true, such as the alleged overstatement of the size of the potential market in this case. *Harris*, 182 F.3d at 807. It need only warn of "risks of a significance similar to that actually realized," such that the investor is

sufficiently on notice of the danger of the investment to make an intelligent decision about it according to his or her own preferences for risk and reward. *Id.*

Axogen's detailed identification of risks meets this standard. Axogen pointed out that it had not achieved profitability and warned that its sales and marketing strategies might be unsuccessful, for reasons that included competition from other products and procedures and the need for Axogen to reduce prices to achieve sales. These are among the specific problems with Axogen's estimates alleged in the amended complaint.

Actual Knowledge of Falsity

Alternatively, regardless of whether the cautionary statements were sufficient, Plaintiff has not pled Defendants' actual knowledge that the statements were false or misleading as required by the PSLRA. *See* 15 U.S.C. § 78u-5(c)(1). In fact, Plaintiff expressly disclaims any allegation of fraud or intentional misconduct for purposes of its 1933 Act claims. (Doc. 58 at ¶ 11). For the same reasons discussed below in connection with Plaintiff's allegations of scienter for purposes of the 1934 Act, Plaintiff has pled no facts in this claim supporting the required "strong inference" of actual knowledge.[4]

---

[4] As Plaintiff correctly notes (Doc. 81 at 9), the 1933 Act does not generally require scienter be proven in order to establish liability. The PSLRA, however, requires proof of actual knowledge of falsity even for claims under the 1933 Act where, as here, the challenged statements are forward-looking. *Ehlert*, 85 F. Supp. 2d at 1274. Plaintiff, therefore, must satisfy the "strong inference" pleading standard with respect to Defendants' actual knowledge to plead its claims under the 1933 Act. *Id.*; *see also Harris v. Ivax Corp.*, 998 F. Supp. 1449, 1452 (S.D. Fla. 1998), *aff'd*, 182 F.3d 799 (11th Cir. 1999).

Accordingly, Counts I through IV of the amended complaint, brought under the 1933 Securities Act, fail to state a claim.

***Plaintiff's Claims under the 1934 Securities Exchange Act***

In Count V, Plaintiff alleges a claim under Section 10(b) of the 1934 Securities Exchange Act and Rule 10b-5. (Doc. 58 at ¶¶ 103-06). In Count VI, Plaintiff asserts a claim under Section 20 of the Securities Exchange Act against defendants Zederej and Mariani as "controlling persons" based on the underlying Section 10(b) and Rule 10b-5 violations. (*Id.* at ¶¶ 323-28).

A claim for violation of section 10 and Rule 10b-5 requires pleading of: (1) a material misrepresentation or omission; (2) scienter, (3) connection with a purchase or sale of security; (4) reliance, (5) economic loss; and (6) a causal connection between the misrepresentation or omission and the loss. *Mizzaro*, 544 F.3d at 1236-37.

Claims under the 1934 Securities Exchange Act are additionally governed by the PSLRA's safe harbor relating to forward-looking statements and by its requirement that the plaintiff allege facts giving rise to a strong inference of the required scienter.

<u>Forward-Looking Statements</u>

The amended complaint's allegations of false statements under the 1934 Act overlap in part with those alleged under the 1933 Act. While the 1933 Act claims are based on statements made in offering materials, the 1934 Act claims include allegations of additional statements made in "earnings calls" with stock analysts

and in presentations to investors. Beginning with the three statements also included in Plaintiff's claims under the 1993 Act, the Court will examine each of the challenged statements, as required by *Harris* and *Carvelli*, to determine whether the statement is forward-looking. With respect to certain statements, the Court will also address the extent to which they are alleged to be false and whether they are material.

*Market Size*

Plaintiff's claims under the 1934 Act challenge various statements by Defendants relating to the size of the market for Axogen's products. The challenged statements include the same market estimates alleged in Plaintiff's 1933 Act claims. *See* (Doc. 58 at ¶¶ 57-61, 63-66, 238, 255-56). They also include additional statements similarly asserting that there was a "market opportunity" or "addressable market opportunity" or "target market" of more than $2 billion overall for Axogen's products (*Id.* at ¶¶ 223, 225, 228, 229, 232, 233, 237, 239, 241-42, 243, 245-46, 247, 250-51, 255, 257, 260, 261, 263, 265-66, 270-71, 273-75), of $1.5 billion for extremity trauma (*Id.* at ¶¶ 229, 232, 243, 247, 257), and of $668 million or $976 million for Avance. (*Id.* at ¶¶ 60, 65, 229, 238, 239, 243, 246, 256).

For the same reasons discussed above regarding Plaintiff's claims under the 1933 Act, these statements regarding the size of the market alleged under the 1934 Act are forward-looking.

*Support for Defendants' Market Claims*

The same is true for Plaintiff's allegations that Defendants "falsely represented that the Company's claims were based on a reasonable interpretation and application of the findings" of the Noble article, the Brattain article, and the HHS report. (*Id.* at ¶¶ 232, 238, 242, 246, 251, 261). These are forward-looking for the same reasons discussed above under the 1933 Act.

*Axogen's Ability to Service the Market*

Plaintiff alleges under the 1934 Act that Defendants represented that Axogen "could service" or "could actually service" or "would address," the large markets Axogen claimed. (*Id.* at ¶¶ 232, 242, 261, 275). These statements are virtually identical to those challenged by Plaintiff in its 1933 Act claims and are forward-looking for the reasons discussed above.

*Prices Axogen Could Charge*

Plaintiff alleges that Axogen's market estimates relied on "prices that the Company could not charge in the medium and long term." (*Id.* 58 at ¶¶ 228, 232, 275). Whether Axogen could, "in the medium and long term," charge the prices on which it based its forward-looking TAM calculations could only be determined with the passage of time. *See Harris*, 182 F.3d at 805. Accordingly, to the extent Axogen's "reliance" on certain prices in creating its estimates constitutes a false or misleading "statement," it is forward-looking.

*Stage of Market Penetration*

The same is true for the statement that Axogen was in the "early" stages of market penetration. (Doc. 58 at ¶¶ 221, 228, 232, 237, 242, 246, 251, 254, 261, 266, 271). As Plaintiff itself alleges in the amended complaint, such statements are simply the "logical corollary" of the estimated size of the total market opportunity and the undisputed fact that Axogen's revenues were only a fraction of the total market. (*Id.* at ¶ 221). Whether Axogen's growth was in its early stages, or had already peaked, could only be determined with the passage of time. Consequently, these statements are forward-looking.

*Number of PNI Surgeries*

Plaintiff alleges that Defendants, in explaining the "market opportunity," overstated the number of PNI and extremity trauma surgeries in the United States each year, estimating approximately 900,000 PNI surgeries and over 700,000 extremity trauma surgeries. (*Id.* at ¶¶ 225-226, 228, 229-32, 234, 237, 240, 242, 243, 245-46, 249-51, 252, 254, 258-61, 263, 266, 271, 273, 275). For example, the November 2017 prospectus stated, "We believe that, each year in the United States, more than 1.4 million people *suffer* traumatic injuries to peripheral nerves, *resulting in* over 700,000 extremity nerve repair procedures." (Doc. 58 at ¶¶ 57, 238) (emphasis added). At an earnings call on April 30, 2018, Zederej stated, "There *are* more than 900,000 nerve repair surgeries annually in the U.S., pointing to a market opportunity of over $2.2 billion for Axogen's products." (*Id.* at ¶ 252) (emphasis added). Various statements asserted that Axogen's product portfolio

"addresses" over 900,000 nerve repair procedures. (*Id.* at ¶¶ 231, 250, 251, 260, 271, 273). Slides presented to investors titled "Current Targeted Nerve Markets" referred to "[o]ver 900,000 Procedures Annually in U.S." (*Id.* at ¶¶ 229, 239, 247, 257). One slide stated that "U.S. procedural estimates remain > 900,000." (*Id.* at ¶¶ 206, 273).

These statements were not framed in the past tense, and so they did not literally and grammatically refer to observable historical facts. At the same time, while framed grammatically in the present tense, they did not refer to observable facts in existence at the point in time they were made, in contrast to, for example, statements as to the content of the company's current balance sheets. *Cf. Harris*, 182 F.3d at 806 (statement that customer "filed a Chapter 11 bankruptcy petition" was not a forward-looking statement or assumption about the future, but an observable, known fact).

Instead, these statements are predictive or forward-looking in nature, referring to the number of PNI surgeries that could be expected to happen in the current annual period and in years going forward. *See Ehlert*, 245 F.3d at 1318 n.5 (statement framed in present tense had "forward-looking connotations"). To be sure, these statements imply the existence of past experience or data supporting the prediction, but this implied basis is subsumed into and interwoven with the prediction. As discussed above, such mixed statements are forward-looking. *See Carvelli,* 934 F.3d at 1329.

*Surgeon "Caution"*

Plaintiff alleges that Defendants stated orally "We find that surgeons are initially cautious adopters for nerve repair products. They typically start with a few cases and then wait and see the results." (*Id.* at ¶¶ 234, 235, 252, 262). Similarly, in its 2016 and 2017 10K filings, Axogen stated: "We have experienced that surgeons initially are cautious adopters for nerve repair products. Surgeons typically start with a few cases and then wait and review the results of these initial cases." (Docs. 75-1 at 60; 75-2 at 63; 58 at ¶¶ 238, 244). Plaintiff alleges Defendants misleadingly offered these statements as "the reason the Company had not penetrated the non-existent multi-billion dollar market." *See, e.g.*, (Doc. 58 at ¶ 228).

The oral version of these statements is framed in the present tense ("We find"), but in context its sense would appear to be the same as the written version from Axogen's 10K filings, which is framed in the past (perfect) tense ("We have experienced . . ."). As such, both most naturally refer to Axogen's past experience. In other words, "We find" means "We have found."

This is further confirmed by the context in which these statements appear. In the oral version, the statements follow reports of Axogen's success in "building awareness of advances in peripheral nerve repair and expanding usage of our products with innovator and early adopter surgeons" and having "developed some level of product reorder" with active accounts, which are "usually past this wait

period." (*Id.* at ¶ 262). The "cautious adopter" sentences appear to explain why Axogen has, in the past, had success "expanding usage" with existing accounts.

Similarly, the written statements in Axogen's 10K filings, read in context, purport to explain why Axogen's increase in sales revenue from 2015 to 2016 and from 2016 to 2017 was attributable more to increased activity in existing accounts than to the addition of new accounts. Axogen's 2016 10K stated:

> . . . AxoGen revenues increased in 2016 compared to 2015 primarily as a result of revenue growth in active accounts, and to a lesser extent, the development and growth of new accounts.
>
> *We have experienced that surgeons initially are cautious adopters for nerve repair products. Surgeons typically start with a few cases and then wait and see the results of these initial cases.* Active accounts are usually past this wait period and have developed some level of product reorder. These active accounts have typically gone through the committee approval process, have at least one surgeon who has converted a portion of his or her treatment algorithms of nerve repair to the AxoGen portfolio and are ordering AxoGen products as least six times in the last 12 months.
>
> *As such, revenue growth primarily occurs from increased purchasing for active accounts, followed by revenue growth from new accounts.* Each new period of measurement is thus benefited from growth in active accounts which may include those that were new accounts in the prior measurement period. AxoGen has continued to broaden its sales and marketing focus which is expected to have a positive contribution to its revenue growth in the long term. In 2016 revenue growth exceeded the growth in expenses, demonstrating improved productivity of our commercial strategy.

(Doc. 75-1 at 60) (emphasis added); *see also* (Doc. 75-2 at 63). In short, the statements about "surgeon caution" were not forward-looking, since they were offered to explain financial results in the preceding year or to explain the relative success Axogen had already experienced in expanding usage by existing accounts.

The context for these statements, however, presents a different problem for the sufficiency of the amended complaint. Plaintiff does not assert that the statements regarding Axogen's experience of surgeon caution, taken on their own merits, were false. In other words, Plaintiff does not assert that Axogen's actual experience with surgeon adoption of its products was not accurately represented in these statements. Rather, Plaintiff alleges the statements were misleading because they were offered as "the reason the Company had not penetrated the non-existent multi-billion dollar market." (Doc. 58 at ¶ 228). As quoted above, however, the statements as they appear in Axogen's 10K filings were not offered for that purpose, but as an explanation of why revenue growth in the previous year had occurred more with existing accounts than new accounts.

The same is true of the alleged oral statements, which mirror the statements in the 10K filings. Given Zederej's reference to "expanding usage" by "early adopters," and to Axogen's excitement "to be moving towards the middle adopters," the "caution" language appears to describe why expanded usage had occurred more in the "early adopter" than the "middle adopter" category, but not as an explanation why Axogen had failed to penetrate the assertedly large market more than it had.

Accordingly, based on Plaintiff's allegations quoting the statements and on the documents in which they appear, these statements were not offered for the purpose Plaintiff alleges renders them false or misleading. To the extent, however, that Plaintiff argues the statements were false or misleading because the context in

which they appeared implied support for forward-looking statements regarding the size of the market, the Court finds them to be forward-looking because the situation is analogous to that presented in *Harris*. *Harris* held that where an explanation underlying a forward-looking statement contains a mixture of historical statements and assumptions about the future, and the explanation is alleged to be misleading by omission, the entire explanation is treated as forward-looking. *Harris*, 182 F.3d at 807. To hold otherwise, the Eleventh Circuit explained, would "inhibit corporate officers from fully explaining their outlooks," which would create a "muzzling effect," and "hamper the communication that Congress sought to foster." *Id.* at 806-07.

Here, Plaintiff does not allege the statements regarding surgeon caution to be false on their own, but to be misleading due to the context in which they appear as part of the explanation underlying a forward-looking projection, along with other forward-looking assumptions and statements. The explanation as a whole should therefore be treated as one forward-looking statement, notwithstanding the historical nature of the statements regarding surgeon caution. *See Harris*, 182 F.3d at 807. Accordingly, if other requirements for safe harbor protection are met, the statements regarding surgeon caution are non-actionable.

*Date of Noble Article*

Plaintiff points to several instances in which the Noble article was cited as having been published in 2008, rather than 1998. (Doc. 58 at ¶¶ 178, 232, 251, 261). Defendants assert that this was a one-time "mix-up" in a single slide deck

(Doc. 74 at 30 n.16), but that fact does not appear in the amended complaint. Regardless, a citation to a source such as this, offered in support of forward-looking market estimates, is inextricably interwoven with the forward-looking statements and as such protected by the safe harbor, for the same reasons discussed above.

Moreover, Axogen's 10Ks correctly identified the article's date as 1998, and the article itself bears the date of its publication. *See* (Docs. 75-1 at 8; 75-6). In the context of the overall forward-looking nature of the other statements and the other information available to investors, these incorrect citations cannot be regarded as material. As a matter of law, it cannot be said that "in light of the facts existing at the time, a reasonable investor in the exercise of due care would have been misled," or that there was a "substantial likelihood" that "a reasonable investor would have viewed the misrepresentation or omission as significantly alter[ing] the total mix of information made available." *Carvelli*, 934 F.3d at 1317 (internal quotation and citation omitted).

*Funding of Brattain Article*

Finally, Plaintiff alleges that Defendants cited the Brattain article in its 10K filings to support its market estimates, but omitted to state that the research reflected in the article was funded by Axogen. (Doc. 58 at ¶¶ 238, 246). The Court finds this statement to be non-actionable for several reasons.

First, *the Brattain article itself stated on its first page that the research it reflected had been funded by Axogen.* (Doc. 75-5 at 2). This alleged omission is therefore immaterial. Second, citation to an article supporting Axogen's forward-

looking market estimate is inextricably interwoven with the forward-looking estimate itself, and therefore protected under the safe harbor. Third, where an explanation with forward-looking and historical elements is alleged to be misleading by omission, the entire explanation is treated as one forward-looking statement. *See Harris*, 182 F.3d at 807. That is the case here. The citation to Brattain is alleged to be part of an explanation supporting Defendants' forward-looking market estimates, and as such should be treated as part of one forward-looking statement.

Other Safe Harbor Requirements

Forward-looking statements are not actionable if they are identified as such and accompanied by the required cautionary language, or the statements are immaterial, or they were made without actual knowledge of their falsity. Some of the foregoing forward-looking statements alleged under the 1934 Act were set forth in Axogen's offering materials and incorporated 10K filings. Those were accompanied by the same cautionary language which the Court found to be meaningful and sufficient in connection with Plaintiff's claims under the 1933 Act. The Court finds them to be sufficient here as well.

Most of the alleged statements challenged in Plaintiff's 1934 Act claims, however, were made not in 10K filings, but orally in calls with analysts and in presentations to investors. Plaintiff has not alleged the statements made in these different contexts were identified by Defendants as forward-looking or accompanied

by cautionary language, and Defendants have not supplied documentation showing that they were.

Regardless of any cautionary language, however, such statements are not actionable if they were immaterial or if they were made without actual knowledge they were false. In contrast to Plaintiff's claims under the 1933 Act, Plaintiff alleges as a conclusion, for purposes of the 1934 Act, that the Axogen executives responsible for the statements knew that they were false and misleading. (Doc. 58 at ¶ 308). But for the same reasons discussed below in connection with the scienter required under the 1934 Act, there are no allegations of *fact* from which the required "strong inference" of actual knowledge can be drawn.

Scienter for Claims Under 1934 Securities Exchange Act

Under controlling Eleventh Circuit precedent, the element of scienter requires a showing of either an intent to deceive, manipulate, or defraud or "severe recklessness," which requires more than mere simple or even inexcusable negligence. *Mizzaro*, 544 F.3d at 1239.[5] It is limited to those highly unreasonable omissions or misrepresentations that involve "an extreme departure from the standards of ordinary care and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* (quoting *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1282 n.18 (11th Cir. 1999)).

[5] As discussed above, to the extent that the challenged statements are forward-looking, the PSLRA elevates the scienter requirement to one of "actual knowledge," which is not met for all the same reasons discussed herein.

The PSLRA was enacted to curb abusive litigation practices by private parties. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). To achieve that goal, the Act imposed "exacting pleading requirements" under which the complaint must state with particularity not only the facts constituting the alleged violation, but also facts evidencing scienter, *i.e.,* the defendant's intention "to deceive, manipulate, or defraud." *Id.*; *Hubbard v. Bankatlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1283 (S.D. Fla. 2008) (describing PSLRA pleading requirements as "demanding").

Under the PSLRA, a plaintiff cannot "plead the requisite scienter element generally." *Brophy v. Jiangbo Pharm., Inc.,* 781 F.3d 1296, 1302 (11th Cir. 2015). Instead, the complaint must "with respect to each act or omission alleged to violate [the Securities Exchange Act], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). To allege facts creating the required "strong inference," it is insufficient "that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind." *Tellabs*, 551 U.S. at 314. Instead, the inference must be "powerful or cogent" or "powerful to demonstrate or convince." *Id.* at 323. And it must be "at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314.

To enforce these requirements, a court deciding a motion to dismiss must compare the reasonable inferences that could be drawn in the plaintiff's favor with "plausible, nonculpable explanations for the defendant's conduct." *Id.* at 324. In

doing so, the court must consider the complaint in its entirety but may also look to other sources permissibly examined in deciding a motion to dismiss, such as documents incorporated into the complaint by reference and matters appropriate for judicial notice. *Id.* at 322. "[O]missions and ambiguities count against inferring scienter." *Id.* at 326.

Here, the amended complaint attempts to plead the requisite scienter in paragraphs 276 to 293. Under the stringent standards set forth above, however, it fails to allege sufficient facts to show scienter as to any of the statements alleged to be fraudulent.

*Individual Defendants' Involvement*

Plaintiff first alleges that the Individual Defendants personally participated in making the statements in question. (Docs. 58 at ¶¶ 277-81; 81 at 23). While these allegations, to be sure, connect the individuals to the statements in question, they do nothing to suggest they knew the statements were false. Similarly, Plaintiff asserts that the Individual Defendants repeatedly stated that they had a "sound" basis for their claims based on "seemingly reputable authorities" and had given the company's model "thoughtful" consideration. (*Id.* at ¶¶ 282-84; Doc. 81 at 23). Once again, these allegations have little relevance to whether Defendants knew or recklessly disregarded the alleged falsity of the claims.

*Importance of the TAM*

The same is true for Plaintiff's allegation that the TAM was important to Axogen's operations and growth strategy, as well as to investors. (Docs. 58 at ¶ 286; 81 at 23-24). While that fact might establish that the representation was material or provide a motive for Defendants to assert that the TAM was quite large, it does not support a "strong inference" of scienter required by the PSLRA. Plaintiff's allegations of the Individual Defendants' involvement and the importance of the TAM are at most akin to allegations of "motive and opportunity" to defraud, which the Eleventh Circuit has held insufficient, without more, to allege scienter. *Bryant*, 187 F.3d at 1285-86.

*Confidential Witness Opinions*

Plaintiff alleges that CW1, allegedly a sales representative and then a territory manager, was aware of the "hidden truth" that the company's market was "a fraction" of what Axogen was claiming. (Doc 58 at ¶ 285). Plaintiff argues this allegation supports the inference that "it was known or should have been known, by the superiors in CW1's reporting chain – including Defendant Zaderej." (*Id.*). But allegations that Zederej "should have known" are consistent with mere negligence, and Plaintiff alleges no specific *facts* to show that the views of this witness were actually reported up the "chain" or otherwise reached the Individual Defendants or others in senior management. *See, e.g.*, *Henningsen v. ADT Corp.*, 161 F. Supp. 3d 1161, 1200 (S.D. Fla. 2015) ("[C]onfidential witness allegations, to be accorded much weight, must 'flesh out at least some of the details of the conversations, meetings

and internal documents they describe'"), *aff'd sub nom. IBEW Local 595 Pension & Money Purchase Plans*, 660 F. App'x 850 (11th Cir. 2016).

The amended complaint here does not allege even generally that Defendants were confronted by contrary estimates of the TAM or evidence contrary to the other statements challenged by Plaintiff, much less provide details of conversations, meetings or internal documents. *See Mizzaro*, 544 F.3d at 1247-54 (complaint did not sufficiently plead facts showing that purported complaints by whistleblowers or vendors actually came to the attention of senior management, and no suspicious stock sales were alleged). Therefore, Plaintiff's allegations as to CW1 fail to support a strong inference of scienter.

*Flaws in Defendants' Market Estimates and Sources*

This same fundamental problem undercuts any inference of scienter based on the size of the "discrepancy" between the company's market claims and the "truth" shown by the analyses of Plaintiff's Expert Firm and Seligman. (Doc. 58 at ¶ 287). There are no allegations that the analysis of the Plaintiff's Expert Firm or Seligman, or similar data or analyses, were actually presented to Defendants. *See, e.g.*, *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 791 (11th Cir. 2010) (complaint failed to set forth facts showing that defendants ignored "red flags" that accounting standards were being violated); *Mulvaney v. Geo Group, Inc.*, 237 F. Supp. 3d 1308, 1324 (S.D. Fla. 2017) (complaint lacked particular allegations as to what information the individual defendants actually received; plaintiff failed to allege the content of communications to management regarding

"problems" allegedly brought to management's attention); *Hubbard*, 625 F. Supp. 2d at 1287-88 (complaint failed to allege the precise content of information brought to the attention of corporate executives).

Plaintiff alleges that even a "cursory review" of the article itself reveals the shortcomings of its analysis because it was not published in a peer-reviewed journal, the author is not a "neurosurgeon" or a "certified" statistician, and it lacks many indicia of "legitimate scientific research." (Doc. 58 at ¶ 288). The article, however, identifies Brattain as a "data scientist/statistician" (although it contains no references to "certification"), and Plaintiff pleads no facts showing that this identification was false and that Defendants knew or recklessly disregarded that it was false.

Plaintiff's assertion of the flaws and weaknesses in the Brattain analysis and the lack of indicia of reliability similarly fall short because they do not show that Defendants were presented with information calling these flaws to their attention but consciously or recklessly disregarded them. Expert witnesses are frequently excluded from testifying in court because they lack the proper qualifications or employ an unreliable methodology. That does not by itself support an inference that the party proffering the expert knew or recklessly disregarded the fact that the expert was unqualified or unreliable.

While Defendants cited the Brattain article without simultaneously indicating that it was funded by Axogen, the fact that the article itself states that it was funded by Axogen renders the omission immaterial and undercuts any

inference that Defendants were aware or recklessly disregarded that the omission was misleading. *See, e.g., In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012) (disclosure of data and methodology underlying statements was inconsistent with intent to defraud); *Waterford Township Gen. Employees Retirement Sys. v. Suntrust Banks, Inc.*, No. 1:09-CV-617-TWT, 2010 WL 3368922, at *4 (N.D. Ga. Aug. 19, 2010) (implausibility that alleged fraud would go undetected undercut inference of scienter).

*Stock Sales*

Defendant Zederej sold 25,000 shares of Axogen stock during the Class Period. (Doc. 58 at ¶ 289). When determining whether stock sales are suspicious, courts look at factors such as the percentage of holdings sold by a defendant, the number of defendants who sold stock, and the difference between stock sales during the relevant time period and prior trading activity. *See, e.g.*, *Plymouth Cty. Retirement Sys. v. Carter's Inc.*, No. 1:08-cv-02940-JOF, 2011 WL 13124501, at *25 (N.D. Ga. Mar. 17, 2011) (citing *Druskin v. Answerthink, Inc.*, 288 F. Supp. 2d 1307, 1335-36 (S.D. Fla. 2004); *In re John Alden Fin. Corp. Sec. Litig.*, 249 F. Supp. 2d 1273, 1282 (S.D. Fla. 2003)); *see also Edward J. Goodman,* 594 F.3d at 793 (trades are only relevant to scienter when they are suspicious, which requires allegations of the insider's prior trading history).

The amended complaint lacks allegations regarding Zederej's prior trading history, other than that the trades were not made pursuant to a 10b-5 trading plan, but even this allegation is offered only on "information and belief," with no reference

to specific information supporting that belief. (Doc. 58, at ¶ 289). Nor does Plaintiff allege what percentage of Zaderej's stock the 25,000 shares constituted, or whether defendant Mariani or any other executives sold any shares during the same period. *See Hubbard*, 625 F. Supp. 2d at 1287-88 (inference of scienter from insider stock sales was diminished by the fact that shares sold represented only a fraction of individual defendants' holdings, and they exercised options that resulted in a substantial net increase in holdings during the class period); *Dillard v. Platform Specialty Prods. Corp.*, No. 16-cv-80490-MIDDLEBROOKS, 2016 WL 10586301, at *9 (S.D. Fla. Dec. 8, 2016) (plaintiffs failed to allege the defendant CEO's history of trading or the percentage of shares he sold to place stock sale into context). Once again, these omissions count against an inference of scienter.

*Executive Resignations*

Finally, Plaintiff points to the resignation of two members of Axogen's senior management following the end of the Class Period and "revelation of the truth regarding Axogen's market size" – Chief Commercial Officer John Gingrich and Senior VP of Sales Shawn McCarrey. Neither of these individuals is a defendant or accused of specific wrongdoing, and Plaintiff offers no facts regarding these two departures that would suggest a connection to the Seligman report or to the alleged fraud. *See* (Doc. 58 at ¶ 290-91). As such, no inference of scienter can be drawn

from these two resignations. *Dillard*, 2016 WL 10586301, at *8 (resignations of two individuals were not suspicious where the complaint lacked allegations tying them to the fraud).

Plaintiff correctly points out that allegations of scienter must be judged in the aggregate, rather than piecemeal. (Doc. 81 at 22). Here, "we simply have no substantial allegations to aggregate." *Edward J. Goodman*, 594 F.3d at 793. In short, the allegations of particularized fact here do not suggest an inference of scienter that is "cogent," nor one that is at least as strong as the competing inference that – assuming Plaintiff is correct as to the TAM and other matters asserted in the amended complaint – the Defendants were simply negligent in making the statements they did.

The cases cited by Plaintiffs do not suggest otherwise; each is distinguishable. *Phillips v. Scientific-Atlanta, Inc,* 374 F.3d 1015 (11th Cir. 2004), principally addressed whether a complaint's allegations relating to scienter are to be considered in the aggregate, a point which is not in dispute here. While the Eleventh Circuit affirmed a district court ruling that the allegations of scienter in that case were sufficient, the specific allegations and reasons for affirmance are not discussed. Plaintiff cites *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 783 (9th Cir. 2008), for the proposition that important matters relating to company operations

are presumed to be known to its top management. That case, however, also notes where a complaint "does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard." *Id.* at 784. That is precisely the case here.

Plaintiff's other cited authorities fare no better. *See In re Flowers Foods, Inc. Sec. Litig.*, No. 7:16-CV-222, 2018 WL 1558558, at *13-14 (M.D. Ga. Mar. 23, 2018) (complaint alleged that the defendants ignored red flags and express warnings that went to the truth of the challenged representations and further attempted to conceal the problems); *Owl Creek I, L.P. v. Ocwen Fin. Corp.*, No. 18-80506-CIV-BLOOM/REINHART, 2018 WL 4844019, at *9-11 (S.D. Fla. Oct. 4, 2018) (company's top executives had received reports of a scheme to backdate notices of foreclosure being sent to borrowers); *Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009) (complaint alleged behind-the-scenes admissions by company executives and documentary evidence showing management's awareness of the falsity of representations). The complaints in these cases included the very type of specific factual allegations missing here.

In short, the PSLRA dictates that the motion to dismiss be granted unless facts are pled from which the inference of intent to defraud or severe recklessness is cogent and at least as compelling as the inference there was no such intent. That requirement is not met here as to the Individual Defendants, nor does Plaintiff

allege facts showing scienter on the part of other Axogen agents. Accordingly, no scienter can be imputed to Axogen itself. *See Mizzaro*, 544 F.3d at 1254-55.

For the reasons discussed above, Count V for violation of the 1934 Securities Exchange Act must be dismissed. Since there is no primary violation, Count VI, which asserts "control person" liability against the Individual Defendants, must also be dismissed. *Id.* at 1237, 1255.

## **Conclusion**

Under established law, plaintiffs are required to satisfy "exacting pleading requirements" in cases such as this. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Plaintiff's amended complaint is due to be dismissed for failure to satisfy the PSLRA safe harbor and scienter provisions and the other matters discussed above. Defendants have raised additional arguments for dismissal that have not been addressed. The Court will not address these arguments here because the points discussed above mandate dismissal, and this Order is already lengthy. Neither Plaintiff nor Defendants should draw any inference from the Court's silence regarding the merits of the arguments that have not been addressed here.

It is therefore **ORDERED**, **ADJUDGED**, and **DECREED**:

1. "Defendants' Motion to Dismiss the Amended Class Action Complaint" (Doc. 74) is hereby **GRANTED.**

2. Plaintiff may file a second amended complaint within 60 days from the date of this Order. Failure to file a second amended complaint will result in the dismissal of this action without prejudice without further notice.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 21st day of April, 2020.

**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**