## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | | |
|---|---|---|
| POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) ) | |
| Plaintiff, | ) | Case No.: 8:19-cv-00069-TPB-AAS |
| v. | ) ) | |
| AXOGEN, INC.; KAREN ZADEREJ; PETER J. MARIANI; GREGORY G. FREITAG; JAMIE M. GROOMS; ROBERT J. RUDELIUS; MARK GOLD; GUIDO NEELS; AMY WENDELL; LEERINK PARTNERS LLC; JMP SECURITIES LLC; JEFFERIES LLC; and WILLIAM BLAIR & COMPANY, L.L.C., | ) ) ) ) ) ) ) ) ) ) ) | **CLASS ACTION** **DEMAND FOR JURY TRIAL** Hon. Thomas P. Barber |
| Defendants. | ) | |

---

## SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS

Page

I.    NATURE OF THE ACTION ...................................................................................1

II.   JURISDICTION AND VENUE............................................................................5

III.  CLAIMS FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 ............................6

      A.    SECURITIES ACT PARTIES ...........................................................................6

            1.    Lead Plaintiff .............................................................................6

            2.    Securities Act Defendants ..........................................................6

            3.    Relevant Non-Parties ..................................................................9

      B.    FACTS .....................................................................................................11

            1.    Overview of the Company's Products.......................................11

            2.    The Peripheral Nerve Repair Field and the Market for AxoGen's Products ....................................................................14

      C.    THE TWO PUBLIC OFFERINGS OF AXOGEN STOCK.................................15

            1.    The November 2017 Offering ...................................................15

            2.    The May 2018 Offering..............................................................17

      D.    THE MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS .........................................................................................18

            1.    False Statements of Historical Fact Regarding The Number of Procedures Performed in the United States Annually ...............18

                  a.    The November 2017 Offering Documents ....................18

                  b.    The May 2018 Offering Documents..............................21

            2.    False Statements of Historical Fact Regarding the Value of the Market for Axogen Products..................................................22

                  a.    The November 2017 Offering Documents ....................23

                  b.    The May 2018 Offering Documents..............................24

      E.    THE OFFERING DOCUMENTS WERE MATERIALLY FALSE AND MISLEADING ..........25

            1.    Lead Plaintiff's Expert Analysis ..............................................25

            2.    A Leading Expert in Peripheral Nerve Repair Confirms That Axogen's Statements Concerning Its Total Market Are Unreasonable ....................30

            3.    Confidential Witness Information Corroborates the Expert Firm's Conclusions ....................................................................34

            4.    The Seligman Report Revealed That The Company Had Severely Overstated Its Market ........................................................37

i

5. Axogen's Market Opportunity Was Orders of Magnitude Smaller than Claimed.....................................................................................41

6. Axogen Misleadingly Claims Support for Its Market Claims ..................42

    a. Axogen Represents that Reputable Government Data Supports Its Market Claims – the 2011 HHS Report: .................................42

    b. Axogen Relies on Its Own Funded Marketing Masquerading as Scientific Research – the Brattain Article: ....................................43

    c. The Company Falsely Claims Support from the Noble Article: ...44

7. The Company's Market Claims in the Offering Documents Were Material........................................................................................................51

F. LOSS CAUSATION ......................................................................................52

IV. CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ............................................53

COUNT I Violation of Section 11 of the Securities Act Against the November 2017 Offering Defendants In Connection with the November 2017 Offering.....................53

COUNT II Violation of Section 11 of the Securities Act Against the May 2018 Offering Defendants In Connection with the May 2018 Offering ............................................55

COUNT III Violation of Section 12(a)(2) of the Securities Act Against Axogen, Zaderej, the Director Defendants, Leerink, and JMP In Connection with the November 2017 Offering ....................................................................................................................56

COUNT IV Violation of Section 12(a)(2) of the Securities Act Against Axogen, Zaderej, the Director Defendants, and the Underwriter Defendants In Connection with the May 2018 Offering ............................................................................................................58

V. CLAIMS FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 ....59

A. EXCHANGE ACT PARTIES .........................................................................59

1. Lead Plaintiff.............................................................................................59

2. Exchange Act Defendants .........................................................................60

3. Relevant Non-Parties ................................................................................60

B. THE EXCHANGE ACT DEFENDANTS' FRAUDULENT SCHEME ................................61

1. The Beginning of the Class Period through the November 2017 Offering ......................................................................................................61

2. The Second Annual Analyst and Investor Day through the Company's 2017 Financial Results ...............................................................................66

3. The Company Repeats Its False Claims and Conducts an Additional Public Stock Offering: March 2018 through October 2018 .....................68

4. The Company Increases Its Market Claim by $500 Million: November 2018 through the end of the Class Period....................................................72

5.  The Truth Concerning Defendants' False and Misleading Statements Is Revealed ..................................................................................75

6.  Post-Class Period Events ..................................................................75

7.  The False and Misleading Nature of the Exchange Act Defendants' Class Period Statements ..............................................................................76

C.  THE MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ..................................................................................78

1.  August 2, 2017 ..................................................................................78

2.  September 2017 – Cantor Fitzgerald Global Healthcare Conference .......79

3.  November 1, 2017 .............................................................................81

4.  November 2017 Offering ...................................................................83

5.  November 20, 2017 – Second Annual Analyst and Investor Day ............83

6.  February 28, 2018 .............................................................................85

7.  March 2018 – Canaccord Genuity Musculoskeletal Conference .............87

8.  April 30, 2018 ..................................................................................89

9.  May 2018 Offering ...........................................................................90

10. June 2018 – William Blair 38th Annual Growth Stock Conference .........91

11. August 1, 2018 ..................................................................................93

12. October 29, 2018 ..............................................................................95

13. November 19, 2018 – Third Annual Analyst and Investor Day ...............96

D.  ADDITIONAL ALLEGATIONS OF SCIENTER ..............................................97

1.  Zaderej and Mariani Repeatedly Spoke In Detail About The Quantity of Peripheral Nerve Repair Procedures Performed in the U.S. and Regarding the Size of the Company's Market ......................................................98

2.  Zaderej and Mariani Assured Investors That They Had A Sound Basis for their Statements ...............................................................................99

3.  Centralized Sales Information Was Available to Zaderej and Mariani ...100

4.  Axogen's Small Size and Zaderej and Mariani's Close Oversight of Sales Supports an Inference of Scienter ......................................................101

5.  The Importance of the Information and the Magnitude of the Falsity Supports Scienter ............................................................................102

6.  The Fact That Axogen Paid A Marketing Company to Produce the Brattain Article and That Axogen Repeatedly Cited That Article Without Disclosing That Fact Supports Scienter ...............................................103

7.  Zaderej Made Highly Unusual Stock Sales Before the Truth Was Revealed .........................................................................................103

        8.     The Abrupt Departure of Key Members of Senior Management ............104

        9.     The Scienter of Zaderej and Mariani is Imputed to Axogen ..................104

   E.    LOSS CAUSATION ..............................................................................105

   F.    LEAD PLAINTIFF AND THE CLASS ARE ENTITLED TO A PRESUMPTION OF
       RELIANCE ......................................................................................107

VI.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE
     INAPPLICABLE..............................................................................109

VII.  CLASS ACTION ALLEGATIONS ..............................................................110

VIII.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ..........................................112

   COUNT V Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
      Thereunder Against The Exchange Act Defendants ..................................112

   COUNT VI Violation of Section 20(a) of the Exchange Act Against the Exchange Act
      Individual Defendants..............................................................114

IX.   JURY DEMAND..............................................................................116

X.    PRAYER FOR RELIEF ......................................................................116

## I.     NATURE OF THE ACTION

1.      This action arises from misrepresentations by Axogen, Inc. ("Axogen" or the "Company") and certain of its current and former directors, officers, and underwriters (together, "Defendants") regarding the field of peripheral nerve repair in the United States.  During the period from August 2, 2017, through December 18, 2018, both dates inclusive (the "Class Period"), Defendants made false and misleading claims regarding the incidence of peripheral nerve repair surgeries in the United States as a result of trauma or relating to oral-maxillofacial  procedures. Defendants furthermore claimed that there was a multibillion-dollar market for the Company's products.  Defendants had no reasonable basis for these statements, which misled investors and artificially inflated the price of the Company's stock.

2.      Axogen is a medical technology company that bills itself as "the preeminent nerve repair company."   Touting its "exclusive focus on peripheral nerve repair and protection solutions," Axogen sells just a handful of products.  One of these is the Avance® Nerve Graft ("Avance").  Avance is a segment of nerve tissue, derived from human cadavers, which can be used to support and guide nerve regeneration, particularly to bridge gaps created in peripheral nerves as a result of trauma.[1]  Avance is by far the Company's most important product: during the Class Period, the Company stated that Avance was responsible for approximately *half* of its total revenues.

3.      On the first day of the Class Period, Axogen's Chief Executive Officer, Defendant Karen Zaderej ("Zaderej"), told investors and analysts that "[t]here are more than 900,000 nerve repair surgeries annually in the U.S."  Zaderej also claimed that the market for Axogen's core

---

[1] In the medical field, trauma means, essentially, injury.  A leading medical dictionary defines "trauma" as a "physical injury or wound caused by external force or violence."

nerve repair products had increased to *$2 billion*, reflecting "expanded use of our products in the OMF [oral-maxillofacial] market." Throughout the Class Period, Defendants continued to claim that 900,000 nerve repair surgeries are performed in the United States annually. Defendants' market assertions, however, changed significantly. By the end of the sixteen-month Class Period, Defendants were claiming that the market for Axogen's products had increased to *$2.7 billion*. Defendants' claims regarding the field of peripheral nerve repair and regarding the Company's market—which Defendants asserted was exponentially larger than the Company's 2017 revenues of $60 million—portrayed Axogen as a company with potential for explosive growth, particularly with respect to its flagship product, Avance. These were major selling points to investors, as Axogen's revenues were quite modest and the Company continues to lose money thirteen years after introducing Avance.

4.      The Company conducted two public offerings of common stock just six months apart during the Class Period, raising more than $170 million based on Offering Documents (defined herein) that featured these false and misleading claims front and center.

5.      Court-appointed Lead Plaintiff Police and Fire Retirement System of the City of Detroit ("Lead Plaintiff" or "Detroit Police and Fire") retained a nationally known expert consulting firm to analyze the Company's market size and the basis of the Company's claims of a multibillion dollar market for its products. The firm's findings confirmed that the market for the Company's nerve repair products in the fields of trauma and oral and maxillofacial surgery—which during the Class Period the Company claimed represented 80% to 90% of the market for its products—was *less than a tenth of what the Company told investors*.

6.      On December 18, 2018, Seligman Investments ("Seligman"), an investment firm, published a lengthy and detailed research report (the "Seligman Report") refuting Axogen's claims

concerning the incidence of peripheral nerve repair procedures and the size of the market for the Company's nerve repair products.  The Seligman Report revealed critical flaws in Axogen's representations, thoroughly scrutinizing Defendants' claims in light of scientific literature, authoritative data sources, and extensive interviews with neurosurgeons and former Axogen employees.  The Seligman Report concluded that there are only 28,000 cases of peripheral nerve repair annually in the United States.  The Seligman Report further concluded that the Company's market in the field of extremity trauma—which the Company claimed, just a month before publication of the Seligman Report, was *$1.9 billion*, the vast majority of its total market—was instead just *$52 million*.  This new information shocked the market, sending Axogen's stock price into a tailspin.  Axogen's common stock fell from a closing price of $27.53 on December 17, 2018, to close at $21.36 on the following trading day, December 21, 2018—a drop of *over 22%*.  Axogen's stock price declined further over the following three trading days, to a closing price of $17.09 on December 21, 2018—a decline of 38%, representing investor losses greater than $390 million.  A year and a half later, Axogen's stock price has never even approached its Class Period heights.

7.     Lead Plaintiff brings this federal securities class action on behalf of itself and all persons and entities that purchased or otherwise acquired securities of Axogen during the Class Period, including in the two public offerings the Company conducted in November 2017 and May 2018 (the "Class").  Lead Plaintiff asserts claims against the Securities Act Defendants (defined herein), including Axogen, for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k(a), 77l(a)(2), and 77o, in connection with those two public offerings.  Lead Plaintiff also asserts claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a),

respectively, and the rules and regulations promulgated thereunder, including United States Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Axogen, its Chief Executive Officer Karen Zaderej ("Zaderej"), and its Chief Financial Officer Peter J. Mariani ("Mariani") (collectively, "the Exchange Act Defendants").

8.      On April 21, 2020, the Court issued an order which granted Defendants' Motion to Dismiss and gave Lead Plaintiff leave to amend its complaint.   ECF No. 104 at 47.  Lead Plaintiff subsequently obtained information from ***four additional*** confidential witnesses—each of whom, like CW1, was a manager within Axogen's sales department—supporting Lead Plaintiff's allegations that Defendants made false statements concerning the incidence of peripheral nerve repair procedures conducted in the U.S. annually (both overall and specifically relating to trauma, the most important segment to Axogen).

9.      In addition to new information from those four former Axogen employees, Lead Plaintiff's allegations are also now supported by analysis from Christopher J. Winfree, MD, a peripheral nerve surgeon who has been the Director of the Center for Peripheral Nerve Surgery at Columbia University College of Physicians and Surgeons since 2004.  Dr. Winfree, a highly experienced neurosurgeon who uses Axogen products in his practice, analyzed data regarding the number of peripheral nerve repair procedures conducted in the United States each year and reached a conclusion consonant with the Seligman Report and the Expert Firm (defined below).  He concluded in contrast that Axogen's claims on this subject were not "reasonable or realistic."  Dr. Winfree provided further analysis as to the proportion of peripheral nerve repair procedures in which Axogen products could reasonably be expected to be used.  On this point, as well, Dr. Winfree's conclusions show that Defendants' statements were false.  Dr. Winfree's conclusions, which corroborate information from five CWs and the Expert Firm, are explained further in section

III(E)(2), *infra*, and are set forth in his statement, attached as Exhibit A.  Dr. Winfree's *curriculum vitae* is attached as Exhibit B.

10.     Finally, Lead Plaintiff has also disclosed the name of the Expert Firm—a respected and experienced international consulting firm—discussed in this and Lead Plaintiff's prior complaint.  These additions and amendments to Lead Plaintiff's allegations strengthen and cement the complaint's charge that Defendants made material misstatements of fact concerning the then-existing market for its products.  With respect to the Exchange Act allegations, moreover, these revisions provide further support for the strong inference that that Defendants Zaderej and Mariani knew or with reasonable care would have known that their representations were false, unfounded, and did not result from the sort of inquiry reasonable investors have a right to expect.

## II.     JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, as well as under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 22 of the Securities Act, 15 U.S.C. § 77v.

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and 28 U.S.C. § 1391(b) because the Company's principal place of business is located in in this District and a significant portion of Defendants' actions took place within this District.

13.     In connection with the acts, transactions, and other conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce,

including, but not limited to, the United States mails, interstate telephone communications, and facilities of the national securities markets.

## III.   CLAIMS FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

14.     In this section of this Complaint, Lead Plaintiff asserts strict liability and negligence claims for violations of Sections 11 and 12(a)(2) of the Securities Act on behalf of all persons and entities who purchased or otherwise acquired Axogen's common stock in, pursuant to, and/or traceable to the Offerings (defined herein) and who were damaged thereby.   Lead Plaintiff expressly disclaims any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately in this Complaint from Lead Plaintiff's Exchange Act claims.

### A.     SECURITIES ACT PARTIES

#### 1.     Lead Plaintiff

15.     Lead Plaintiff Detroit Police and Fire is a retirement system with over $3 billion in assets under management on behalf of police officers and firefighters in Detroit, Michigan.   Lead Plaintiff purchased or otherwise acquired Axogen common stock in domestic transactions in, pursuant to, and/or traceable to the Offerings, and was damaged thereby.   Specifically, Lead Plaintiff purchased 3,689 shares of Axogen common stock in the November 2017 Offering at the offering price of $21 per share on November 16, 2017, which settled on November 20, 2017.   In addition, Lead Plaintiff purchased 1,120 shares of Axogen common stock in the May 2018 Offering at the offering price of $41 on May 9, 2018, which settled on May 11, 2018.   Both of these purchases were made from Defendant Leerink Partners LLC ("Leerink"), an underwriter of both of the Offerings.

#### 2.     Securities Act Defendants

16.     Each of the following Defendants is statutorily liable under Sections 11 and 12 of

the Securities Act for the material misstatements and omissions contained in and incorporated into the Offering Documents.

17.     Defendant Axogen, Inc. is incorporated in the State of Minnesota and maintains its corporate headquarters in Alachua, Florida.   Axogen's common stock trades on the Nasdaq exchange under the symbol "AXGN."   Axogen was the issuer of Axogen common stock in the Offerings.

18.     Defendant Zaderej served as Axogen's President, Chief Executive Officer ("CEO"), and a member of the Company's Board of Directors (the "Board") during the entire Class Period and until today, and became Chairman of the Board in May 2018.   Zaderej joined Axogen in 2006 as Vice President of Marketing and Sales, then served as Chief Operating Officer from October 2007 to May 2010, when she was appointed as CEO and became a member of the Board.   Zaderej's total estimated compensation for the Class Period was approximately $5,062,442, including pro rata portions of her annual compensation of $3,704,972 for 2017 and $3,665,188 for 2018.  This compensation included a substantial equity-based component.  Zaderej signed the 2015 Registration Statement, the October 2017 Registration Statement, and the May 2018 Registration Statement, and also signed and certified Axogen's 2016 10-K and 2017 10-K (all of which documents are defined herein).

19.     Defendant Mariani has served as Axogen's Chief Financial Officer ("CFO") since March 2016.  Mariani's total estimated compensation for the Class Period was $2,071,565, including pro rata portions of his annual compensation of $1,656,151 for 2017 and $1,439,007 for 2018.  Mariani signed the October 2017 Registration Statement, and the May 2018 Registration Statement, and also signed and certified Axogen's 2016 10-K and 2017 10-K.

20.     Defendant Gregory G. Freitag ("Freitag") served as a member of the Board and as Axogen's General Counsel beginning in September 2011.  Previously, Freitag was CEO and CFO of the LecTec Corporation ("LecTec"), an IP holding company into which Axogen reverse merged in 2011, thereby entering the public markets.  Freitag recently retired as General Counsel, but will remain a director and will serve as Special Counsel during a transition period expected to last through October 2020.  He was also the Company's CFO from September 2011 to May 2014, then the Company's Senior Vice President Business Development until August 2015.  He again served as Axogen's CFO from August 2015 to March 2016, when he was replaced in that position by Mariani.

21.     Defendant Jamie M. Grooms ("Grooms") co-founded Axogen and served as its CEO from 2002 to May 2010.  He served as a member of the Company's Board from 2002 until 2019, and was Chairman of the Board from September 2011 until May 2018, when Defendant Zaderej assumed that role.

22.     Defendant Robert J. Rudelius ("Rudelius") joined the LecTec Corporation ("LecTec") board of directors in September 2010 and remained on the Board following the merger with Axogen and until the present.

23.     Defendant Mark Gold ("Gold") joined the Board in 2007 and has served on the Board since the merger with LecTec in 2011.

24.     Defendant Guido Neels ("Neels") has served on the Board since August 2015. Furthermore, since 2013 he has been an operating partner of EW Healthcare Partners, L.P. ("EW Healthcare"), an Axogen shareholder that sold 1.15 million shares in the November 2017 Offering, as discussed below.

25.     Defendant Amy Wendell ("Wendell") has served as a member of the Company's Board since September 2016, including as Lead Director since May 2018.

26.     Defendants Freitag, Grooms, Rudelius, Gold, Neels, and Wendell are referred to herein as the "Director Defendants."

27.     Defendant Leerink was an underwriter of both the November 2017 Offering (as book-running manager) and the May 2018 Offering (as joint book-running manager).

28.     Defendant JMP Securities LLC ("JMP") was an underwriter of both the November 2017 Offering (as co-manager) and the May 2018 Offering (as co-manager).

29.     Defendant Jefferies LLC ("Jefferies") was an underwriter of the May 2018 Offering (as joint book-running manager).

30.     Defendant William Blair & Company, L.L.C. ("William Blair") was an underwriter of the May 2018 Offering (as co-manager).

31.     Defendants Leerink, JMP, Jefferies, and William Blair are collectively referred to herein as the "Underwriter Defendants."

32.     Axogen, Zaderej, Mariani, the Director Defendants, and the Underwriter Defendants are collectively referred to herein as the "Securities Act Defendants."

**3.      Relevant Non-Parties**

33.     Lead Plaintiff's claims are supported by information learned from five confidential witnesses ("CWs"), all former Axogen employees whose experience with and knowledge of Axogen, its products, and its market, confirm that Defendants misled investors.[2]

34.     CW1 worked in sales for Axogen for nearly three years, from fall 2015 until summer 2018 (after the May 2018 Offering), first as a sales representative and later as a Territory

---

[2] Masculine pronouns are used for each of the CWs to protect the CWs' identities.

Manager.  In these roles CW1 marketed all of Axogen's products to customers in the New York City metropolitan area, including portions of southern Connecticut and northern New Jersey.  CW1 reported to an Area Sales Manager, Ted Campbell, who reported to Bill Tucker, Area Vice President of Sales for the Eastern United States.  Tucker reported to Vice President of Sales, Shawn McCarrey ("McCarrey"), who was based in Axogen's Alachua headquarters and who reported directly to Zaderej.

35.     CW2 was an Axogen sales manager from 2013 until early 2017 and was responsible for a sales territory in the midwestern United States.  CW2 marketed Axogen's nerve repair products throughout this territory to surgical centers and trauma centers.  CW2 reported to Barry Way, a regional manager, who reported to McCarrey, who reported directly to Zaderej.

36.     CW3 was a regional sales manager at Axogen from summer 2018 to spring 2019 and was responsible for selling the full line of Axogen's products to independent distributors throughout the entire western half of the United States.  CW3 reported to Tim Dominguez, Axogen's area vice president for independent agencies and specialty markets.  Dominguez reported directly to Defendant Zaderej.  Indeed, Dominguez met in person with Zaderej and other top executives each quarter to discuss sales.

37.     CW4 worked for Axogen from early 2016 to late 2019 as an area manager responsible for sales for the entirety of a southern state until his territory was divided midway through his tenure.  CW4 marketed all of Axogen's products and reported to regional manager Brandon Mark, who CW4 said reported to a vice president of sales who in turn reported to the executive team.

38.     CW5 worked for Axogen as a senior account manager in the sales department from early 2015 to late 2017.  In this role, CW5 was responsible for selling Axogen's products, including

Avance and the AxoGuard Product Line, in a territory that included approximately 75 microsurgical doctors, mostly hand surgeons as well as some ENT (ear, nose, and throat) and plastic surgeons, and included large level 1 trauma centers.  At first, CW5 reported to Barry Way, though midway through his tenure he began reporting to Brandon Mark instead.  Both Way and Mark reported to McCarrey, who in turned reported to both Zaderej and Mariani, according to CW5.

39.     The below chart, which shows the lines of reporting of the five CWs, makes clear that these CWs were not far removed from Defendants Zaderej and Mariani:



B.     **FACTS**

1.     **Overview of the Company's Products**

40.     During the Class Period, the Company offered four core products.  By far the most important was, and still is, Avance, which it began distributing in 2007  As noted above, Avance

was responsible for approximately *half* of Axogen's total revenues during the Class Period, and as discussed more fully herein, the Company claimed during the Class Period that over one-third, and as much as 40% of the total market for the Company's products related to Avance.

41.     The Company also offered the AxoGuard® Nerve Connector and the AxoGuard® Nerve Protector (together, the "AxoGuard Product Line").  During the Class Period, these were owned by a third party; Axogen was the distributor.  The Company also sold the Avive® Soft Tissue Membrane ("Avive"), a resorbable soft tissue covering, as well as two diagnostic tools, but the latter are relatively insignificant, as substantially all of Axogen's revenue during the Class Period was derived from Avance, Avive, and the AxoGuard Product Line.

42.     Axogen claimed during the Class Period, as stated in its 2017 10-K, that it is the "leading company focused specifically on . . . technologies for peripheral nerve generation and repair."  "Peripheral" nerves are those nerves that constitute part of the peripheral nervous system, i.e., the components of the nervous system that are located externally to the central nervous system, which is composed of the brain and spinal cord.

43.     Avance, the Company's principal product, is a segment of human nerve used by surgeons to repair peripheral nerve injuries ("PNI") that have created a significant gap in the nerve. The Company has referred to Avance as a "Gap Repair" product.  Avance nerve segments are harvested from human cadavers, and then treated and cleaned to minimize the risk of infection or rejection.  Avance is shipped and stored frozen and then thawed before use.

44.     When a peripheral nerve is transected (i.e., cut), it may or may not create a gap.  A peripheral nerve injury without a gap, or with only a small gap, is generally repaired by directly suturing the nerve together; so, no graft is required.  A significant gap in a transected nerve is usually the result of either severe trauma or a delay in treatment that allows necrosis to develop,

thus compelling the surgeon to remove the unhealthy ends of the nerve to expose healthy nerve tissue, creating a gap.  Avance is used to treat significant gaps created in peripheral nerves by trauma or otherwise.  Avance is offered in a variety of lengths (from 15 mm to 70 mm) and diameters (from 1-2 mm to 4-5 mm).  Reportedly, segments 15 mm in length cost more than $1,500, while 70 mm long segments cost over $6,000.

45.     Where a significant nerve gap is present, a surgeon has several options, including neurotization (wherein a segment of nerve is cut on one end and connected by suture to another location) and the use of hollow-tube conduits (which may be natural or synthetic) to guide the regenerating nerve, as well as grafts, of which there are two types.  Avance is an "allograft," which refers to a transplant of organ or tissue from one individual to another of the same species.  By contrast, many peripheral nerve repairs involve the use of autologous grafts, or "autografts"— organ or tissue transplanted from one location to another on the patient's body.  Autografts are the "gold standard" for repair of transected nerves involving a significant gap, as Dr. Winfree explains. Ex. A at 3.  For example, a surgeon may excise a segment of nerve from a less critical area on the patient (e.g., taking a nerve segment from the patient's ankle area to repair a trauma to a nerve in the patient's arm) to bridge the gap.  As the preferred method, autografts are used much more frequently than allografts in repairing peripheral nerve injuries involving significant gaps.

46.     The principal market for Avance encompasses a portion of neurosurgical procedures to repair peripheral nerve injuries that involve a significant gap and are caused by trauma to the extremities.  Most of these procedures, however, are performed using autografts or alternatives such as hollow-tube conduits.  Avance may also be used to bridge gaps in connection with OMF surgery, but this is of secondary importance; according to the Company's Class Period statements, nearly 70% of the market for Avance was in the area of extremity trauma.

**2.     The Peripheral Nerve Repair Field and the Market for AxoGen's Products**

47.     Following its transition to a publicly held company as a result of the reverse merger with LecTec in 2011, Axogen began spending heavily in pursuit of growth: costs and expenses increased *over 87%* for the first quarter of 2012 compared to the first quarter of 2011, primarily due to increased sales and marketing costs for the nerve business.  Revenue grew as well, though not nearly as starkly: the Company's revenue for the first quarter of 2012 was 47% higher than the quarter ending a year prior, but the actual amount was modest—only $1.65 million of net revenues for that first quarter of 2012.

48.     The next five years saw this trend continue.  Axogen's revenues increased steadily, but so did its costs and expenses, the latter largely due to sales and marketing efforts and the Company's "surgeon education" programs.  Axogen spent heavily during this period before the Class Period (and during the Class Period) to sponsor and present at industry conferences and to provide training programs that featured its products.  Moreover, the Company's revenue growth did not arise entirely from increasing sales volume—the Company instituted product price increases annually.  By the end of 2016—over nine years after introducing Avance—Axogen was still operating at a loss.  The Company's net loss for 2016 was $14.4 million, an increase of over 50% from its 2012 results.  On August 2, 2017, the first day of the Class Period, and just three months before the first of the Offerings, the Company reported a net loss of $5.8 million for the first six months of 2017, resulting in a loss per share of eighteen cents.  It has been no different after the Class Period.  Axogen reported a net loss of over $29 million for 2019 (a 30% increase year-over-year), and of over $8 million for the first quarter of 2020.

49.     Nevertheless, Defendants repeatedly represented that there were nearly a million peripheral nerve repair procedures being performed in the United States each year, and that the

Company had a massive market for its products, particularly Avance.  In statements to investors, Defendants harped upon these two claims.  Defendants referred to Axogen's market at times as a "market opportunity," "addressable market opportunity," or "total addressable market."

50.     Defendants divided Axogen's market by type of procedure (for instance, $1.5 billion relating to extremity trauma and $293 million relating to OMF surgery) as well as by product (for example, $976 million for Avance, including $668 million in the field of extremity trauma).  Extremity trauma constituted approximately 70% to 80% of the Company's claimed market during the Class Period, with OMF a distant second.  In terms of products, the Company claimed that Avance was by far the most important contributor to the Company's market size— and the market for Avance was primarily in the area of extremity trauma.

### C.     THE TWO PUBLIC OFFERINGS OF AXOGEN STOCK

#### 1.     The November 2017 Offering

51.     Beginning on or about November 15, 2017, Axogen conducted a secondary public offering of its common stock pursuant to the registration statements and prospectuses discussed in ¶¶ 52-54 below.  In this offering, Axogen and EW Healthcare sold 1.955 million shares of Axogen common stock at an offering price of $21 per share for proceeds of approximately $41,055,000 (the "November 2017 Offering").   Defendants Leerink and JMP were underwriters of the November 2017 Offering.

52.     On November 5, 2015, Axogen filed a registration statement on Form S-3 for the issuance and sale of up to $100 million of shares of its common stock, which was declared effective on December 11, 2015 (the "2015 Registration Statement").  The 2015 Registration Statement was signed by Defendant Zaderej on behalf of Axogen and by Zaderej and the Director Defendants (except Defendant Wendell) in their capacities as directors and/or officers of the Company.  On October 2, 2017, Axogen filed another registration on Form S-3 for the issuance and sale of up to

4,861,111 shares of its common stock, which was declared effective on October 11, 2017 (the

"October 2017 Registration Statement").  The October 2017 Registration Statement was signed by

Defendant Zaderej on behalf of Axogen and by Zaderej, Mariani, and the Director Defendants in

their capacities as directors and officers of the Company.  On November 15, 2017, the Company

filed two preliminary prospectuses pursuant to SEC Rule 424(B)(5) in connection with an offering

of its common stock.

53.     On November 17, 2017, the Company filed several documents in connection with

the public offering of 805,000 shares of its common stock sold by Axogen and 1.15 million shares

sold by EW Healthcare, an Axogen shareholder, at the public offering price of $21 per share.  The

total of 1,955,000 shares included the sale of 150,000 shares by Axogen and 105,000 shares by

EW Healthcare upon exercise in full by the underwriters of an option to purchase such additional

shares.  This offering is referred to herein as the "November 2017 Offering."

54.     Specifically, on November 17, 2017, Axogen filed two final prospectuses pursuant

to SEC Rule 242(b)(5).  One of these final prospectuses related to the shares offered and sold by

the Company (the "Company Prospectus"), and the other related to the shares offered and sold by

EW Healthcare (the "Selling Shareholder Prospectus").  The Company Prospectus and the Selling

Shareholder Prospectus were each supplemented by a final prospectus supplement, which is part

of those prospectuses.  The Company Prospectus and the Selling Shareholder Prospectus, as

supplemented by the final prospectus supplements, are referred to together herein as the

"November 2017 Prospectus." The Company Prospectus is part of the 2015 Registration

Statement.  The Selling Shareholder Prospectus is part of the October 2017 Registration Statement.

The Company Prospectus and the Selling Shareholder Prospectus, as supplemented by the final

prospectus supplements, are referred to together with the 2015 Registration Statement and the

October 2017 Registration Statement as the "November 2017 Offering Documents."  The November 2017 Offering was conducted pursuant to the November 2017 Offering Documents.

55.     The November 2017 Offering closed on November 20, 2017, and Axogen received net proceeds of approximately $15.4 million.  EW Healthcare received net proceeds of approximately $22.7 million.

### 2.     The May 2018 Offering

56.     Beginning on or about May 7, 2018, Axogen conducted another secondary public offering of its common stock pursuant to the registration statement and prospectus discussed in ¶¶ 57-58 below (the "May 2018 Offering").  Defendants Leerink, Jeffries, Blair and JMP were underwriters of the May 2018 Offering.

57.     On May 7, 2018, Axogen announced that it had commenced an underwritten public offering of an anticipated two million shares of its common stock, and that it expected to grant the underwriters of the offering an option to purchase up to an additional 300,000 additional shares. That same day, Axogen filed a registration statement on Form S-3 as part of a "shelf" registration process (the "May 2018 Registration Statement"), which became effective automatically upon filing.  The May 2018 Registration Statement was signed by Defendant Zaderej on behalf of Axogen and by Zaderej, Mariani, and the Director Defendants in their capacities as directors and/or officers of the Company.  The May 2018 Registration Statement contained a prospectus.  Also on May 7, 2018, Axogen filed a prospectus and preliminary prospectus supplement pursuant to SEC Rule 424(b)(5) for this offering, which is referred to herein as the "May 2018 Offering" (and together with the November 2017 Offering, the "Offerings").

58.     On or about May 10, 2018, Axogen filed a final prospectus, which was supplemented by a final prospectus supplement, for this public offering (the "May 2018 Prospectus").  The May 2018 Prospectus is part of the May 2018 Registration Statement.  The May

2018 Registration Statement and the May 2018 Prospectus are referred to together herein as the "May 2018 Offering Documents" (and together with the November 2017 Offering Documents as the "Offering Documents").

59.     The May 2018 Offering closed on May 11, 2018.  In the May 2018 Offering, Axogen sold 50% more shares than originally announced (i.e., three million shares, in addition to 450,000 shares issued upon exercise of the underwriters' option), at the offering price of $41 per share, and received net proceeds of approximately $132,463,000.

### D.     THE MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS

60.     The Offering Documents pursuant to which the Offerings were conducted contained false and misleading statements, and omitted material information necessary to make the statements therein not misleading.  These statements concerned the incidence of peripheral nerve repair procedures relating to trauma as well as regarding the market for the Company's four core nerve repair products, i.e., Avance, Avive, and the AxoGuard Product Line.

### 1.     False Statements of Historical Fact Regarding The Number of Procedures Performed in the United States Annually

61.     The November 2017 Offering Documents and May 2018 Offering Documents both contained materially false statements of historical fact regarding the number of PNI surgeries that occur in the United States annually.  The number of PNI surgeries that occurred in the United States was a material, indeed *critical*, factor that investors considered in evaluating the Company's historical financial performance and operating results, and the Offering Documents made false statements on that topic to alleviate investor concerns regarding the Company's historical performance and results.

### a.     The November 2017 Offering Documents

62.     The November 2017 Prospectus, on page S-1, stated:

18

We believe that, each year in the United States, more than 1.4 million people suffer traumatic injuries to peripheral nerves, resulting in over 700,000 extremity nerve repair procedures.

63.     The November 2017 Prospectus also stated that this calculation was solidly based on an analysis of scientific research and other reliable sources:

The estimated size of the Extremity Trauma portion of the market is based upon epidemiological studies regarding the general number of trauma patients, physician interviews and incidence of PNI in the population.

64.     The prospectus defined "PNI" as "peripheral nerve injury."

65.     In addition, the November 2017 Prospectus and the October 2017 Registration Statement both incorporated by reference the Company's annual report on Form 10-K for 2016 (the "2016 10-K") (which the Company originally filed on March 1, 2017).  The 2016 10-K, on page 7, stated:

Axogen believes each year in the U.S. more than 1.4 million people suffer traumatic injuries to peripheral nerves. Axogen estimates that traumatic injuries to peripheral nerves result in over 700,000 extremity nerve repair procedures.

66.     Like the November 2017 Prospectus itself, the 2016 10-K represented that this had a solid basis, specifically:

The estimated size of the Extremity portion of the market is based upon epidemiological studies regarding the general number of trauma patients, physician interviews and incidence of PNI in the population.

67.     The November 2017 Offering Documents thus twice stated that the above assertions regarding the incidence of "traumatic injuries to peripheral nerves" and the resulting incidence of "extremity nerve repair procedures" had a firm foundation of scientific research and reliable sources, which it characterized as "epidemiological studies regarding the general number of trauma patients, physician interviews and incidence of PNI in the population."  The 2016 10-K identified, in support of these claims, the following three sources:

(1)   "Health, United States, 2011, Publication of U.S. Department of Health & Human Services" (the "2011 HHS Report"), which was published by the National Center for Health Statistics, a federal government institution within the Department of Health and Human Services;

(2)   "Noble, et al. J of Trauma Injury Infection and Critical Care 1998" (the "Noble Article"); and

(3)   "Kurt Brattain, MD, Magellan Medical Technology Consultants, Inc., Minneapolis, Minnesota 2013" (the "Brattain Article").

68.   The November 2017 Prospectus also stated, with respect to "the Oral portion of the market," that:

> [R]esearch . . . has indicated approximately 80,000 PNI occur in the U.S. each year that are related to third molar extractions, anesthetic injections, dental implants and benign pathology.

69.   This was an increase over the statement made in the 2016 10-K, which stated, with the respect to "the Oral portion of the market," that:

> [R]esearch . . . has indicated that approximately 68,000 PNI occur in the U.S. each year that are related to third molar extractions, anesthetic injections, dental implants and benign pathology.

70.   Like its assertions regarding PNI surgeries relating to trauma, the 2016 10-K represented that this assertion regarding the number of PNI in the "Oral market" was based on a solid inquiry.  Further misrepresenting the truth, it stated that this claim was "based upon research" and identified, in support of the claim, the 2011 HHS Report, the Noble Article, and the Brattain Article.

71.   The 2016 10-K stated that "[t]raumatic PNI described herein, and excluding Oral and Carpal tunnel defined below, is referred to by Axogen as occurring in the 'Extremity' PNI market."  Further it defined "Oral" as follows: "Some of these surgical nerve injuries can occur during dental and oral surgery procedures such as third molar extractions, placement of dental

20

implants and removal of tumors during which an injury may be caused to one or more sections of the trigeminal nerve ('Oral')."

72.     As set forth in § III(E), *infra*, the statements in ¶¶ 62-71, above—including the representation that the Company's claims were supported by the 2011 HHS Report, the Noble Article, and the Brattain Article—were material misstatements.

### b.     The May 2018 Offering Documents

73.     The prospectus contained in the May 2018 Registration Statement stated on its third page:

> We believe that each year in the U.S. more than 1.4 million people suffer damage or discontinuity to peripheral nerves resulting in over 700,000 extremity nerve repair procedures.

74.     The prospectus further stated that this calculation was solidly based on an analysis of scientific research and other reliable sources:

> The estimated size of the Extremity Trauma portion of the market is based upon epidemiological studies regarding the general number of trauma patients, physician interviews and incidence of PND in the population.

75.     The prospectus contained in the May 2018 Registration Statement defined "PND" as "peripheral nerve damage or discontinuity."   The prospectus specified that "[t]he 'Extremity Trauma' portion of the Market . . . encompasses the traumatic PND described above but excludes the OMF, Breast and Carpal Tunnel . . . portions of the Market."   Further, it defined "OMF" as follows: "Nerve damage or discontinuity can occur during dental and oral surgery procedures such as third molar extractions, placement of dental implants and removal of tumors during which one or more sections of the trigeminal nerve can be damaged or discontinued ('OMF')."

76.     The prospectus contained in the May 2018 Registration Statement incorporated by reference (and thus made anew the statements contained in), *inter alia*, the Company's 2017 annual report on Form 10-K (the "2017 10-K"), which the Company originally filed on February 28, 2018,

and which also contained false and misleading statements regarding the incidence of peripheral nerve repair procedures resulting from trauma.  Specifically, the 2017 10-K stated on pages 7-8:

> We believe that each year in the U.S., more than 1.4 million people suffer damage or discontinuity to peripheral nerves resulting in over 700,000 extremity nerve repair procedures.

77.      Like the 2016 10-K, the 2017 10-K also stated that "[t]he estimated size of the Extremity Trauma portion of the market is based upon epidemiological studies regarding the general number of trauma patients, physician interviews and incidence of PND in the population." The 2017 10-K defined "PND" and "Extremity Trauma" in the same manner as the prospectus in the May 2018 Registration Statement.

78.      The May 2018 Offering Documents thus twice stated that the above assertions regarding the incidence of "traumatic injuries to peripheral nerves" and the resulting incidence of "extremity nerve repair procedures" had a firm foundation of scientific research and reliable sources, which it characterized as "epidemiological studies regarding the general number of trauma patients, physician interviews and incidence of PND in the population."  The 2017 10-K specifically identified, in support of these claims, the 2011 HHS Data, the Noble Article, and the Brattain Article.

79.      As set forth in § III(E), *infra*, the statements in ¶¶ 73-78, above, including the representation that the Company's claims were supported by the 2011 HHS Report, the Noble Article, and the Brattain Article, were material misstatements

### 2.      False Statements of Historical Fact Regarding the Value of the Market for Axogen Products

80.      The November 2017 Offering Documents and May 2018 Offering Documents also made related but distinct material misstatements regarding the monetary value of the market for Axogen's then-current product portfolio, in particular but not limited to the "Extremity Trauma"

(or "Extremity") portion of the market, and the number of procedures that "would be addressed" by specified Axogen products.

### a.   The November 2017 Offering Documents

81.    The November 2017 Prospectus, on page S-1, stated:

Based on our estimates, we believe the U.S. peripheral nerve injury ("PNI") market for our current product portfolio for Extremity Trauma, Oral and Carpal Tunnel is nearly $2.0 billion (the "Market"). We estimate that the Extremity Trauma portion of the Market is approximately $1.5 billion.

82.    The 2016 10-K, on page 7, included nearly the exact same statement:

Based on estimates prepared by Axogen, it believes the United States PNI market for its current product portfolio for Extremity, Oral and Carpal Tunnel Revision is $1.8 billion (the "Market"). We estimate that the Extremity portion of the Market is approximately $1.5 billion.

83.    The 2016 10-K made additional false and misleading claims, stating:

Axogen further estimated the portion of extremity nerve repair procedures that would be addressed by Axogen's Gap Repair, Primary Repair, Nerve Protection and Proaction products and applied the average sales price of the Axogen product appropriate to the procedure (Avance Nerve Graft, AxoGuard Nerve Connector, AxoGuard Nerve Protector and Avive Soft Tissue Membrane, respectively).  As a result, Axogen estimates that the market sizes, within the Extremity portion of the Market, for our Avance Nerve Graft, AxoGuard Nerve Connector, AxoGuard Nerve Protector and Avive Soft Tissue Membrane products are approximately $668 million, $161 million, $238 million and $439 million, respectively.

Axogen estimates that the Oral portion of the Market is approximately $129 million of the Market.

84.    The November 2017 Offering Documents represented that these claims were solidly grounded in scientific research and other reliable sources, including the 2011 HHS Data, the Noble Article, and the Brattain Article.

85.    As set forth in § III(E), *infra*, the statements in ¶¶ 81-84, above, including the representation that the Company's claims were supported by the 2011 HHS Report, the Noble Article, and the Brattain Article, were material misstatements.

**b.      The May 2018 Offering Documents**

86.     The prospectus contained in the May 2018 Registration Statement stated on its third

page:

> We estimate the United States PND [peripheral nerve damage or discontinuity] market for our current product portfolio for Extremity Trauma, OMF, Breast and Carpal Tunnel is $2.2 billion (the "Market").  From a product prospective, as to the Market, we estimate that Avance Nerve Graft represents $976 million, AxoGuard Nerve Connector represents $391 million, AxoGuard Nerve Protector represents $433 million and Avive Soft Tissue Membrane represents $439 million.
>
> We estimate that the Extremity Trauma portion of the Market is approximately $1.5 billion.
>
> We estimate that the OMF portion of the market is approximately $293 million.

87.     The 2017 10-K stated:

> We estimate the United States PND market for our current product portfolio for Extremity Trauma, OMF, Breast and Carpal Tunnel is $2.2 billion (the "Market"). From a product prospective as to these targeted markets, we estimate that Avance Nerve Graft represents $976 million, AxoGuard Nerve Connector $391 million, AxoGuard Nerve Protector $433 million and Avive Soft Tissue Membrane $439 million.
>
> We estimate that the Extremity Trauma portion of the Market is approximately $1.5 billion. The estimated size of the Extremity Trauma portion of the market is based upon epidemiological studies regarding the general number of trauma patients, physician interviews and incidence of PND in the population. . . .  We have estimated the portion of these extremity nerve repair procedures that would be addressed by our Gap Repair, Primary Repair, Nerve Protection and Proaction products and applied the average sales price of the appropriate product (Avance Nerve Graft, AxoGuard Nerve Connector, AxoGuard Nerve Protector and Avive Soft Tissue Membrane, respectively) to determine that the probable market sizes. Within the Extremity Trauma portion of the Market, our Avance Nerve Graft, AxoGuard Nerve Connector, AxoGuard Nerve Protector and Avive Soft Tissue Membrane products are approximately $668 million, $161 million, $238 million and $439 million, respectively.
>
> We estimate that the OMF portion of the Market is approximately $293 million.

88.     The 2017 10-K defined "Extremity Trauma" and "OMF" in the same manner as the

prospectus in the May 2018 Registration Statement.

89.     As set forth in § III(E), *infra*, the statements in ¶¶ 86-88 above—including the representation that the Company's claims were supported by the 2011 HHS Report, the Noble Article, and the Brattain Article—were material misstatements.

### E.     THE OFFERING DOCUMENTS WERE MATERIALLY FALSE AND MISLEADING

90.     In the Offering Documents, Defendants made false and misleading statements to investors regarding the incidence of peripheral nerve repair procedures, in particular those resulting from trauma, as well as regarding the market for the Company's four core nerve repair products, the portion of that market relating to Extremity Trauma, and the portion relating to Avance.   Furthermore, Defendants repeatedly represented this market opportunity as one the Company was capable of actually *servicing*, which was also false and misleading.   Defendants bridged the gap between their impressive claims and the Company's revenues—which were paltry relative to the number of peripheral nerve repair procedures they claimed were performed annually in the United States—by representing that their claims were supported by legitimate scientific literature and data.   All of this was untrue and misleading.

### 1.     Lead Plaintiff's Expert Analysis

91.     Lead Plaintiff retained a nationally known expert consulting firm, The Brattle Group (the "Expert Firm"), with experience in the healthcare and medical fields to review the Company's claims regarding the incidence of peripheral nerve repair procedures and regarding the size of the Company's market.   The Expert Firm reviewed and analyzed Axogen's Class Period disclosures regarding these matters and the materials cited by the Company in support thereof. Based on the review of these and other materials, as set forth below, the Expert Firm calculated that ***just 38,192 nerve procedures are performed in the United States annually*** and that the U.S. market for Axogen's core products in the areas of trauma and OMF is ***$112 million***, thus ***at least***

25

***$1.5 to $1.6 billion less*** than (***or only 5% to 6.9% of***) what Defendants claimed for those areas during the Class Period.

92.     The Expert Firm's work is based on, *inter alia*, authoritative, reliable, and publicly available data from the Centers for Medicare & Medicaid Services ("CMS") (a federal agency within the U.S. Department of Health of Human Services) and the Kaiser Family Foundation, as well as Axogen's own data as to the average values of procedures relevant to its nerve repair products.  The Expert Firm's calculations are conservative in that they rely on Axogen's published product prices.  As discussed below, Axogen overstated the actual prices that Axogen can charge customers for its products.

93.     According to CMS data for 2016, 4,415 nerve procedures (including placement, repair, connection, and suture of nerves) were performed in the traditional Medicare program, which encompasses approximately 68% of all Medicare enrollees.  These data concern all nerve procedures and thus include procedures relating to extremity trauma as well as OMF.  Scaling up this number to the total number of Medicare enrollees (which represents approximately 17% of the total U.S. population) and then to the total U.S. population indicates that ***just 38,192 nerve procedures are performed in the U.S. annually***.  This figure is calculated based on reliable, nationwide data concerning over 11% of the population of the United States.  In comparison, Axogen's wild claims are linked only to data relating to a single healthcare facility in Ontario (which was the basis of the Noble Article on which Axogen relied).  This analysis clearly shows that the Company's claims in the Offering Documents regarding the incidence of extremity nerve repair procedures, specifically over 700,000 annually, and OMF procedures, 68,000 to 80,350 annually, are unfounded and *enormously* overstated—by a factor of nearly twenty.

94.     In addition, the Expert Firm calculated the portion of the Company's trauma and OMF market that the Company was capable of servicing in light of competition.  As discussed herein, Axogen's statements claiming that its products "would address" the market misrepresented that the Company could actually service the entirety of its market in those fields.  The Expert Firm calculated the Company's serviceable market, or that subset of the Company's total market that the Company might be able to service in light of competition and other circumstances, under two different scenarios.

95.     The Expert Firm's calculations regarding the incidence of peripheral nerve repair procedures characterized as trauma or OMF, and regarding the size of the Company's market in those areas, , and the portion of that market that the Company is capable of servicing, are set forth in the table below.

**Annual US Market Size for Nerve Procedures Resulting from Trauma or OMF**[3]

|  | Scenario 1 | Scenario 2 |
|---|---|---|
| [1] Annual Traditional Medicare Nerve Procedures | 4,415 | 4,415 |
| [2] % of Medicare Enrollees in Traditional Medicare | 68% | 68% |
| [3] Annual Medicare Nerve Procedures | 6,493 | 6,493 |
| [4] Medicare % of Population | 17% | 17% |
| [5] Annual Nerve Procedures in USA | 38,192 | 38,192 |
| [6] Average Price for Relevant Axogen Products | $2,923 | $2,923 |
| [7] Addressable Market | $112 MM | $112 MM |

---

[3] The footnotes and note to this table, which set forth the Expert Firm's calculations and the sources employed, are as follows:

   [1] Centers for Medicare & Medicaid Services, "Medicare National/HCPCS Aggregate table, CY2016, Microsoft Excel (.xlsx)," U.S. Department of Health and Human Services, https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier2016.html.

96.     Trauma is by far the most significant market for Avance, as the Company told investors in the Offering Documents.  The Company claimed in the 2017 10-K that the market for Avance was $976 million and that this included a $668 million market in the field of extremity trauma—or nearly 70% of the total market for Avance.  In fact, the trauma market was a tiny sliver of what the Company claimed, and thus the market for Avance—by far the most important of the Company's products in terms of both revenue and purported market size—was likewise but a fraction of what Defendants represented.

---

[2] United States, 2016, "Medicare Advantage Enrollees as a Percent of Total Medicare Population," Kaiser Family Foundation, https://www.kff.org/medicare/state-indicator/enrollees-as-a-of-total-medicare-population/?activeTab=map&currentTimeframe=2&selectedDistributions=overall&selectedRows=%7B%22wrapups%22:%7B%22united-states%22:%7B%7D%7D%7D&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

[3] [1] / [2].

[4] United States, 2016, "Medicare Beneficiaries as a Percent of Total Population," Kaiser Family Foundation, https://www.kff.org/medicare/state-indicator/medicare-beneficiaries-as-of-total-pop/?currentTimeframe=2&selectedRows=%7B%22wrapups%22:%7B%22united-states%22:%7B%7D%7D%7D&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

[5] [3] / [4].

[6] Weighted average of the "Weighted Average Procedure Values" used for the Trauma and OMF markets in Axogen's 2019 corporate presentation. "Corporate presentation," Axogen, March 31, 2019, slide 9, https://d1io3yog0oux5.cloudfront.net/_799cb3050364b5f5e786b78e255c893f/axogeninc/db/338/8369/pdf/Q1+2019+-+Axogen_Corporate_Presentation+FINAL.pdf.

This weighted average price is calculated as $\frac{700{,}000*2{,}725+56{,}000*5{,}400}{700{,}000+56{,}000}$.

[7] [5] * [6].

[8] [7] * [8].

Note: The nerve procedures considered in this analysis are Healthcare Common Procedure Coding System codes 64831 - 64911. These involve placement, repair, connection, and suture of the nerve.

97.     The Expert Firm's findings are consistent with the Seligman Report and with relevant scientific literature.  The Seligman Report, following a robust and thorough analysis buttressed by interviews with neurosurgeons (including those who were significant users of Axogen products) and former Company employees, concluded that there are only approximately 28,000 PNI cases each year in the United States and that the market for Avance relating to trauma is merely $52 million. *See* § III(E)(3), *infra*.

98.     Moreover, as set forth in ¶ 151 below, employing a reliable PNI prevalence rate, as opposed to that which Axogen cited, to the entire U.S. population shows that the size of Axogen's trauma-related market is on the order of just millions of dollars, not billions as Axogen represented in the Offering Documents.

99.     Further, the Expert Firm analyzed publicly available data regarding Medicare charges and found that the prices Axogen used in calculating the value of its total market overstate the amounts that Axogen is capable of charging in the medium and long term.  This is because the prices Axogen used are close to the prices that healthcare providers receive for performing the procedures in which Axogen products are used.  Thus, Axogen claimed that it can charge close to the prices that healthcare providers receive.  This is not true, because numerous other costs are incurred in these procedures and must be paid by the providers, who therefore cannot or will not pay the prices that Axogen used in its market calculations.  Therefore, Axogen's use of these prices to calculate its market was false and misleading.  For that same reason, the Expert Firm's utilization of Axogen's product prices as stated in Axogen's investor presentations has the effect of limiting the difference between the Expert Firm's analysis and Axogen's grandiose market claims.

100.     The Expert Firm's analysis is based on publicly available information and is subject to revision and refinement based on further review and analysis of materials following a reasonable opportunity for discovery from Defendants.

>    **2.     A Leading Expert in Peripheral Nerve Repair Confirms That Axogen's Statements Concerning Its Total Market Are Unreasonable**

101.     As referenced above, *supra* ¶ 9, Lead Plaintiff has also received an analysis from a leading expert in peripheral nerve repair concerning the likely number and prevalence of nerve surgeries in the United States requiring nerve grafts.

102.     Dr. Christopher J. Winfree, MD, is a specialist in peripheral nerve repair.  Dr. Winfree attended medical school at Columbia University, following which he served as an intern in General Surgery at Columbia-Presbyterian Medical Center, and then as a resident in Neurological Surgery at The Neurological Institute of New York.  (Ex. B).  He completed a fellowship in Peripheral Nerve Surgery, followed by a fellowship in Functional and Stereotactic Neurosurgery.  Dr. Winfree maintains a board certification in Neurological Surgery.  Since 2004, Dr. Winfree has worked as an attending neurological surgeon at Columbia University's Medical Center ("Columbia").  Among other roles at Columbia, he has served as an assistant professor of Neurological Surgery (2004-2013), an assistant professor of Clinical Neurological Surgery (2013-present), the Director of Columbia's Center for Peripheral Nerve Surgery (2005-present), and the Director of Columbia's Center for Neurological Pain Management (2006-present).  He is a member of a number of professional organizations, including the American Association of Neurological Surgeons (AANS), the Congress of Neurological Surgeons (CNS), the American College of Surgeons, the New York State Neurosurgical Society, and the Neurosurgical Society of America. He serves on the Society of Neurological Surgeons Boot Camp Committee and the CNS Self-Assessment in Neurological Surgery editorial board. He recently completed his term as

President of the AANS/CNS Joint Section on Pain.  Dr. Winfree has received a number of awards in the field of neurological surgery and has written extensively in the areas of peripheral nerve surgery.  He was named as one of "America's Top Doctors" in 2019 by research company Castle Connolly Medical.

103.    In Exhibit A, Dr. Winfree sets forth his analysis concerning the likely number and prevalence of peripheral nerve injuries in the United States, and the number of such injuries requiring grafts.  He concludes that the Seligman Report—which, as discussed further below, indicates that there are about 28,000 nerve injuries per year, of which only about half require nerve grafts like Avance—represents a "generous" estimate of the number of such surgeries requiring Axogen products.  Ex. A at 2.  He also states that he does not believe that "Axogen's calculation that over 700,000 extremity nerve repair procedures" are performed in the United States each year is either "reasonable or realistic."  *Id.*

104.    Dr. Winfree sets forth a number of reasons why the market for Axogen's products is significantly smaller than Axogen has represented, each of which is confirmed by CWs, the expert consulting firm, or the Seligman report.

105.    First, based on his extensive clinical experience, standard nerve treatment protocols, as well as recent studies concerning extremity traumas, Dr. Winfree observes that the vast majority of extremity injuries do not require any nerve grafts.  *Id.*  Citing nationwide studies published in 2019 of upper and lower extremity trauma patients with peripheral nerve injuries, Dr. Winfree estimates that the total number of all extremity nerve injuries caused by trauma is about 25,000, which is far less than the 700,000 extremity nerve repair procedures per year figure that Axogen hyped to its investors.  *Id.*

106.    As Dr. Winfree observes, even when there is an injury to a peripheral nerve, not all such injuries require surgical treatment, and of those that do, not all benefit from peripheral nerve repair.  *Id.*  As stated in a three-year-long study published in 2018 of 49,382 patients who had suffered upper extremity injuries, only about 35% of such patients had "lacerating or soft tissue injuries."  *Id.*  Dr. Winfree explains that "many, if not most, nerve lacerations are adequately repaired by direct end-to-end anastomosis, whereby the nerve ends are simply sutured back together."  *Id.*  If one were to assume that as many as *half* of such nerve injuries required a graft, then only 8,642 such 49,382 patients would need grafts. (Of course, that does not suggest that all 8,642 would need allografts generally or Axogen products specifically).

107.    Of the approximately two-thirds of patients in the study with upper extremity injuries who had nonlacerating injuries, Dr. Winfree estimates based on is clinical experience that only a third would require nerve repair or nerve transfer, with the remaining injuries improving spontaneously or requiring surgery without nerve repair.  *Id.*  Of those requiring nerve repair or nerve transfer, if even half could benefit from the use of Axogen products, then only about 13,992 patients in the study with nonlacerating injuries of the upper extremities would require such products.

108.    Based on this analysis, Dr. Winfree concludes that only "about a third (29%) of all nerve injury patients could potentially benefit from the use of Axogen products."  *Id.*  Thus, even the Seligman Report's conclusion that about 50% of such injuries would involve Axogen products is "generous."  *Id.*

109.    Dr. Winfree explains that, in addition to the lack of necessity for such products in most extremity injuries—and even in most nerve injuries—Axogen products may not be more widely used because of their cost.  *Id.* at 3.  Some insurance companies do not approve Axogen

products for certain cases because the procedure is considered "experimental" in certain instances. *Id.* As Dr. Winfree observes, it "is common knowledge among persons working in peripheral nerve repair" that "the high cost of Axogen products, as for other devices, is a limiting factor in their widespread use in procedures that do not require their use." *Id.*

110.    Dr. Winfree also explains that "it is rare to find a surgical procedure that could not be performed without the use of an Axogen product." *Id.* In cases of nerve *biopsy*, though, Dr. Winfree explains that Avance is the only reasonable product for nerve repair; however, there are only about 1,000 such procedures annually in the United States. *Id.*

111.    In certain types of nerve surgeries not involving trauma (e.g., limb amputations, most of which are from "peripheral vascular disease and diabetes," peripheral neurectomy, and complicated redo nerve decompressions), patients can benefit from Axogen products. *Id.* at 3-4. Even so, there are only about 3,000 such procedures each year in the United States, Dr. Winfree estimates. *Id.* at 4.

112.    Finally, Dr. Winfree explains that in the neurosurgical peripheral nerve community, "the gold standard for the graft reconstruction of motor nerves is ***autograft repair.***"[4] For neurosurgeons who reconstruct major motor peripheral nerves (e.g., media, ulnar, radial, and other such nerves), they "do not routinely use Axogen (or any other synthetic product) to perform these reconstructions." Instead, they use autografts. *Id.* at 3.

113.    Thus, Dr. Winfree estimates that the total number of peripheral nerve injuries in the United States is far less than even the number of such injuries for which Axogen states that its products could be used. Further, Dr. Winfree explains that there are a number of reasons why such

---

[4] Ex. A at 3 (emphasis added). As explained elsewhere in this Complaint, autograft repair involves using a segment of the patient's own nerves from another part of her body rather than, for instance, using a length of nerve tissue from a cadaver.

products would not be used for all or even most nerve injuries.  From Dr. Winfree's analysis, it is clear that the Seligman Report's are closer to (though they likely overstate) the actual figures concerning the potential market for Axogen products, and that Axogen's representations with respect to such figures are unreasonable and unrealistic.

### 3. Confidential Witness Information Corroborates the Expert Firm's Conclusions

114.    Information from five former Axogen employees corroborates the Seligman Report and Lead Plaintiff's expert analysis establishing that Defendants made material misrepresentations.

115.    CW1 was an Axogen sales representative beginning in 2015 until being promoted in early 2018, during the Class Period, to a territory manager position.  According to CW1, there were only approximately fifty to sixty sales representatives and territory mangers during this time.

116.    During his tenure at Axogen, CW1 marketed the Company's nerve repair products to customers in the metropolitan New York City area, including portions of southern Connecticut and northern New Jersey, an area with a high density of healthcare facilities, including neurosurgeons and trauma centers.  CW1 marketed all of Axogen's products, including Avance, to hospitals, surgery centers, and private medical practices.  In these roles at Axogen before and during the Class Period, CW1 thus had on-the-ground insight into the incidence of peripheral nerve repair surgeries in the areas of trauma and OMF, as well as the magnitude of the market for the Company's nerve repair products and the degree to which the Company had penetrated that market.  CW1 stated that Avance comprised 70% to 80% of the Company's sales in northern New Jersey in 2017.  When presented with the Company's claim of a $2 billion market—a claim that the Company increased to $2.7 billion during the Class Period—CW1 described the claim as

unsupported and "pretty farfetched," noting accurately that Axogen's revenues were a small fraction of purported market.

117.    CW2 said that the Company set impossibly ambitious sales goals that could not be met year after year because the market soon became saturated.   Indeed, his territory became saturated before he left the Company in early 2017.  This is so even though he had a number of Level 1 trauma centers in his territory, which handle a disproportionately large number of trauma surgeries.  As Avance is most likely to be used in trauma PNI surgeries, the saturation of this region confirms there was not a large, untapped market for Axogen's products, as it claimed.

118.    CW2's territory also included several smaller surgical centers, which CW2 said were only equipped to deal with digital nerve injuries that could often be remedied by a primary repair, which frequently did not require the use of an allograft.  CW2 further explained that the high cost of Axogen's products dissuaded smaller surgical centers from using them because the cost would often exceed the reimbursement the centers would receive and thus they would lose money on the procedures.  CW2 fielded numerous calls from customers regarding cost concerns, and described one customer complaint he received near the end of this time with Axogen that using Axogen's products had caused it to lose money.  In light of his experience, CW2 believed that Defendants' claims regarding the peripheral nerve repair field and the market for Axogen's products was likely inflated and unrealistic.

119.    CW3 seconded CW2's observation that the high cost of Axogen's products relative to the reimbursement levels for the PNI procedures limited Axogen's sales.   Based on conversations with other Axogen sales representatives who sold directly to customers (rather than to independent distributors, as CW3 did), CW3 knew that: not all of Axogen's products were reimbursable by insurance; it was hard for some surgery centers to use them and "stay in the

green"; many physicians felt they were too expensive to use; and this cost problem negatively affected Axogen's sales, especially with respect to breast reconstruction procedures.   CW3 reported that Axogen's annual price increases exacerbated this problem.   Moreover, CW3—whose sales territory covered half of the country—described the Company's claims of a nearly $1 billion market for Avance as "completely inflated" and a "pipe dream."

120.   CW4 stated that, based on his experience and conversations with other Axogen employees, it was impossible for Axogen to accomplish sales approaching $2 billion, as Defendants claimed.   The sales in CW4's territory illustrate this.   CW4 explained that by 2019, his territory was "fully saturated."    The vast majority of the relevant surgeons in that territory were hand surgeons, and there were a handful of head and neck doctors, dental surgeons, and plastic surgeons.   Because these doctors are very specialized, they are unlikely to need all of Axogen's products, i.e., a hand surgeon might use one or two Axogen products appropriate for the procedures they performed, but would not need other Axogen procedures appropriate for different procedures such as those that a dental surgeon would perform.   Thus, according to CW4, it was impossible to cross-sell products to existing customers to the extent the Company claimed, and the Company's "active accounts" were not at an "early stage of penetration," as Defendants repeatedly told investors, but were close to *fully* penetrated.   CW4 also corroborated the cost concerns identified by CW2 and CW3.   CW4 pointed out that most private insurers would not reimburse doctors for the use of Avive, Axogen's "soft tissue membrane," which is harvested from human umbilical cords.

121.   CW5, similarly, was "amazed" by the Company's claims regarding the market for its products.   CW5 said there was not a nearly $1 billion market for Avance and only would be if there were new ways to use Avance.   Like other CWs, CW5 stated that cost was a major issue that

rendered Axogen products inappropriate for a large quantity of peripheral nerve repair procedures, especially at small surgery centers, because most private insurers would not cover the cost of an allograft and such grafts were not reimbursable by Medicare or Medicaid, so the doctor would have to pass along the full cost to the patient, full payment from whom was not guaranteed.  CW5 said that doctors would decline to use Avance because they could get "just as good, or an even better result" from autografts, and doctors at level 1 trauma centers held the view that autografts were well studied and preferable to allografts.

### 4.   The Seligman Report Revealed That The Company Had Severely Overstated Its Market

122.   On December 18, 2018, Seligman Investments published the Seligman Report.  The Seligman Report thoroughly analyzed and rebutted Defendants' claims concerning the market for Axogen's core nerve repair products, including the portions relating to trauma and to Avance.  The Seligman Report claimed that it reflected extensive research involving analysis of scientific literature, consultation with subject matter experts, and interviews with former Axogen employees and neurosurgeons (many of whom were long-time customers of Axogen).

123.   With respect to Axogen's claims about its market for Extremity Trauma, the Seligman Report reviewed the Noble Article and found that it did not support the Company's claims.  The Seligman Report observed that the Noble Article discussed only one regional trauma center in Canada, rather than the U.S., that it was published in 2008, rather than 1998 as stated by the Company, and found a PNI prevalence rate of 2.8%, not the 4.76% rate employed by Axogen in its market claims.  The Seligman Report further pointed out that the Noble Article's focus on a level 1 trauma center skewed its findings towards a dramatically higher PNI prevalence.

124.   The Seligman Report then reviewed much more robust and more recent studies involving larger numbers of patients (in the U.S.) that directly addressed the prevalence of PNI as

a percentage of trauma patients, and found those studies to have reported significantly lower, more reliable PNI rates than those on which Axogen relied.

125.     The Seligman Report first discussed a 2016 study that analyzed a massive database of 20.6 million traumatic injury discharges from 2000 to 2011 (the "2016 Trauma Study").  The database analyzed in the 2016 Trauma Study is maintained by the U.S. Agency for Healthcare Research and Quality, the lead federal agency charged with improving the safety and quality of the U.S. health care system.  The 2016 Trauma Study, published in a reputable peer-reviewed medical journal, analyzed injuries in the database by location and type, and found that (i) "[t]he average annual rate of trauma discharges remained steady at 524.3 per 100,000 population," and (ii) nerve injuries from extremity trauma constituted 0.46% of trauma discharges in the U.S. during the period encompassed by the data.  Unlike the 1998 article Axogen cites, the 2016 Trauma Study (1) examined all trauma discharges over more than a decade; (2) determined the relative prevalence of different types of injury; and (3) examined the United States as a whole rather than a single trauma facility in Canada.

126.     The Seligman Report also analyzed the 2008 Extremity Trauma Article, which, as noted in ¶ 149, *infra*, analyzed a database concerning sixteen million individuals.  The 2008 Extremity Trauma Article concluded that "significant peripheral nerve injuries are rare in people with limb trauma, with an overall rate of 1.64%."  It also notes that its findings were lower than studies focused on single trauma centers, such as the Noble Article, and that "[p]revious studies involving tertiary care centers with a higher proportion of patients with severe trauma reflect a referral bias.  Therefore, those PNI rates are not generalizable to the whole population."  The article stated that its conclusions "likely reflect the population rates *more accurately* than single centers."

127.     Using data from these two articles, the Seligman Report then calculated Axogen's Extremity Trauma market.  Using a trauma discharge rate of 524 as set forth in the 2016 Trauma Study, the Seligman Report applied that rate to the estimated total US population of 326 million, yielding approximately 1.7 million total trauma discharges annually.  Then, taking the finding from the 2008 study that PNI is present in 1.64% of extremity trauma patients, the Seligman Report calculated that there are approximately 28,000 PNI cases each year in the U.S., rather than the 719,000 the Company claimed.  This conclusion of the Seligman Report thus aligns with the Expert Firm's analysis in finding a starkly smaller volume of PNI procedures each year than what Axogen told investors.  As noted above, the Expert Firm calculated that the Company's combined market for OMF and trauma encompasses just 38,192 nerve procedures each year in the U.S.

128.     The Seligman Report further noted that many PNI cases can be repaired without any kind of graft (such as nerve trauma involving a small gap, or no gap at all, in the transected nerve) and that many surgeons prefer autografts (which are considered the "gold standard" for bridging peripheral nerve gaps).  As a result of these considerations, the Seligman Report determined that not all PNI cases were truly within Axogen's market.  The report applied the "aggressive and unrealistic assumption" that allografts such as Avance might be used in 50% of PNI cases, or approximately 14,000 PNI cases annually.  This aligns with the Noble Article's observation that only 54% of patients that suffered a PNI within its scope required *any* surgery to a peripheral nerve.  Using the non-weighted average price for the smallest ($1,500 for a 15 mm segment) and longest ($6,000 for a 70 mm segment) lengths of Avance on the market (yielding an average of $3,750), the Seligman Report determined that Axogen's market for Avance with respect to trauma is just $52 million: a miniscule fraction of the $976 million market for Avance that Axogen touted to investors during the Class Period.

129.     The Seligman Report observed that this result "explains the mystery of why sales of Axo[G]en's flagship allograft product [Avance] are a mere $39 million by our estimate, 11 years after product launch."

130.     The Seligman Report corroborated its analysis by interviewing former Axogen employees, including sales representatives, area sales managers, and executives, as well as independent distributors.   Their testimonials—enlightening to investors and devastating to the Company's market narrative—included the following two statements:

> "For market size they throw out a $1B+ number quite a bit. They took all peripheral nerve injuries and defined them as a revenue generator. They added up all the CPT codes and came up with a number in the billions. **It's not true. It's comical. All the reps know that. It's fluff. It's not realistic. It's maybe a $150-200mm market. It would be the kiss of death if anyone questioned that number.** No one in middle management can challenge it or make a joke about it. Have to say yes ma'am and do your job and make sure you keep it." – Attributed to a former Axogen sales representative (emphasis in Seligman Report)

> **"I've always been highly critical of the $2B nerve market size. It's a highly flawed number. I in no way believe that.** I know where that number came from and it's based on hospital admissions, percent of reported nerve cases, a lot of if's. When you look at the clinical side, things like nerve palsy etc. are self resolving and the rest are simple repairs that don't need Axogen's product. **There is a lot of conversation among Axogen's reps about the market size figure. It's a misleading number."** – Attributed to a former Axogen sales manager (emphasis in Seligman Report)

131.     In preparing its report, Seligman Investments also interviewed numerous doctors who perform PNI surgery, including many "knowledge and opinion leaders" ("KOLs"), among the highest-volume users of Avance, who receive significant payments from the Company to educate their peers about Axogen's products.   As the Seligman Report notes, if these doctors have any bias, it likely would be a bias in favor of the Company.   Yet these surgeons repeatedly indicated that the Seligman Report's estimates of the market, not Axogen's, were appropriate:

> **"Why are Axogen's graft revenues only $35mm?  These injuries just aren't that common."** – Attributed to one of Axogen's highest volume customers (emphasis in Seligman Report)

**"20,000 nerve cases per year is a ballpark.  That's probably a reasonable estimate."** – Attributed to a KOL and speaker for Axogen who performs a high volume of nerve repair procedures annually (emphasis in Seligman Report)

"[T]he case volume is limited.  These kinds of injuries are not common. . . . Axogen is basically a trauma product used in academic facilities." – Attributed to a surgeon who has presented papers for Axogen (emphasis in Seligman Report)

"It's just the volume of these cases.  There's a 10:1 ratio between lacerations and those with a gap. . . .  What does that say about market size?  Yeah digital nerve injuries are a small market. . . .  Why are Axogen revenues so small after 11 years?  A lot of injuries can be repaired just otherwise without a graft." – Attributed to a surgeon in the eastern U.S. (emphasis in Seligman Report)

132.    Surgeon interview excerpts in the Seligman Report also undercut the Company's oft-repeated contention that its products are early in the adoption cycle among surgeons.  Based upon those interviews, the Seligman Report stated that doctors in the Company's market were already aware of the products and that doctors who were likely to use them were largely doing so already:

**"Over the past ten years, all my hand fellows have been using Axogen**.  Ten years ago there were none.  Over the last 5-6 years, they all use it." – Attributed to a surgeon in the western U.S. (emphasis in Seligman Report)

"I do 750 procedures per year. . . . 30 cases per year with an Axogen product.  I'm maxed out.  All my partners – 4 doctors – use it maximally." – Attributed to a surgeon in the western U.S. (emphasis in Seligman Report)

### 5.    Axogen's Market Opportunity Was Orders of Magnitude Smaller than Claimed

133.    The $1.8 billion to $2.7 billion U.S. market that Axogen claimed existed for Axogen's core nerve repair products, including at least $1.5 billion for Extremity Trauma, ***does not exist***.  Rather, the market for Axogen's products in the fields of Extremity Trauma and OMF combined is only ***$112 million***.  As a result, the market for Avance—Axogen's most important product—which the Company claimed was primarily in the field of Extremity Trauma, was a sliver of what was stated in the Offering Documents.

### 6.     Axogen Misleadingly Claims Support for Its Market Claims

134.    There is a vast disparity between the statements Defendants' made in the Offering Documents about the market for Axogen's products and the truth about the actual size of the market.  In the Offering Documents, Defendants justified their claims concerning the size of the market by reference to three sources: the 2011 HHS Report, the Brattain Article, and the Noble Article.  Defendants did not refer to these sources in the prospectuses for the Offerings themselves, but did include them in the 2016 10-K and 2017 10-K as support for their claim encompassed "over 700,000 extremity nerve repair procedures" performed in the U.S. each year. Contrary to the Defendants' statements, however, these sources do ***not*** support Defendants' false and misleading market claims and the citations and references to them were themselves separate misrepresentations by Defendants.

### a.     Axogen Represents that Reputable Government Data Supports Its Market Claims – the 2011 HHS Report:

135.    To support its claims regarding the market for Avance, Axogen's 2016 10-K and 2017 10-K each cited the 2011 HHS Report. Nowhere, however, in the 583-page 2011 HHS Report does the word "nerve" appear.  The word "trauma" appears three times:  twice in the phrase "birth trauma" and once in a citation to the National Traumatic Occupational Fatalities database.  In short, this publication has nothing to do with the size of the market for the peripheral nerve repair and does not support the contention for which Axogen cited it.  Defendants have never provided any rationale for citing to or relying on this document.  Rather, following the Class Period, Axogen effectively admitted that the 2011 HHS Report does not support its market size claims in that, following the Class Period, Axogen removed the citation to this document from its list of supposed sources for its representations of market size.

**b.      Axogen Relies on Its Own Funded Marketing Masquerading as Scientific Research – the Brattain Article:**

136.    Axogen also cited the Brattain Article in connection with its Extremity Trauma market claims.  This document was published in 2013 and authored by a doctor named Kurt Brattain ("Brattain").  In that article, Brattain estimated that the U.S. market for repair of peripheral nerves in the extremities is in the range of $1.32 billion to $1.93 billion per year.

137.    However, the Brattain Article cannot withstand even minimal scrutiny.  As the Brattain Article states on its first page, Axogen funded the Brattain Article, presumably for the purpose of having something to cite to investors (which Axogen started doing at least as early as 2015).  Axogen did not tell investors in the Offering Documents that it provided the funding for the Brattain Article—an omission that rendered its citation to and reliance on that document materially misleading.

138.    Additionally, the Brattain Article is littered with red flags that reveal its unreliable and biased nature.  First, the Brattain Article has never been published in a medical or scientific journal, as revealed by a review of medical and scientific journal databases, and thus was not subject to the peer review process required by such journals.  Rather, it was issued as an attachment to a press release by "Magellan Medical Technology Consultants," a consulting company that "help[s] clients bring . . . products to market."

139.    Second, the author, Kurt Brattain, has no practical experience or expertise in PNI surgery or marketing.  The Brattain Article describes him as "a data scientist/statistician [who] is board certified in Family Medicine with a current license in the state of Minnesota."  His LinkedIn profile indicates he is employed by "Geissler Companies," a small veterinary products company the chairman of which is Donald Brattain, presumably a relative of his.

43

140.    Third, and most fundamentally, the substance of the Brattain article would never survive peer review.  At its core is a survey of U.S. nerve repair surgeons.  The article does not, however, state how its sampling was conducted, only that "an independent market research firm produced an online survey asking nerve repair surgeons for their opinions on current nerve repair techniques and devices as well as their future utilization of the currently available options."  It does not indicate the response rate to the survey, the population of nerve surgeons to whom the survey was sent, or how this population was identified.  Moreover, "the 25 surveyed nerve injury surgeons" had "a combined annual PNI repair caseload of 2,824 cases."  This miniscule sample size further undermines any confidence in the results.

141.    Raising further suspicions, the Brattain Article is strikingly similar to Defendant Zaderej's statements during Class Period earnings calls.  For example, the Brattain Article stated that "we've only scratched the surface of this market," bringing to mind Defendant Zaderej's statements that "we are just scratching the surface of our available market potential" (as she said during the August 2, 2017, February 28, 2018, April 30, 2018, and August 1, 2018 earnings calls) (*see* ¶¶ 260, 269, 280, 289, 298, and 303, below).  Similarly, Zaderej stated on the October 29, 2018 earnings calls, the last Axogen earnings call before the Seligman Report was released, that "we're just scratching the surface of what is a large growth opportunity," as noted in ¶ 318, below.

142.    The Brattain Article did not provide a reasonable basis for the market claims the Company set forth in the Offering Documents.

c.      **The Company Falsely Claims Support from the Noble Article:**

143.    In both the 2016 10-K and the 2017 10-K, the Company cited the Noble Article in connection with the statement that "each year in the U.S. more than 1.4 million people suffer traumatic injuries to peripheral nerves. Axogen estimates that traumatic injuries to peripheral nerves result in over 700,000 extremity nerve repair procedures."  The Company's citations to the

44

Noble Article, however, do not support this proposition, and the citations are false and misleading for numerous reasons.

144.    The Noble Article reported the results of a study "to determine the prevalence, cause, severity, and patterns of associated injuries of limb peripheral nerve injuries sustained by patients with multiple injuries seen at a regional Level 1 trauma center."  The article's authors analyzed data regarding patients treated between January 1, 1986 and November 30, 1996 at the principal Level 1 trauma center in the Canadian province of Ontario.  At that institution, "standardized trauma assessment forms . . . are used to document all of the injuries to patients," and that data is entered into a computerized database, which offers "a comprehensive overview of each patient's injuries and treatment course" at the trauma center.  The Noble Article's authors analyzed this database to identify patients that suffered a PNI.  They then conducted a detailed review of those patients' charts to confirm that a PNI was suffered.  Certain patients that were identified as having suffered a PNI in the database were excluded from the count of PNI results because the PNI could not be confirmed by a review of their charts.  As a result of these analyses, the Noble Article reported: "From a trauma population of 5,777 patients treated between January 1, 1986, and November 30, 1996, 162 patients were identified as having an injury to at least one of the peripheral nerves of interest, *yielding a prevalence of 2.8%*.

145.    Thus, the Noble Article did *not* attempt to estimate or determine the prevalence of PNI in Ontario, in Canada as a whole, or in the United States.  Nevertheless, throughout the Class Period, Axogen extrapolated this study of a single institution in Ontario (which found only 162 patients that sustained a PNI) to the entire United States in order to claim that the Company's nerve repair market included over 700,000 extremity trauma procedures performed annually.  There is

no basis to apply the Noble Article's prevalence rate to the United States as a whole, nor has Axogen supplied one—either during or subsequent to the Class Period.

146.    The Expert Firm reviewed the Noble Article and identified multiple reasons why the Noble Article would identify a higher PNI prevalence rate than the United States as a whole. *First*, a level 1 trauma center is not like other hospital emergency departments.  Level 1 trauma centers are eminently capable institutions: level 1 is the highest designation of trauma center. There are fewer of them—only 239 in the U.S. as of 2016, as opposed to the over 4,600 hospital-based emergency departments as of 2008.  According to the American Trauma Society:

> [A] Level I Trauma Center is a comprehensive regional resource that is a tertiary care facility central to the trauma system. A Level I Trauma Center is capable of providing total care for every aspect of injury – from prevention through rehabilitation.

> Elements of Level I Trauma Centers Include:

> - 24-hour in-house coverage by general surgeons, and prompt availability of care in specialties such as orthopedic surgery, neurosurgery, anesthesiology, emergency medicine, radiology, internal medicine, plastic surgery, oral and maxillofacial, pediatric and critical care.

> - Referral resource for communities in nearby regions.

>   . . .

> - Meets minimum requirement for annual volume of severely injured patients.

147.    A level 1 trauma center is thus a "comprehensive regional resource" that offers "prompt availability of care in specialties such as . . . neurosurgery," serves as a "[r]eferral resources for communities in nearby regions," and satisfies "minimum requirement[s] for annual volume of severely injured patients."  Patient populations at level 1 trauma centers can be expected to experience PNI more frequently than patient populations generally.  By definition, level 1 trauma centers offer prompt care in several areas of particular relevance to PNI, including emergency medicine, plastic surgery, oral and maxillofacial care, and perhaps most notably,

*neurosurgical care*.  Thus, patients in need of such care are referred more frequently to such centers instead of other types of healthcare facilities.  Furthermore, level 1 trauma centers serve as a referral resource for communities in nearby regions, whose emergency health services may be unable to address peripheral nerve injury promptly, exacerbating the PNI disparity between level 1 trauma centers and emergency departments at other types of healthcare facilities.  Moreover, level 1 trauma centers meet "minimum requirements for annual volume of severely injured patients."  Thus, their patient populations reflect a higher incidence of severe injury relative to health providers that are not subject to such minimum requirements.  Considerable trauma is necessary to injure nerves.  Indeed, the primary type of limb injury incurred is an uncomplicated fracture, which results in nerve injury only infrequently.  Level 1 trauma centers, which treat severe injuries on a more frequent basis, will report a higher rate of peripheral nerve injuries among their patients.

148.    The scientific literature makes this explicit.  For example, a 2008 article entitled "The Incidence of Peripheral Nerve Injury in Extremity Trauma" (the "2008 Extremity Trauma Article") was published in a peer-reviewed scientific journal and, despite *directly* addressing the size of the Company's Extremity Trauma market opportunity *more recently than the Noble Article*, was *not* cited by Defendants.  The 2008 Extremity Trauma Article surveyed the Noble Article and other relevant literature and concluded that "*[p]revious studies involving tertiary care centers with a higher proportion of patients with severe trauma reflect a referral bias.  **Therefore, those PNI rates are not generalizable to the whole population***."

149.    By contrast to the Noble Article's analysis of under 6,000 patients in Ontario, the 2008 Extremity Trauma Article analyzed a database that reports inpatient and outpatient healthcare service use of individuals nationwide (in the U.S.) who are covered by the benefit plans of large

47

U.S. employers, health plans, and government and public organizations, reflecting over 16 million people.  Of those people, the prevalence of limb trauma was only *1.4%*, a far cry from the 2.8% the Noble Article reported and over 70% smaller than the 4.76% rate Axogen employed. Furthermore, the article concluded that, *of this 1.4% that experienced limb trauma, **only 1.64% sustained nerve injuries***.  Thus, of the 16 million persons in the database, only 0.02296% sustained nerve injuries.  This 1.64% prevalence rate is significantly more reliable than the 2.8% rate set forth in the Noble Article—or the much higher 4.76% rate employed by Axogen, as discussed below.

150.    Applying these rates from the 2008 Extremity Trauma Article to the total U.S. population of approximately 326 million indicates that approximately 75,000 persons suffer limb trauma involving PNI each year in the U.S., or ***less than 11% of Axogen's unsupported claim***. First, the 2008 Extremity Trauma Article found that 1.4% of the approximately 16 million persons in its study scope suffered limb trauma.  Thus, it indicates that 4.6 million persons suffer limb trauma in the U.S. each year.  Second, the 2008 Extremity Trauma Article found that 1.64% of limb trauma cases involved injury to a peripheral nerve.  Applying this 1.64% prevalence rate to 4.6 million persons reveals that each year in the U.S. approximately 75,000 persons suffer PNI as a result of limb trauma.

151.    Given an average price for the relevant Axogen nerve repair products of $2,725, as set forth in Axogen's post-Class Period investor presentation,[5] this yields a total market of $205 million, a small fraction of the multi-billion dollar market Axogen claimed, and much closer to the $112 million (for trauma and OMF combined) that the Expert Firm reached, as set forth above.

---

[5] The Company made available a revised investor presentation dated as of December 31, 2018, just days after the Class Period ended (the "December 31, 2018 Investor Presentation").

These calculations by the Expert Firm, which included calculations regarding the portions of the market that Axogen could service, are set forth below.

**Annual US Market Size for Nerve Procedures Relating from Trauma**[6]

|  | Scenario 1 | Scenario 2 |
|---|---|---|
| [1] US Population | 327 MM | 327 MM |
| [2] % with Limb Trauma | 1.4% | 1.4% |
| [3] Individuals with Limb Trauma | 4.6 MM | 4.6 MM |
| [4] % with PNI | 1.64% | 1.64% |
| [5] PNI Cases | 75,118 | 75,118 |
| [6] Average Price for Relevant Axogen Products | $2,725 | $2,725 |
| [7] Addressable Market | $205 MM | $205 MM |

---

[6] The footnotes and note to this table, which set forth the Expert Firm's calculations and the sources employed, are as follows:

Sources:

[1] "Population estimates, July 1, 2018, (V2018)," U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/US#.

[2] Christopher A. Taylor *et al*., "The Incidence of Peripheral Nerve Injury in Extremity Trauma," *American Journal of Physical Medicine & Rehabilitation* 87(5) (May 2008): p. 384.

[3] [1] * [2].

[4] Christopher A. Taylor *et al*., "The Incidence of Peripheral Nerve Injury in Extremity Trauma," *American Journal of Physical Medicine & Rehabilitation* 87(5) (May 2008): p. 384.

[5] [3] * [4].

[6] Assumption taken from Axogen. "Corporate presentation," Axogen, March 31, 2019, slide 9, https://d1io3yog0oux5.cloudfront.net/_799cb3050364b5f5e786b78e255c893f/axogeninc/db/338/8369/pdf/Q1+2019+-+Axogen_Corporate_Presentation+FINAL.pdf.

[7] [5] * [6].

[8] Scaling down to account for competition including competition in primary repairs and autograft vs. allograft.

[9] [7] * [8].

Note: Taylor *et al.*'s definition of limb trauma is inclusive of diagnostic codes associated with trauma to many relevant body parts including: wrist, hand, fingers, ankle, foot, etc. Christopher

152.     The second reason that it is improper to apply the Noble Article's prevalence rate to the U.S. as a whole is that the Noble Article reported a prevalence rate on a *per patient* basis. Axogen, however, applied that prevalence rate to emergency room *visits*.  Of course, the number of emergency room visits may be larger (and *cannot* be smaller) than the number of patients visiting an emergency room because a single patient might visit an emergency room more than once within the relevant time period.  This is not a minor disparity.  For instance, a 2008 article (published in a peer-reviewed scholarly journal) analyzing California data found that the mean number of emergency department visits per patient per year was ***1.69***.  In light of this, Axogen's application of a per *patient* prevalence rate to numbers of emergency department *visits* resulted in ***vastly*** overstating the number of extremity trauma procedures performed annually in the United States.

153.     Finally, the 2.8% PNI prevalence rate per patient reported by the Noble Article is remarkably high compared to similar studies, such as the 2008 Extremity Trauma Article discussed in ¶ 149 above.

154.     Compounding matters, Axogen did not use the 2.8% PNI prevalence rate that the Noble Article reported.  Rather, Axogen used a PNI prevalence rate of 4.76% (or 170% of the Noble Article's conclusion).  Following the end of the Class Period (but not before), Axogen explained in the December 31, 2018 Investor Presentation that this reflected the inclusion of patients that the Noble Article excluded on the basis that their "peripheral nerve trauma was found to involve plexus or nerves not of interest to the present analysis."  Axogen now claims that these

---

A. Taylor *et al*., "The Incidence of Peripheral Nerve Injury in Extremity Trauma," *American Journal of Physical Medicine & Rehabilitation* 87(5) (May 2008): p. 383.

injuries are "in the Axogen scope of nerve repair" and that "including these injuries increases the rate to 4.76%."

155.    This 4.76% rate is extraordinarily higher than comparable studies reflected in the scientific literature available during and prior to the Class Period.  Furthermore, that 4.76% rate does *not* reflect the detailed chart review that was part of the Noble Article's methodology.  As discussed above, the Noble Article reflected the use of a database to identify patients in the study population that had suffered trauma resulting in any form of a PNI.  However, this *excluded* PNI involving "plexus or nerves not of interest."  As a second step, the Noble Article states, "*[a]fter the PNI patients were identified*, a detailed chart review was undertaken to verify the database information."  That review led to the exclusion of nearly *11%* of the patients identified in the database as having suffered a PNI.  Axogen's choice to employ a prevalence rate reflecting the inclusion of patients who suffered PNI involving "plexus or nerves not of interest" but whose charts were *not* subject to a detailed review is unjustified, is inconsistent with the methodology of the Noble Article, and served to materially inflate the Company's market relating to extremity trauma procedures.

### 7.    The Company's Market Claims in the Offering Documents Were Material

156.    The Company's claims in the Offering Documents that there existed a multibillion dollar market for its core nerve repair products, particularly Avance, and particularly in the areas of extremity trauma and OMF, were material to investors.  The size of the Company's market was fundamental to the value of the Company and thus of its common stock.  Furthermore, the Company's market size was particularly important because the Company had not attained profitability—the Company's value was thus highly dependent on the purportedly gigantic market that it claimed existed for its products.

157.    Moreover, the discrepancy between the Company's claims and the truth, as calculated by the Expert Firm and as corroborated by five CWs and the Seligman Report, was itself material.  The market for Axogen's core products in the areas of trauma and OMF—the two most significant fields in the Company's market, according to the Offering Documents—is only 5% to 6.9% of what the Offering Documents claimed.  This enormous disparity profoundly affected the value of the Company, as shown by the drastic decline in the price of its common stock upon publication of the Seligman Report.

F.    LOSS CAUSATION

158.    The Seligman Report was published on December 18, 2018.  In response to the shocking disclosures and new analysis and information in the Seligman Report, Axogen's stock price fell *22%*, from a closing price of $27.53 per share on December 17, 2018 (the day before the Seligman Report was published), to close at $21.36 on December 18, 2018.  This coincided with a remarkably high volume of trading in the market—over 4,944,743 shares traded hands on December 18, 2018, compared to just 214,825 one week prior.

159.    Over the following three trading sessions, Axogen's stock price declined an additional 20%, closing at $19.83 per share on December 19, $17.89 on December 20, and $17.09 on December 21, 2018, with unusually heavy trading on each of these days.

160.    During much of the ninety days following the end of the Class Period, Axogen's stock price was lower than $17 per share, and at the end of this ninety-day period it remained mired at $21.50 per share.

161.    The decline in the price of Axogen common stock from December 17 to December 21, 2018, was the direct result of the nature and extent of the revelations made to the market by the Seligman Report concerning the market for the Company's core nerve repair products.  The timing and magnitude of the decline in the price of Axogen common stock negates any inference

that the losses suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the actionable conduct alleged herein.  Rather, the revelations of truth and the resulting market reaction supports the reasonable inference that the market understood that Defendants' prior statements were materially false and misleading and omitted material information.  The analysis performed by the Expert Firm confirms that the Seligman Report revealed new, material information and that the Company made material misrepresentations during the Class Period.

## IV.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT I
### Violation of Section 11 of the Securities Act
### Against the November 2017 Offering Defendants
### In Connection with the November 2017 Offering

162.    Lead Plaintiff incorporates by reference and realleges each and every allegation relating to the Securities Act claims, as well as §§ VI and VII, *infra*, as if fully set forth herein.

163.    This Count is brought pursuant to Section 11 of the Securities Act against Defendants Axogen, Zaderej, Mariani, Leerink, and JMP (together, the "November 2017 Offering Defendants") on behalf of Lead Plaintiff and members of the Class who purchased or otherwise acquired Axogen common stock in, pursuant to, and/or traceable to the November 2017 Offering and were damaged by the acts alleged herein.

164.    The 2015 Registration Statement and the October 2017 Registration Statement, at the time when the relevant parts thereof became effective, contained (and/or incorporated by reference) untrue statements of material fact or omitted to state (and/or incorporated by reference documents that omitted to state) material facts required to be stated therein or necessary to make the statements therein not misleading.

165.    As the issuer in the November 2017 Offering, Axogen is strictly liable for the actionable statements and omissions in the 2015 Registration Statement and the October 2017 Registration Statement.

166.    The Defendants other than Axogen named in this Count acted negligently in that none of them conducted a reasonable investigation to ensure, or had reasonable grounds to believe and di believe, that the statements contained in the 2015 Registration Statement and the October 2017 Registration Statement were true and that there was no omission of material fact required to be stated therein or necessary to make the statements therein not misleading.  These Defendants are liable for the actionable statements in the 2015 Registration Statement and the October 2017 Registration Statement in that, *inter alia*: (i) Defendant Zaderej signed the 2015 Registration Statement and the October 2017 Registration Statement as the CEO and/or a director of Axogen, and Defendant Mariani signed October 2017 Registration Statements as the Company's CFO; (ii) the Director Defendants, and Zaderej, were directors of the Company at the time of the filing of the relevant parts of the 2015 Registration Statement and the October 2017 Registration Statement with respect to which their liability is asserted; and (iii) Leerink and JMP were underwriters of the November 2017 Offering.

167.    When they acquired Axogen common stock in, pursuant to, and/or traceable to the November 2017 Offering, Lead Plaintiff and members of the Class did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained (and/or incorporated by reference) in the 2015 Registration Statement and the October 2017 Registration Statement.

168.    Lead Plaintiff and the Class suffered damages in connection with the purchase or acquisition of Axogen common stock in, pursuant to, and/or traceable to the November 2017 Offering.

### COUNT II
**Violation of Section 11 of the Securities Act**
**Against the May 2018 Offering Defendants**
**In Connection with the May 2018 Offering**

169.    Lead Plaintiff incorporates by reference and realleges each and every allegation relating to the Securities Act claims, as well as §§ VI and VII, infra, as if fully set forth herein.

170.    This Count is brought pursuant to Section 11 of the Securities Act against Defendants Axogen, Zaderej, Mariani, and the Underwriter Defendants (together, the "May 2018 Offering Defendants") on behalf of Lead Plaintiff and members of the Class who purchased or otherwise acquired Axogen common stock in, pursuant to, and/or traceable to the May 2018 Offering and were damaged by the acts alleged herein.

171.    The May 2018 Registration Statement, at the time when the relevant parts thereof became effective, contained (and/or incorporated by reference) untrue statements of material fact or omitted to state (and/or incorporated by reference documents that omitted to state) material facts required to be stated therein or necessary to make the statements therein not misleading.

172.    As the issuer in the May 2018 Offering, Axogen is strictly liable for the actionable statements and omissions in the May 2018 Registration Statement.

173.    The Defendants other than Axogen named in this Count acted negligently in that none of them conducted a reasonable investigation to ensure, or had reasonable grounds to believe and di believe, that the statements contained in the Offering Documents were true and that there was no omission of material fact required to be stated therein or necessary to make the statements therein not misleading.  These Defendants are liable for the actionable statements in the May 2018

Registration Statement in that, *inter alia*: (i) Defendant Zaderej signed the May 2018 Registration Statement as the CEO and/or a director of Axogen, and Defendant Mariani signed as the CFO of Axogen; (ii) the Director Defendants, and Zaderej, were directors of the Company at the time of the filing of the relevant parts of the May 2018 Registration Statement with respect to which their liability is asserted; and (iii) the Underwriter Defendants were underwriters of the May 2018 Offering.

174.    When they acquired Axogen common stock in, pursuant to, and/or traceable to the Offerings, Lead Plaintiff and members of the Class did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained (and/or incorporated by reference) in the May 2018 Registration Statement.

175.    Lead Plaintiff and the Class suffered damages in connection with the purchase or acquisition of Axogen common stock in, pursuant to, and/or traceable to the May 2018 Offering.

**COUNT III**
**Violation of Section 12(a)(2) of the Securities Act**
**Against Axogen, Zaderej, the Director Defendants, Leerink, and JMP**
**In Connection with the November 2017 Offering**

176.    Lead Plaintiff incorporates by reference and realleges each and every allegation relating to the Securities Act claims, as well as §§ VI and VII, infra, as if fully set forth herein.

177.    This count is brought pursuant to Section 12(a)(2) of the Securities Act against the Axogen, Zaderej, the Director Defendants, Leerink, and JMP on behalf of Lead Plaintiff and members of the Class who purchased or otherwise acquired Axogen common stock in, pursuant to, and/or traceable to the November 2017 Offering.

178.    The Defendants named in this Count offered, sold, and/or solicited the purchase of (or assisted in the offer, sale, or solicitation of the purchase of) Axogen common stock by means of a prospectus or oral communication.

179.     The Defendants named in this Count assisted in the planning of the November 2017 Offering and actively participated in the decisions regarding, among other things, the price of Axogen common stock sold in the November 2017 Offering and the information contained in the November 2017 Prospectus (including both the Company Prospectus and the Selling Shareholder Prospectus).

180.     The prospectuses included (and/or incorporated by reference) untrue statements of material fact or omitted to state (and/or incorporated by reference documents that omitted to state) material facts required to be stated therein or necessary to make the statements therein not misleading.

181.     The Defendants named in this Count acted negligently in that none of them exercised reasonable care to ensure that the prospectuses did not include untrue or misleading statements or omissions of material fact.

182.     When they acquired Axogen common stock directly from the Defendants named in this Count, Lead Plaintiff and other members of the Class did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained (and/or incorporated by reference) in the prospectuses for the November 2017 Offering.

183.     Lead Plaintiff and other members of the Class suffered damages in connection with the purchase or acquisition of Axogen common stock in, pursuant to, and/or traceable to the November 2017 Offering.

184.     By reason of the foregoing, the Defendants named in this Count are liable to Lead Plaintiff and other members of the Class for (i) the consideration paid for Axogen common stock with interest thereon, less the amount of any income received thereon, upon tender of such shares

of Axogen common stock, or (ii) damages as to the such shares of Axogen common stock no longer owned.

## COUNT IV
### Violation of Section 12(a)(2) of the Securities Act
### Against Axogen, Zaderej, the Director Defendants, and the Underwriter Defendants
### In Connection with the May 2018 Offering

185.    Lead Plaintiff incorporates by reference and realleges each and every allegation relating to the Securities Act claims, as well as §§ VI and VII, infra, as if fully set forth herein.

186.    This count is brought pursuant to Section 12(a)(2) of the Securities Act against the Axogen, Zaderej, the Director Defendants, and the Underwriter Defendants on behalf of Lead Plaintiff and members of the Class who purchased or otherwise acquired Axogen common stock in, pursuant to, and/or traceable to the May 2018 Offering.

187.    The Defendants named in this Count offered, sold, and/or solicited the purchase of (or assisted in the offer, sale, or solicitation of the purchase of) Axogen common stock by means of a prospectus or oral communication.

188.    The Defendants named in this Count assisted in the planning of the May 2018 Offering and actively participated in the decisions regarding, among other things, the price of Axogen common stock sold in the Offerings and the information contained in the May 2018 Prospectus.

189.    The prospectus included (and/or incorporated by reference) untrue statements of material fact or omitted to state (and/or incorporated by reference documents that omitted to state) material facts required to be stated therein or necessary to make the statements therein not misleading.

190.    The Defendants named in this Count acted negligently in that none of them exercised reasonable care to ensure that the prospectus did not include untrue or misleading statements or omissions of material fact.

191.    When they acquired Axogen common stock directly from the Defendants named in this Count, Lead Plaintiff and other members of the Class did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained (and/or incorporated by reference) in the prospectuses for the May 2018 Offering.

192.    Lead Plaintiff and other members of the Class suffered damages in connection with the purchase or acquisition of Axogen common stock in, pursuant to, and/or traceable to the May 2018 Offering.

193.    By reason of the foregoing, the Defendants named in this Count are liable to Lead Plaintiff and other members of the Class for (i) the consideration paid for Axogen common stock with interest thereon, less the amount of any income received thereon, upon tender of such shares of Axogen common stock, or (ii) damages as to the such shares of Axogen common stock no longer owned.

## V.    CLAIMS FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934

### A.    EXCHANGE ACT PARTIES

#### 1.    Lead Plaintiff

194.    Lead Plaintiff purchased or otherwise acquired Axogen common stock on domestic exchanges in the United States during the Class Period, including in, pursuant to, and/or traceable to both of the Offerings, and was damaged as a result of the Exchange Act Defendants' materially false and misleading statements and omissions alleged herein.

### 2. Exchange Act Defendants

195.    Defendant Axogen issued the common stock that is the subject of this action and issued the SEC filings and other documents containing actionable statements as set forth herein.

196.    As noted above, Defendant Zaderej served as Axogen's President, Chief Executive Officer ("CEO"), and a member of the Company's Board of Directors (the "Board") during the entire Class Period and until today, and became Chairman of the Board in May 2018.

197.    Also as noted above, Defendant Mariani has served as Axogen's Chief Financial Officer ("CFO") since March 2016.

198.    Zaderej and Mariani are collectively referred to herein as the "Exchange Act Individual Defendants." Zaderej and Mariani were both direct and substantial participants in the Exchange Act violations alleged in this Complaint. Zaderej and Mariani both spoke directly to investors and analysts, on behalf of the Company, in numerous earnings calls and other events during the Class Period, signed and certified the Company's annual reports on Form 10-K for 2016 and 2017 and all of the Company's quarterly reports on Form 10-Q filed with the SEC during the Class Period or incorporated by reference in the Offering Documents (defined herein), signed and certified the registration statements and prospectuses for the Offerings, and personally made many of the false or misleading statements and omissions set forth herein.

199.    Axogen and the Exchange Act Individual Defendants are collectively referred to herein as the "Exchange Act Defendants."

### 3. Relevant Non-Parties

200.    Information from CWs 1 through 5, described in §§ III(A)(3) and III(E)(3), *supra*, supports Lead Plaintiff's claims for violation of the Exchange Act.

B.    THE EXCHANGE ACT DEFENDANTS' FRAUDULENT SCHEME

201.    When the Class Period began, Avance had already been on the market for ten years, yet the Company's gross revenues were only $41 million for 2016 and only $27.4 million for the first six months of 2017. Nevertheless, the Exchange Act Defendants repeatedly portrayed the Company as being on the cusp of a breakout in light of the nearly one million peripheral nerve repair procedures performed each year in the United States in which, according to these Defendants, Axogen's products, in particular Avance, were appropriate for use. At least seventeen times during the Class Period, the Exchange Act Defendants told investors that 900,000 or more peripheral nerve repair procedures and/or over 700,000 such procedures resulting specifically from trauma, are performed in the U.S. each year. This false and groundless context for the Company's historical results misled investors.

### 1.    The Beginning of the Class Period through the November 2017 Offering

202.    The Class Period began on August 2, 2017, when Axogen announced an increase to its "addressable market opportunity" to *$2 billion*. That day, Axogen filed its Form 10-Q for the second quarter of 2017 (the "2017 Q2 10-Q") and hosted an investor conference call. The Company reported quarterly revenue of $15.2 million, but a quarterly net *loss* of $2.1 million. On the earnings call, in which both Defendants Zaderej and Mariani participated, Defendant Zaderej stated:

> There are more than 900,000 nerve repair surgeries annually in the U.S., pointing to a market opportunity of over $2 billion for Axogen's products.

203.    Zaderej further stated:

> We're also pleased to announce a change to our *addressable market opportunity* to *$2 billion* due to expanded use of the Axogen product portfolio in oral and maxillofacial procedures . . . . We believe this additional application of our product portfolio moves the *current addressable market opportunity to $2 billion in our current markets of trauma, upper extremity, and oral and maxillofacial surgery*.

61

204.     Zaderej concluded her initial remarks by commenting: "We are pleased with our progress and with the opportunity to continue to develop *the emerging nerve repair market* and drive long-term sustainable growth."

205.     Defendant Mariani echoed Zaderej's remarks, telling analysts, in response to a direct question about the Company's growth, that the Company was "just scratching the surface of this opportunity."

206.     The "market opportunity of over $2 billion for Axogen's products" that Axogen claimed on the first day of the Class Period represented *more than a 10% increase over what the Company told investors just five months prior*.  While a positive announcement, it begged the question why the Company's revenues constituted only *2%* of this claimed market, even though its flagship product, Avance, had been introduced a decade earlier.

207.     On that earnings call, Zaderej claimed that "surgeons are initially cautious adopters for nerve repair products.  They typically start with a few cases and wait and see the results."  The 2017 Q2 10-Q filed that same day reiterated this point, stating: "We have experienced that surgeons initially are cautious adopters for nerve repair products. Surgeons typically start with a few cases and then wait and review the results of these initial cases which can take from six to twelve months, or longer."  These statements falsely and misleadingly explained the vast discrepancy between the Company's historical financial results and the huge number of PNI procedures that the Company claimed were performed in the U.S. each year, bolstering that false claim and misleading investors.

208.     On the August 2, 2017 earnings call, Zaderej emphasized the Company's results for the first half of 2017 and its strategy to further penetrate the existing $2 billion market it was currently targeting.  Zaderej described the role of the Company's new Chief Commercial Officer, Jon Gingrich, who joined Axogen the month prior:

*As a member of the Axogen executive leadership team, he will report directly to me* and will oversee the development and execution of the company's sales and marketing strategies.  These efforts, along with the continued development of our surgeon education events, market awareness activities, and further development of clinical data are allowing us to help surgeons develop confidence in the adoption of the Axogen portfolio of products.  We're pleased with the first half of 2017 and believe we're demonstrating our ability to successfully execute our strategy and continue to drive awareness and growth in the *emerging peripheral nerve repair market*.

209.    Therefore, the Company explained the discrepancy between its historical results and the vast number of peripheral nerve repair procedures being performed in the U.S. each year as the result of the caution of surgeons.

210.    The market reacted positively to Axogen's representations.  In response to the Company's disclosures and public statements by Defendants Zaderej and Mariani, Axogen's stock price on the day before the Class Period rose over 250% by July 25, 2018, and its closing price on the day before publication of the Seligman Report was more than 175% of its price immediately before the Class Period.

211.    Before, during, and after the Class Period, the Company used PowerPoint-type presentations at investor conferences. Many of these presentations used a common template to portray Axogen's market, as well as the portions of this market represented by certain types of procedures, such as extremity trauma, and the portions addressable by the Company's four core products, including Avance.  On or about September 25, 2017, Defendant Zaderej, on behalf of Axogen, presented a version of this presentation at the Cantor Fitzgerald Global Healthcare Conference.  One slide of this presentation, shown below, claimed that the Company's target market was $2 billion (the same as claimed on the first day of the Class Period), that extremity trauma represented $1.5 billion of this total, and that $668 million of the extremity trauma market was addressable by Avance.



212. With respect to its claim that the Company's current targeted nerve markets encompassed "Over 900,000 Procedures Annually in U.S.", including 719,000 procedures in the field of Extremity Trauma, the Company cited the Noble Article.

213. At that Cantor Fitzgerald Global Healthcare Conference, the Company touted its sales execution and "[i]ncreasing [m]arket [p]enetration," and repeatedly emphasized the significance of the purported $2 billion market at this event. In another slide from its presentation (shown below), the Company told investors that Axogen was the "Pre-eminent Nerve Repair Company" with a "[c]omprehensive product portfolio [that] addresses 900,000+ procedures," and reiterated the claim of a "$2.0B+ market opportunity."



214.    The Company repeated its claims in its quarterly report on Form 10-Q for the third

quarter of 2017 (the "2017 Q3 10-Q"), which it filed on November 1, 2017.  The 2017 Q3 10-Q

reported quarterly revenues of $16 million, but, again, a quarterly net loss, this time to the tune of

$2.1 million.  On an earnings call the Company hosted with analysts that same day, in which

Defendants Zaderej and Mariani both participated, Zaderej reminded investors of the recent

increase to Axogen's market claims.  Explaining the discrepancy between the Company's revenues

and the hundreds of thousands of peripheral nerve repair procedures purportedly occurring each

year in the U.S., Zaderej repeated the line that "surgeons are initially cautious adopters for nerve

repair products."

215.    In response to these representations, Axogen's stock rose over 19%, from a closing

price of $20.55 on October 31, 2017, the day before the Company filed the 2017 Q3 10-Q and

hosted the associated earnings call, to close at $24.55 on November 3, 2017.

216.    On November 17, 2017, Axogen filed the November 2017 Prospectus, which

contained, *inter alia*, the statements set forth in ¶¶ 62-63, 68, 81, and 84 *supra*.  The November

2017 Prospectus also incorporated by reference, and thereby made anew the statements contained in, the Company's 2016 10-K, including the statements set forth in ¶¶ 65-67, 69-70, 82-84, *supra*.

217.    On November 21, 2017, the Company announced that the November 2017 Offering had closed on November 20, 2017.  The price of Axogen's common stock rose over 5.4% from its closing price on November 14, 2017 (the day before the Company announced that it would conduct the November 2017 Offering and filed a preliminary prospectus containing the same statements set forth above) to its closing price on November 21, 2017 (the day Axogen announced the November 2017 Offering had closed).

### 2.    The Second Annual Analyst and Investor Day through the Company's 2017 Financial Results

218.    On November 20, 2017, the first trading today after Axogen filed the November 2017 Prospectus and the November 2017 Offering closed, Axogen hosted its Second Annual Analyst and Investor Day.  During this event, Axogen repeated its false statements regarding the incidence of PNI surgeries, claiming that "over 900,000" peripheral nerve repair procedures are performed each year in the United States, including 719,000 extremity trauma procedures. Moreover, the Company significantly increased its estimates of its market, claiming, as shown in the slide below that the Company presented at this event, that the Company's market was not $2 billion but ***$2.2 billion***, ***over 22% than the $2 billion figure it first announced just three months prior***, and that the market for Avance was ***$976 million***..  As it did at the Cantor Fitzgerald conference on or about September 25, 2017, the Company cited the Noble Article in support of these claims.



219.    Elsewhere in this presentation, the Company claimed a "[p]otential [o]pportunity of [o]ver 900,000 [n]erve [r]epair [p]rocedures in . . . the U.S. [a]lone" on an annual basis, including 837,000 procedures annually in the field of "Extremities [Trauma and Compression]," a figure that apparently included carpal and cubital tunnel surgeries.

220.    The Company's stock price responded to these claims, rising 10.8% from its closing price on the trading day before the Second Annual Analyst and Investor Day to close at $26.15 on the day following that event.

221.    The Company's misstatements continued on February 28, 2018, when Axogen filed its 2017 annual report on Form 10-K (the "2017 10-K") with the SEC and hosted an earnings call with analysts.  Despite 2017 revenues of $60.4 million, the Company reported a net loss of $10.4 million for 2017.  In the 2017 10-K, the Company asserted that "each year in the U.S., more than 1.4 million people suffer damage or discontinuity to peripheral nerves resulting in over 700,000 extremity nerve repair procedures," and repeated its claim of a $2.2 billion market for peripheral nerve repair applications for Avance, Avive, and the AxoGuard Product Line in the "Extremity

Trauma, OMF, Breast and Carpal Tunnel" areas.  Axogen also told investors, again, that $1.5 billion of this market related to extremity trauma and that $976 million was addressable by Avance. Though this market was 22% higher than what the Company claimed in the 2016 10-K, in the 2017 10-K it cited the same three sources as in that earlier annual report: the Noble Article, the 2011 HHS Report, and the Brattain Article.

222.    In an earnings call the Company hosted that same day, Defendant Zaderej reiterated the $2.2 billion market claim and assured investors that "we are just scratching the surface of our available market potential."

223.    In response to these representations, Axogen's stock price increased over 8.8%, from a closing price of $31.20 per share on February 27, 2018 to a close of $33.95 on March 1, 2018.

### 3.    The Company Repeats Its False Claims and Conducts an Additional Public Stock Offering: March 2018 through October 2018

224.    On or about March 6, 2018, Axogen presented at the Canaccord Genuity Musculoskeletal Conference, using the same slide concerning the Company's market as it did at its Analyst and Investor Day on or about November 20, 2017.  This slide stated that over 900,000 nerve repair procedures performed each year in the United States, including 719,000 Extremity Trauma procedures, both of which figures the Company represented were supported by the Noble Article.  The slide further stated that there was a $976 million market opportunity for Avance and an overall market opportunity of $2.2 billion for Axogen's products, of which $1.5 billion related to Extremity Trauma.

225.    Axogen's stock price continued to climb in response to these representations, rising over 5.8%, from a close of $32.60 on March 5, 2018 to close at $34.50 on March 7, 2018.

226.    On April 30, 2018, the Company filed its quarterly report on Form 10-Q for the first quarter of 2018 (the "2018 Q1 10-Q") and hosted an earnings call.  The 2018 Q1 10-Q reported quarterly revenues of $17.3 million, yet showed that the Company incurred a quarterly net loss of $5.6 million.  On the earnings call, Defendant Zaderej told analysts: "There are more than 900,000 nerve repair surgeries annually in the U.S."  She further stated that "Axogen is generating strong and consistent revenue growth in a nerve repair market that remains largely untapped," which market she twice characterized as "emerging."  She told investors that Axogen was "just scratching the surface of [its] available market potential," and said there was a "market opportunity of over $2.2 billion for Axogen's products."  She further repeated the explanation that "surgeons are initially cautious adopters for nerve repair products" as an explanation for the Company's historical results.

227.    The Company's rising stock price was buttressed by these representations, closing at a per share price of $39.80 on April 30, 2018.

228.    A week later, on May 7, 2018, Axogen announced that it would conduct the May 2018 Offering and filed the May 2018 Registration Statement, which contained the statements set forth in ¶ 86, *supra*, and incorporated the 2017 10-K, which contained the statements set forth in ¶¶ 87-88, *supra*,.  On May 10, 2018, Axogen filed the May 2018 Prospectus, which repeated those same statements from the May 2018 Registration Statement and also incorporated the 2017 10-K.

229.    Axogen's stock price increased further, jumping from $42.50 per share at the close of May 4, 2018, the day before Axogen announced the May 2018 Offering, to a closing price of $44.60 on May 11, 2018, the day after the filing of the May 2018 Prospectus—an increase of 4.9%.

230.    On or about June 14, 2018, during its presentation at the William Blair 38th Annual Growth Stock Conference, Axogen again used a PowerPoint-type presentation claiming that

900,000 relevant procedures are performed annually in the United States, including 718,000 for trauma to extremities, and that Axogen's current target markets were $2.2 billion, including $1.5 billion for extremity trauma and $976 million for Avance.

231.    The market apparently still believed that Axogen was a growth stock with vast untapped "market opportunity."  The Company's stock price closed on June 14, 2018, at $50.15 per share.

232.    On August 1, 2018, Axogen filed its quarterly report on Form 10-Q for the second quarter of 2018 (the "2018 Q2 10-Q").  The 2018 Q2 10-Q reported quarterly revenues of $20.6 million, yet the net losses continued: this time they totaled $7.4 million for the quarter.  That same day, the Company hosted an earnings call with analysts in which Defendants Zaderej and Mariani participated.  On the call, Zaderej told analysts: "There are more than 900,000 nerve repair surgeries annually in the U.S., pointing to a market opportunity of over $2.2 billion for Axogen's products."

233.    Zaderej further stated:

We are building awareness of advances in peripheral nerve repair and see expanding usage of our products with innovator and early-adopter surgeons, and are *excited to be moving toward developing the middle adopters, who are the majority segment of the nerve repair community*.

We find surgeons are initially cautious adopters for nerve repair products.  They typically start with a few cases and then wait to see the results.

234.    Zaderej claimed:

The majority of these procedures are being performed in approximately 5,100 centers.  Most of our active accounts are still at an early stage of penetration and provide additional opportunities for growth.  As a result, we believe *we're just scratching the surface of our available market potential*.

235.    Zaderej finished her prepared remarks by stating: "We're pleased with our progress and with our opportunity to continue developing the emerging nerve repair market and driving

long-term sustainable growth for Axogen."  Before taking questions, Zaderej repeated the claim that the "***peripheral nerve repair market . . . currently represents more than $2.2 billion in existing applications and we expect will continue to grow***."

236.    The market continued to discount the Company's persistent net losses.   The Company's stock price remained inflated, increasing in response to this news by over 3%, from a closing price of $44.925 on July 31, 2018, to close at $46.30 on August 1, 2018.

237.    On or about October 29, 2018, Axogen filed its quarterly report on Form 10-Q for the third quarter of 2018 (the "2018 Q3 10-Q").  The 2018 Q3 10-Q reported quarterly revenues of $22.7 million, but a net loss of over $4.1 million. That same day, the Company hosted an earnings call with analysts in which Defendants Zaderej and Mariani participated.  Zaderej touted the Company's growth, assuring investors that, despite the continuing net losses, Axogen was "continu[ing] to develop [its] market through the execution of [its] strategic initiatives . . . [to] allow [the Company] to build long-term sustainable growth."  Zaderej described the peripheral nerve repair market as one "that currently represents more than $2.2 billion in existing applications and we expect will continue to grow."

238.    In response to a direct question from an analyst regarding revenue guidance for 2019, Zaderej replied:

> We've been thoughtful in selecting what will be our guidance for next year and thinking about how you want to model our business going forward.  We still fundamentally believe that the market in peripheral nerve repair is very strong and that we're just scratching the surface of what is a large growth opportunity.  We know from the work that we've done with surgeons in the past and what we see continuing is that surgeons in this market convert their nerve repair solutions in a very deliberate way as they see results in their own hands as they make changes.
>
> And we believe ***we're uniquely positioned in this market*** to really capitalize on those factors with a very differentiated product portfolio, the substantial amount of clinical evidence that we've built to date and a pipeline of surgeons who are in that trial process.  And we look to all of those things as we think about the future and combine that with the productivity of our expanding sales team to lay out what we

think is *a very thoughtful model that shows continued growth for the long term*. So, *it is with quite a bit of thought and looking at what we've learned over the last many years in the peripheral nerve repair market that we've put together the guidance and think that would be a good guidance for you in setting your model*.

239.    Investors, Zaderej reassured, should be confident in the Company's ability to grow and lead in the tantalizing $2 billion market that she cited: the Company was "very thoughtful" and applied "what [it] learned over the last many years" in plotting—and disclosing—its trajectory within this market.  They were, as she had said before, "just scratching the surface" of the market.

240.    Axogen's stock price continued to respond positively to these representations, rising to $35.75 per share at the close of trading on October 30, 2018 from a close of $32.72 on October 26, 2018—an increase of over 9.2%.  The stock rose further over the next two trading sessions, closing at $38.25 on November 1, 2018, in response to the representations set forth above.

### 4.    The Company Increases Its Market Claim by $500 Million: November 2018 through the end of the Class Period

241.    On or about November 19, 2018, Axogen hosted its Third Annual Analyst and Investor Day.  Zaderej had previously told investors during the summer and fall of 2018 that Axogen expected its peripheral nerve repair market to "continue to grow."  At this event, the Company doubled down on those claims, *increasing its claimed market by $500 million to a total of $2.7 billion*.  Defendants Zaderej and Mariani, among others, presented a PowerPoint-style presentation that touted Axogen's "[c]omprehensive product portfolio address[ing] [a] *large and untapped market opportunity*."  One slide, shown below, claimed the Company's $2.7 billion market included $*1.9 billion* relating to trauma based on over 700,000 procedures annually:



242. With respect to "Trauma," the presentation cited, inter alia, the Noble Article. It did not cite the 2011 HHS Report or the Brattain Article.

243. The presentation claimed that the "Trauma Market Increase is Driven by Multiple Product Usage and Price," as set forth in the slide shown below:



244.    The presentation further described the Company as focusing on "[d]riving deeper awareness and penetration by sub-segment" in the trauma field, and as having a "[f]oundation for [l]ong-term [s]ustainable growth" in its nerve repair product portfolio.

245.    In the Company's press release issued that same day on Globe Newswire and the Company's own website, Axogen listed the massive increase in its market as the first of several "Key Updates," and described it as an "[u]pdate value of the market opportunity in existing applications of the peripheral nerve repair market from $2.2 billion to $2.7 billion."  The press release stated that the increase was "primarily driven by updated assumptions for net procedure values, and increased prevalence of Connector Assisted Repair in trauma cases."  The Company did not explain this "increased prevalence of Connector Assisted Repair in trauma cases," nor did the Company did not modify its claim that over 700,000 annual procedures are performed each year in the U.S. to repair peripheral nerves damaged by trauma.

246.    The Company's stock price remained inflated as a result of these claims, closing at $29.305 per share on November 20, 2018, and rising to $34.29 per share at the close of trading on December 3, 2018.

247.    In sum, during the Class Period, the Exchange Act Defendants repeatedly claimed that the market for four of the Company's products—Avance, Avive, and the two products in the AxoGuard Product Line—exceeded $1.8 billion, a figure which was increased to $2 billion, then $2.2 billion, and finally, just one month before the end of the Class Period, to $2.7 billion, with the majority ($1.5 billion and then $1.9 billion) relating to trauma.  The Exchange Act Defendants further represented that the Company was just beginning to penetrate the peripheral nerve repair market.  These claims were all baseless and painted a false and misleading picture of the market for the Company's core nerve repair products, particularly Avance.

### 5. The Truth Concerning Defendants' False and Misleading Statements Is Revealed

248.   On December 18, 2018, Seligman Investments published the Seligman Report.  As set forth more fully in § III(E)(4), *supra*, the Seligman Report methodically analyzed and rebutted the Exchange Act Defendants' claims concerning the market for Axogen's core nerve repair products, including the portions relating to trauma and to Avance.  On the basis of extensive research including analysis of scientific literature, consultation with subject matter experts, and interviews with former Axogen employees and neurosurgeons (most of whom are long-time customers of Axogen), the Seligman Report calculated that the market for Avance relating to trauma is $52 million—a fraction of what the Company claimed.  The Seligman Report calculated that there are approximately 28,000 PNI cases each year in the U.S., rather than the 719,000 the Company claimed, and found that the Noble Article did not support the Company's claims.

249.   In response to the new information contained in the Seligman Report, Axogen's stock price declined 22%.  From a closing price of $27.53 per share on December 17, 2018 (the day before the Seligman Report was published), Axogen's stock price fell to $21.36 at the close of trading on December 18, 2018.  Axogen's stock price declined an *additional* 20% over the following three trading sessions to close at $17.09 per share on December 21, 2018.  Since then, the Company's stock price has not approached the heights at which it traded during the Class Period prior to the publication of the Seligman Report.

### 6. Post-Class Period Events

250.   Axogen has not explicitly addressed the Seligman Report in its SEC filings.  Following the end of the Class Period, however, Axogen revised the market discussion in its most recent annual report on Form 10-K and modified the investor presentation that appears on its website.

251.    In Axogen's Form 10-K for 2018 (the "2018 10-K"), filed with the SEC on February 26, 2019, Axogen added a proviso that did not appear in its Class Period statements or filings: "Estimating the Total Addressable Market for nerve repair is challenging as there is not a simple data source for the incidence of peripheral nerve issues.  This is further complicated by the fact that nerves can be injured in many traumatic and surgical injuries and can be impacted from the head to the toe of a patient."

252.    In addition, in the 2018 10-K, Axogen modified the citations it provided for its Extremity Trauma market claims.  Axogen abandoned its unfounded references to the 2011 HHS Report and the Brattain Article—effectively conceding that they provide no real support for the Company's claims—and added citations to the 2015 National Hospital Ambulatory Medical Care Survey conducted by the U.S. Census Bureau (the "2015 NHAMCS Data") and an additional scientific journal reference, neither of which prop up the facade of false and misleading claims that artificially inflated the Company's stock price during the Class Period.

253.    These and other amendments aside, the Company has not, because it cannot, rebutted the truth that its reliance on the Noble Article, the 2011 HHS Report, and the Brattain Article was baseless and that its Class Period market claims, including the portions attributed to Extremity Trauma and/or to Avance, were enormously overstated.

### 7.    The False and Misleading Nature of the Exchange Act Defendants' Class Period Statements

254.    The statements alleged herein made by the Exchange Act Defendants during the Class Period were materially false or misleading for the reasons set forth in § III(E), *supra*.  In addition, they were materially false and misleading because the Company misrepresented that it had yet to penetrate the vast majority of its market.

255.    Axogen's market was, in reality, a minor fraction of what it told investors during the Class Period.  As a result, the Company's revenues represented a significant portion of the existing market.  There was ***not*** a massive, multi-billion dollar portion of the market remaining for Axogen to penetrate, contradicting the Exchange Act Defendants' claims to investors.

256.    Throughout the Class Period, the Exchange Act Defendants claimed that Axogen was in the early stages of penetrating the peripheral nerve repair market.  At the beginning of the Class Period, the Company reported $23 million of revenue for the first six months of 2017, while claiming that the market for its core products was $2 billion—a ***forty-three-fold disparity***. Likewise, the Company's revenue for the entirety of 2017, as reported on the 2017 10-K, was $60.4 million, or ***2.7%*** of the $2.2 billion market that the 2017 10-K falsely claimed existed.  For 2018, moreover, a reporting period that closed just days after the end of the Class Period, the Company brought in revenue totaling $83.9 million—just ***3.1%*** of the $2.7 billion market that the Company was at that time claiming.

257.    Dovetailing with this vast disparity between the Company's revenues and its purportedly multi-billion dollar market, the Exchange Act Defendants repeatedly represented that the Company's market was "emerging" and that the Company's market penetration was in its early phase—that Axogen was "just scratching the surface" of its market.  This was false and misleading because the Company had already significantly penetrated its market, particularly in the field of extremity trauma.  As shown by the Expert Firm's analysis, discussed above, the Company's *combined* market for OMF and extremity trauma is ***$112 million*** or less.  During the Class Period, OMF represented approximately less than 10% of the Company's claimed market, while trauma comprised the vast majority of its market.  Given that the Company's total annual revenues were $60.4 million for 2017 and $83.9 million for 2018, and that trauma was by far the most important

area for Avance, the Company had already achieved significant penetration in the trauma market and the largely overlapping market for Avance.  Even if the Company had only begun to penetrate other markets, such as breast reconstruction neurotization or carpal and cubital tunnel applications, it was false and misleading to claim that the peripheral nerve repair market was "emerging" or that the Company was in the early stages of market penetration, while failing to disclose that the Company had substantially penetrated the trauma market and the market for Avance—its most important markets and most important product.

### C.   THE MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

#### 1.   August 2, 2017

258.   On August 2, 2017, the beginning of the Class Period, Axogen hosted an earnings call with analysts, to coincide with the filing of the 2017 Q2 10-Q, in which Defendants Zaderej and Mariani participated.  During that call, Defendant Zaderej stated:

> We're also pleased to announce *a change to our addressable market opportunity to $2 billion* due to expanded use of the Axogen product portfolio in oral and maxillofacial procedures . . . .  We believe this additional application of our product portfolio *moves the current addressable market opportunity to $2 billion in our current markets of trauma, upper extremity, and oral and maxillofacial surgery*.

259.   Zaderej also stated:

> We're building awareness of peripheral nerve repair and expanding usage of our products with innovator and early adopter surgeons, and are excited to be moving towards developing the middle adopters who are the majority segment of the nerve repair market. We find surgeons are initially cautious adopters for nerve repair products. They typically start with a few cases and then wait and see the results.

260.   Zaderej further told analysts:

> Axogen is generating strong and consistent revenue growth in a nerve repair market that remains largely untapped.  There are more than 900,000 nerve repair surgeries annually in the U.S., pointing to a market opportunity of over $2 billion for Axogen's products. The vast majority of these procedures are being performed in approximately 5,100 centers.

In the second quarter, 510 of these centers were active Axogen accounts. Most of these active accounts are still at an early stage of penetration and provide additional opportunities for growth. As a result, we believe *we are just scratching the surface of our available market potential*.

261.    In response to a question from an analyst regarding the Company's growth, Defendant Mariani stated, "we believe *we're just barely scratching the surface of this opportunity* and we continue to think the growth in excess of 40% is solid and sustainable as we continue to develop this market."

262.    Zaderej responded to an analyst question regarding the Company's target markets by stating:

We have a very long list of expansion opportunities for the platform that we have in peripheral nerve repair.  And so actually our – we have a wonderful problem and that we have to choose from many different options.  And so the areas that we focused in first where [sic] things that we thought were the lowest hanging fruit in terms of *readiness to adopt*[.]

263.    The statements in the five above paragraphs were false and misleading because they: vastly overstated the market for the Company's products (including the portions relating to extremity trauma, to OMF, and to Avance) and the number of nerve repair surgeries performed in the U.S. each year (including the portion relating to extremity trauma and to OMF), relied on prices that the Company could not charge in the medium and long term, and misleadingly represented that the Company was in the early stages of market penetration (though the Company had already significantly penetrated the extremity trauma and OMF markets).

## 2.    September 2017 – Cantor Fitzgerald Global Healthcare Conference

264.    On or about September 25, 2017, Defendant Zaderej, on behalf of Axogen, presented at the Cantor Fitzgerald Global Healthcare Conference.  One slide of this presentation, shown below, claimed that the Company's then-current target market was $2 billion, that extremity trauma represented $1.5 billion of this total, and that $668 million of the extremity trauma market

was addressable by Avance.  This slide further stated that OMF accounted for $293 million of the Company's market, while carpal and cubital tunnel procedures made up the remaining $188 million.



265.    With respect to its claim that the Company's current targeted nerve markets encompassed "Over 900,000 Procedures Annually in U.S.", and that this included 719,000 procedures annually in the field of Extremity Trauma, the Company cited the Noble Article.

266.    In another slide from its presentation (shown below), the Company told investors that Axogen was the "Pre-eminent Nerve Repair Company" with a "[c]omprehensive product portfolio [that] addresses 900,000+ procedures."



267.   The statements in the three above paragraphs were false and misleading because they vastly overstated the market for the Company's products (including the portions relating to extremity trauma, to OMF, and to Avance) and the number of nerve repair surgeries performed in the U.S. each year (including the portion relating to extremity trauma and to OMF), misleadingly represented that the Company was in the early stages of market penetration (though the Company had already significantly penetrated the extremity trauma and OMF markets), falsely represented that the Company's claims were based on a reasonable interpretation and application of the findings of the Noble Article, were based on prices that the Company could not charge in the medium and long term, and misleadingly represented that could actually service the markets described therein.

### 3.   November 1, 2017

268.   On November 1, 2017, the Company hosted an earnings call with analysts to coincide with the filing of the 2017 Q3 10-Q.  Defendants Zaderej and Mariani both participated in this call, during which Zaderej stated:

As a reminder, last quarter we announced a change in our addressable market opportunity due to expanded use of the Axogen product portfolio in oral and maxillofacial procedures, including nerve repair during mandible reconstruction due to benign tumor resection.   We believe *this additional application of our product portfolio moved the current addressable market opportunity to $2 billion in our current markets of trauma, upper extremity, and oral and maxillofacial surgery*.

269.    She explained:

Axogen is generating strong and consistent revenue growth in a nerve repair market that remains largely untapped.  There are more than 900,000 nerve repair surgeries annually in the U.S. pointing to a *market opportunity of over $2 billion for Axogen's products*.  The vast majority of these procedures are being performed in approximately 5100 centers.  In the third quarter, 563 of these centers were active Axogen accounts.  Most of these active accounts are still in the early stage of penetration and provide additional opportunities for growth.  As a result, we believe we are *just scratching the surface of our available market potential*.

270.    Zaderej further described the Company's penetration in this $2 billion market as follows:

We're pleased with 2017 to date and believe we are demonstrating our ability to successfully execute our strategy and continue to drive awareness and growth in the *emerging peripheral nerve repair market*.   We are building awareness of peripheral nerve repair and expanding usage of our products with innovator and early adopter surgeons, and are *excited to be moving towards developing the middle adopters who are the majority segment of the nerve repair market*.

We find surgeons are initially cautious adopters for nerve repair products.  They typically start with a few cases and then wait and see the results.

271.    Despite this caution on the part of surgeons, Zaderej finished her initial remarks by commenting: "We are pleased with our progress and with the opportunity to continue to develop the emerging nerve repair market and drive long-term sustainable growth."

272.    The statements in the four above paragraphs were false and misleading because they vastly overstated the market for the Company's products (including the portions relating to extremity trauma, to OMF, and to Avance) and the number of nerve repair surgeries performed in the U.S. each year (including the portion relating to extremity trauma and to OMF) and

misleadingly represented that the Company was in the early stages of market penetration (though the Company had already significantly penetrated the extremity trauma and OMF market).

### 4.   November 2017 Offering

273.    On November 17, 2017, Axogen filed the November 2017 Prospectus, which contained the statements set forth in ¶¶ 80-81, 84, *supra*, and incorporated the 2016 10-K, which contained the statements set forth in ¶¶ 82-83, *supra*.  Those statements were false and misleading because they vastly overstated the market for the Company's products (including the portions relating to extremity trauma, to OMF, and to Avance) and the number of nerve repair surgeries performed in the U.S. each year (including the portion relating to extremity trauma and to OMF), falsely represented that the Company's claims were based on a reasonable interpretation and application of the findings of the Noble Article, the Brattain Article, and the 2011 HSS Data, and omitted to state the material information that the Brattain Article was funded by the Company.

### 5.   November 20, 2017 – Second Annual Analyst and Investor Day

274.    On or about November 20, 2017, Axogen hosted its Second Annual Analyst and Investor Day.  On behalf of the Company, Defendants Zaderej and Mariani, among others, presented a PowerPoint-type presentation, prepared by the Company, to investors and analysts, which it also filed with the SEC shortly thereafter.  In this presentation, Axogen claimed, as shown in the slide below, that the Company's market was not $2 billion but ***$2.2 billion***, and that the market for Avance was ***$976 million.***  The Company claimed that this market reflected 900,000 relevant procedures each year in the United States, including 719,000 extremity trauma procedures.  The Company cited the Noble Article in support of these claims.



275.   Elsewhere in this presentation, the Company claimed a "[p]otential [o]pportunity of [o]ver 900,000 [n]erve [r]epair [p]rocedures in . . . the U.S. [a]lone" on an annual basis, including 837,000 procedures annually in the field of "Extremities [Trauma and Compression]," a figure that apparently included procedures to address carpal and cubital tunnel, as shown below.



276.    Also on November 20, 2017, the Company issued a press release on its own website and on Globe NewsWire, a widely available wire service.  The press release stated: "The company currently estimates that the addressable market for Breast Reconstruction Neurotization is $250 million, which increases the total addressable market across all of its current applications from $2.0 billion to $2.2 billion."  The press release described the Company, in a statement attributed to Defendant Zaderej, as having "evolved from an initial niche product company in a new market to one with a comprehensive platform for nerve repair in an ***emerging*** peripheral nerve market."

277.    The statements in the above three paragraphs were false and misleading because they vastly overstated the market for the Company's products (including the portions relating to extremity trauma, to OMF, and to Avance) and the number of nerve repair surgeries performed in the U.S. each year (including the portion relating to extremity trauma and to OMF), misleadingly represented that the Company was in the early stages of market penetration (though the Company had already significantly penetrated the extremity trauma and OMF market), misleadingly represented that the Company could actually service the purportedly vast market, and falsely represented that the Company's claims were based on a reasonable interpretation and application of the findings of the Noble Article.  .

### 6.    February 28, 2018

278.    On February 28, 2018, Axogen filed the 2017 10-K.  In that report, the Company stated:

> We estimate the United States PND market for our current product portfolio for Extremity Trauma, OMF, Breast and Carpal Tunnel is $2.2 billion (the "Market"). From a product prospective as to these targeted markets, we estimate that Avance Nerve Graft represents $976 million, AxoGuard Nerve Connector $391 million, AxoGuard Nerve Protector $433 million and Avive Soft Tissue Membrane $439 million.
>
> We estimate that the Extremity Trauma portion of the Market is approximately $1.5 billion. The estimated size of the Extremity Trauma portion of the market is based

85

upon epidemiological studies regarding the general number of trauma patients, physician interviews and incidence of PND in the population. We believe that each year in the U.S., more than 1.4 million people suffer damage or discontinuity to peripheral nerves resulting in over 700,000 extremity nerve repair procedures ("Health", United States, 2011, Publication of U.S. Department of Health & Human Services; Noble, et al. J of Trauma Injury Infection and Critical Care 1998; Kurt Brattain, MD, Magellan Medical Technology Consultants, Inc., Minneapolis, Minnesota 2013). We have estimated the portion of these extremity nerve repair procedures that would be addressed by our Gap Repair, Primary Repair, Nerve Protection and Proaction products and applied the average sales price of the appropriate product (Avance Nerve Graft, AxoGuard Nerve Connector, AxoGuard Nerve Protector and Avive Soft Tissue Membrane, respectively) to determine that the probable market sizes. Within the Extremity Trauma portion of the Market, our Avance Nerve Graft, AxoGuard Nerve Connector, AxoGuard Nerve Protector and Avive Soft Tissue Membrane products are approximately $668 million, $161 million, $238 million and $439 million, respectively.

279.    Explaining the disparity between the Company's revenues and the massive market it claims existed, the 2017 10-K stated:

> *We have experienced that surgeons initially are cautious adopters for nerve repair products*. Surgeons typically start with a few cases and then wait and review the results of these initial cases which can take from six to twelve months, or longer.

280.    In an earnings call the Company hosted that same day, Defendant Zaderej stated that "[t]here are more than 900,000 nerve repair surgeries annually in the U.S. pointing to a market opportunity of over $2.2 billion for Axogen's products." She further told investors that "new application in breast reconstruction neurotization, along with the expanded use of the Axogen product portfolio and [sic] oral and maxillofacial procedures, changes our addressable market to $2.2 billion across our current target applications."  Zaderej claimed that "*we are just scratching the surface of our available market potential*."

281.    The statements in the three paragraphs above were false and misleading because they vastly overstated the market for the Company's products (including the portions relating to extremity trauma, to OMF, and to Avance) and the number of nerve repair surgeries performed in the U.S. each year (including the portion relating to extremity trauma and to OMF), misleadingly

represented that the Company was in the early stages of market penetration (though the Company had already significantly penetrated the extremity trauma and OMF market), falsely stated that the Company's "would" address the purportedly vast market, falsely represented that the Company's claims were based on a reasonable interpretation and application of the findings of the Noble Article, the Brattain Article, and the 2011 HSS Data, and omitted to state the material information that the Brattain Article was funded by the Company.

### 7.    March 2018 – Canaccord Genuity Musculoskeletal Conference

282.    On or about March 6, 2018, members of Axogen's senior management team presented at the Canaccord Genuity Musculoskeletal Conference.  At that event, these Axogen employees presented a PowerPoint-type presentation that claimed Axogen's current target markets were $2.2 billion, including $1.5 billion for extremity trauma and $976 million for Avance, as shown on the slide below.



283.    With respect to its claim that Axogen's current target markets include 719,000 Extremity Trauma procedures each year in the U.S., the presentation cited the Noble Article.

284.    On another slide, the presentation stated that there are 837,000 procedures annually in the field of "Extremities [Trauma and Compression]," a figure that apparently included procedures to address carpal and cubital tunnel.  For that proposition, the presentation cited, *inter alia*, the Noble Article.  This slide is shown below



285.    Finally, yet another slide reiterated the claim that Axogen's product portfolio "addresses 900,000+ procedures" and that the Company has a $2.2 billion market opportunity, as shown below.



286.    The statements and slides in the four paragraphs above were false and misleading

because they vastly overstated the market for the Company's products (including the portions

relating to extremity trauma and to Avance) and the number of nerve repair surgeries performed

in the U.S. each year (including the portion relating to extremity trauma), misleadingly represented

that the Company was in the early stages of market penetration, though the Company had already

significantly penetrated the extremity trauma market, and falsely represented that the Company's

claims were based on a reasonable interpretation and application of the findings of the Noble

Article. .

### 8.    April 30, 2018

287.    On April 30, 2018, to coincide with the filing of the 2018 Q1 10-Q, Axogen hosted

an earnings call with analysts in which Defendants Zaderej and Mariani participated.  During that

call, Defendant Zaderej repeated the claim that:

> Axogen is generating strong and consistent revenue growth in a nerve repair market
> that remains largely untapped.  There are more than 900,000 nerve repair surgeries

annually in the U.S., pointing to a market opportunity of over $2.2 billion for Axogen's products. The majority of these procedures are being performed in approximately 5,100 centers. Most of our 604 active accounts are still at an early stage of penetration and provide additional opportunities for growth. As a result, we believe we're just scratching the surface of our available market potential.

288. Defendant Zaderej characterized the nerve repair market as "emerging," and stated:

We're building awareness of peripheral nerve repair and expanding usage of our products with innovator and early adopter surgeons, and are excited to be moving towards developing the middle adopters who are the majority segment of the nerve repair market. We find surgeons are initially cautious adopters for nerve repair products. They typically start with a few cases and then wait and see the results.

289. The statements in the two paragraphs above were false and misleading because they vastly overstated the market for the Company's products (including the portions relating to extremity trauma and to Avance) and the number of nerve repair surgeries performed in the U.S. each year (including the portion relating to extremity trauma) and misleadingly represented that the Company was in the early stages of market penetration (though the Company had already significantly penetrated the extremity trauma and OMF markets), and falsely was attributed to surgeon caution the vast disparity between the Company's historical revenues and the number of PNI procedures she claimed were performed in the U.S. each year.

### 9. May 2018 Offering

290. On May 7, 2018, Axogen filed the May 2018 Registration Statement, which contained the statements set forth in ¶ 86, *supra*. Those statements were false and misleading because they vastly overstated the market for the Company's products (including the portions relating to extremity trauma and to Avance) and the number of nerve repair surgeries performed in the U.S. each year (including the portion relating to extremity trauma).

291. The May 2018 Prospectus incorporated by reference, and thereby made anew the statements contained in, *inter alia*, the Company's 2017 10-K, which contained the statements set

forth in ¶¶ 87-88, *supra*.  These statements were false and misleading for the reasons set forth in § III(E), *supra*.

**10.      June 2018 – William Blair 38th Annual Growth Stock Conference**

292.     On or about June 14, 2018, members of Axogen's senior management team presented at the William Blair 38th Annual Growth Stock Conference.  At that event, these Axogen employees presented a PowerPoint-type presentation that claimed Axogen's current target markets were $2.2 billion, including $1.5 billion for extremity trauma and $976 million for Avance, as shown on the slide below.



293.     With respect to its claim that Axogen's current target markets include 719,000 Extremity Trauma procedures each year in the U.S., the presentation cited the Noble Article.

294.    On another slide, the presentation stated that there are 837,000 procedures annually in the field of "Extremities [Trauma and Compression]," a figure that apparently included procedures to address carpal and cubital tunnel.  For that proposition, the presentation cited, *inter alia*, the Noble Article.  This slide is shown below.



295.    Finally, yet another slide reiterated the claim that Axogen's product portfolio "addresses 900,000+ procedures" and that the Company has a $2.2 billion market opportunity, as shown below.



296.    The statements and slides in the four paragraphs above were false and misleading because they vastly overstated the market for the Company's products (including the portions relating to extremity trauma and to Avance) and the number of nerve repair surgeries performed in the U.S. each year (including the portion relating to extremity trauma), misleadingly represented that the Company was in the early stages of market penetration (though the Company had already significantly penetrated the extremity trauma market), misleadingly represented that the Company could service the purportedly vast market, and falsely represented that the Company's claims were based on a reasonable interpretation and application of the findings of the Noble Article.  .

### 11.    August 1, 2018

297.    On August 1, 2018, the same day it filed the 2018 Q2 10-Q, Axogen hosted an earnings call with analysts in which Defendants Zaderej and Mariani participated.  Zaderej told analysts:

We are building awareness of advances in peripheral nerve repair and see expanding usage of our products with innovator and early-adopter surgeons, and are **excited to be moving toward developing the middle adopters, who are the majority segment of the nerve repair community**.

We find surgeons are initially cautious adopters for nerve repair products. They typically start with a few cases and then wait to see the results. Active accounts are usually past this wait period and have developed some level of product reorder.

298.    Zaderej claimed:

Axogen is generating strong revenue growth in a nerve repair market that remains largely untapped. There are more than 900,000 nerve repair surgeries annually in the U.S., pointing to a market opportunity of over $2.2 billion for Axogen's products.

The majority of these procedures are being performed in approximately 5,100 centers. Most of our active accounts are still at an early stage of penetration and provide additional opportunities for growth. As a result, we believe we're just scratching the surface of our available market potential.

299.    Zaderej finished her prepared remarks by stating: "We're pleased with our progress and with our opportunity to continue developing the emerging nerve repair market and driving long-term sustainable growth for Axogen."

300.    Before taking questions, Zaderej repeated the claim that the "peripheral nerve repair market . . . currently represents more than $2.2 billion in existing applications and we expect will continue to grow."

301.    The statements in the four paragraphs above were false and misleading because they vastly overstated the market for the Company's products (including the portions relating to extremity trauma, to OMF, and to Avance) and the number of nerve repair surgeries performed in the U.S. each year (including the portion relating to extremity trauma and OMF), misleadingly represented that the Company was in the early stages of market penetration (though it had already significantly penetrated the extremity trauma and OMF market).

### 12.    October 29, 2018

302.    On October 29, 2018, the day it filed the 2018 Q3 10-Q, Axogen hosted an earnings call with analysts in which Defendants Zaderej and Mariani participated.  Zaderej stated: "We're pleased with our progress and with our opportunity to continue developing the emerging nerve repair market and driving long-term sustainable growth for Axogen."  Zaderej claimed: "We're excited to be moving toward developing the middle adopters, who are the majority segment of the nerve repair community."

303.    Moreover, in response to a direct question from an analyst regarding revenue guidance for 2019, Zaderej replied:

> We've been thoughtful in selecting what will be our guidance for next year and thinking about how you want to model our business going forward.  We still fundamentally believed that *the market in peripheral nerve repair is very strong and that we're just scratching the surface of what is a large growth opportunity*. We know from the work that we've done with surgeons in the past and what we see continuing is that surgeons in this market convert their nerve repair solutions in a very deliberate way as they see results in their own hands as they make changes.
>
> And we believe we're uniquely positioned in this market to really capitalize on those factors with a very differentiated product portfolio, the substantial amount of clinical evidence that we've built to date and a pipeline of surgeons who are in that trial process.  And we look to all of those things as we think about the future and combine that with the productivity of our expanding sales team to lay out what we think is *a very thoughtful model that shows continued growth for the long term*. So, it is with *quite a bit of thought and looking at what we've learned over the last many years in the peripheral nerve repair market* that we've put together the guidance and think that would be a good guidance for you in setting your model.

304.    In response to another direct analyst question regarding the Company's plan for growth, Zaderej replied:

> *We have a foundation in our core trauma market that we believe is still at early stages, not with depth of penetration*, we layer on top of that, the OMS [sic] which is actually getting some good traction with, certainly, the early adopters and excitement especially in the mandible reconstruction segment, and our emerging opportunity in breast neurotization and we will all of those will contribute to a solid opportunity for overall growth in 2019 and certainly beyond that.

. . . Like all of the markets that we've talked about, peripheral nerve repair is slow, but we see that as a substantial long-term driver for our business and see that as another growth area.

305.    Zaderej also stated described the "peripheral nerve repair market" as "a market that currently represents more than $2.2 billion in existing applications and we expect will continue to grow."

306.    The statements in the four paragraphs above were false and misleading because they vastly overstated the market for the Company's products (including the portions relating to extremity trauma and to Avance) and the number of nerve repair surgeries performed in the U.S. each year (including the portion relating to extremity trauma) and misleadingly represented that the Company was in the early stages of market penetration, including with respect to the trauma market.

### 13.    November 19, 2018 – Third Annual Analyst and Investor Day

307.    On or about November 19, 2018, Axogen hosted its Third Annual Analyst and Investor Day.   On behalf of the Company, Defendants Zaderej and Mariani, among others, presented a PowerPoint-type presentation, prepared by the Company, to investors and analysts. The presentation claimed that Axogen's "[c]omprehensive product portfolio addresses [a] *large and untapped market opportunity*."

308.    One slide of the Company emphasized the "update[d]" value of the Company's claimed U.S. market opportunity of $2.7 billion, increased from $2.2 billion, based on over 900,000 relevant procedures annually, including over 700,000 in the field of trauma, as shown in the slides in ¶ 241, *supra*.   This slide cited, *inter alia*, the 2015 NHAMCS Data and the Noble Article.

309.    In addition, that same day, the Company issued a press release that described the "[u]pdate value of the market opportunity in existing applications of the peripheral nerve repair

market from $2.2 billion to $2.7 billion." The press release stated that the increase was "primarily driven by updated assumptions for net procedure values, and increased prevalence of Connector Assisted Repair in trauma cases."

310. These statements set forth in the three above paragraphs, and the slides in ¶¶ 241 and 243, *supra*, were false and misleading because they vastly overstated the market for the Company's products (including the portions relating to extremity trauma and to Avance) and the number of nerve repair surgeries performed in the United States each year (including the portion relating to extremity trauma), misleadingly represented that the Company could service the purportedly vast market, relied on product prices that the Company could not charge in the medium and long term, and misleadingly represented that the Company was in the early stages of market penetration.

### D.   ADDITIONAL ALLEGATIONS OF SCIENTER

311. The Exchange Act Individual Defendants were active and culpable participants in the fraud—they personally made materially false or misleading statements and omissions and had ultimate authority over the Company's misstatements and omissions. The Exchange Act Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements set forth in § III(D) above were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the specific facts alleged above regarding the Exchange Act Individual Defendants' personal knowledge and/or reckless disregard of the falsity of the materially false misrepresentations and omissions, the Exchange Act Individual Defendants' scienter with respect to the false and misleading claims alleged herein is further evidenced by the following facts.

1.     **Zaderej and Mariani Repeatedly Spoke In Detail About The Quantity of Peripheral Nerve Repair Procedures Performed in the U.S. and Regarding the Size of the Company's Market**

312.    Both of the Exchange Act Individual Defendants, Zaderej and Mariani, directly, repeatedly, and in detail addressed the topics of the incidence of peripheral nerve repair procedures performed in the U.S. each year, particularly for trauma, and the size of the Company's market, including the portions of that market purportedly relating to Extremity Trauma and to Avance, on earnings calls with market analysts. These topics were a central focus of the statements made by the Exchange Act Individual Defendants on behalf of the Company during each and every quarterly earnings call the Company hosted during the Class Period—and both of the Exchange Act Individual Defendants participated in all of those calls.

313.    For instance, as set forth in ¶ 202, *supra*, during a conference call with analysts on the first day of the Class Period, Defendant Zaderej stated:

> There are more than 900,000 nerve repair surgeries annually in the U.S., pointing to a market opportunity of over $2 billion for Axogen's products.

314.    Zaderej further stated on that call:

> We're also pleased to announce a change to our addressable market opportunity to $2 billion due to expanded use of the Axogen product portfolio in oral and maxillofacial procedures . . . . We believe this additional application of our product portfolio moves the cur-rent addressable market opportunity to $2 billion in our current markets of trauma, upper extremity, and oral and maxillofacial surgery.

315.    Defendant Mariani, who also participated in that call, bolstered Defendant Zaderej's remarks when he stated that the Company was "just scratching the surface of this opportunity."

316.    The Exchange Act Individual Defendants personally made numerous additional statements to investors regarding the Company's market, including statements substantially similar to those set forth in the three paragraphs above on each of the Class Period earnings calls,

as set forth in § V(C)(1), *supra*.  Both Exchange Act Individual Defendants participated in each of the periodic earnings call set forth in § V(C)(1), *supra*, and thus had the ability and opportunity to correct in real time any misstatements made by the other during such calls.

### 2.    Zaderej and Mariani Assured Investors That They Had A Sound Basis for their Statements

317.    The Exchange Act Individual Defendants not only spoke on numerous occasions throughout the Class Period regarding the Company's market—they repeatedly (and falsely) stated that they had a sound basis for their claims on that topic.  As set forth in ¶¶ 313-314, as well as in § V(C)(1), *supra*, these Defendants described the Company's market by reference to the volume of nerve repair surgeries they claimed were performed annually in the U.S., as well as the aggregate dollar value of those procedures.   As an example, Defendant Zaderej presented on behalf of Axogen at the Cantor Fitzgerald Global Healthcare Conference on or about September 25, 2017, where she made an investor presentation including the slides set forth in ¶¶ 212-213, *supra*, and a citation to, among other sources, the Noble Article.  Citations to seemingly reputable authorities to support claims regarding the Company's market—an issue of central importance to investors and to the Company—strongly implies an actual intent to deceive, particularly because those authorities do ***not*** provide a basis for the Company's Class Period claims, as set forth in §§ III(E), *supra*.

318.    Furthermore, the Exchange Act Individual Defendants assured investors that they paid particular attention to the field of peripheral nerve repair and to the size and scope of the Company's market, including with respect to extremity trauma.  For example, on October 29, 2018, Defendant Zaderej answered an analyst question about the Company's growth and assured participants on the call that her answer was based on careful consideration of the Company's market size:

We've been thoughtful in selecting what will be our guidance for next year and thinking about how you want to model our business going forward. We still fundamentally believe that the market in peripheral nerve repair is very strong and that we're just scratching the surface of what is a large growth opportunity.

319.    Zaderej said that the Company had "la[id] out what we think is a very thoughtful model that shows continued growth for the long term," and that "it is with quite a bit of thought and looking at what we've learned over the last many years in the peripheral nerve repair market that we've put together the guidance and think that would be a good guidance for you in setting your model." Given these reassurances that the Company had put "quite a bit of thought" into its growth and provided "a very thoughtful model that shows continued growth for the long term," the inference that Zaderej and Mariani—the Company's CEO and CFO, respectively—were aware of or were at least reckless in not knowing the truth, is very strong.

320.    Moreover, Zaderej and Mariani assured investors that the Company's SEC filings were complete, accurate, and not misleading. They reviewed, approved, and signed Axogen's SEC filings and certifications pursuant to Exchange Act Rule 13a-14(a). During the Class Period, as Axogen's CEO and CFO, Zaderej and Mariani signed Rule 13a-14(a) certifications for *each* of the Company's quarterly and annual reports filed with the SEC during the Class Period, certifying that the filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading."

### 3.    Centralized Sales Information Was Available to Zaderej and Mariani

321.    These Defendants each had a duty to monitor any conduct or information that threatened to undermine the veracity of these filings, including all material facts concerning the true size of the market for the Company's core nerve repair products. Yet, they repeatedly made false and misleading statements despite the facts known to the five CWs whose information supports Lead Plaintiff's claims, and despite the centralized information available to them.

322.    During the Class Period, Axogen uses a customer relationship management ("CRM") system with centralized information, according to CW4, who understood that this was used by Axogen's director of business intelligence—who reported *directly* to the Company's top management—to calculate proposed growth targets for each sales representative each year.  The CRM system contained information including prior year sales, growth rates, and a listing of target doctors in each sales territory.  CW2 confirmed that this director of business intelligence used information based on prior year sales, as well as industry classification benchmarks, to develop sales projections.

323.    Axogen's CRM system included information known to the five former employees whose information supports Lead Plaintiff's claims.  This system provided more than sufficient data for Zaderej and Mariani to learn that their claims were false as to the peripheral nerve repair field, particularly for trauma, and the size of the Company's market, or at least to prompt them to investigate further, which would have caused them to discover the truth.

4.    **Axogen's Small Size and Zaderej and Mariani's Close Oversight of Sales Supports an Inference of Scienter**

324.    Axogen's small size supports an inference that Zaderej and Mariani knew or were reckless in not knowing the truth regarding their oft-repeated claims as to the field of peripheral nerve repair and the size of the market for Axogen's products.  Five former Axogen employees provided information indicating that Defendants' claims were false, and the organizational proximity between these employees and the Exchange Act Individual Defendants supports a strong inference of scienter.  Moreover, Axogen's director of business intelligence reported directly to Zaderej and Mariani, further establishing scienter.

325.    In addition to the above-described lines of reporting, CW2 provided additional information making clear that Defendant Zaderej and the rest of Axogen's executive team kept

close tabs on sales, indicating they were aware of the view, held by CW2 and the other CWs, that the Company's statements regarding the peripheral nerve repair field and the Company's market were false.  CW2 pointed out that Axogen was a fairly small company and that Zaderej and the entire executive leadership attended the Company's annual sales conferences in January, at which the company held an awards ceremony to recognize high-performing salespeople and communicated sales targets for that year.  Zaderej followed sales closely enough that sales representatives that failed to meet their sales goals were "on the radar" of those representatives' managers as well as of Zaderej, according to CW2.

### 5. The Importance of the Information and the Magnitude of the Falsity Supports Scienter

326.    The fundamental significance of the Company's market supports the strong inference that the Exchange Act Individual Defendants acted with scienter.  That the Company's market in trauma cases—the largest segment of its overall market—was approximately $200 *million*, rather than $1.5 *billion*, is of critical relevance to the Company's operations, manufacturing, sales and marketing, surgeon education programs, and overall strategy for growth. As the CEO and CFO, respectively, of the Company, the Exchange Act Individual Defendants thus knew or were reckless in not knowing the truth of this matter.

327.    This inference is further strengthened by the vast discrepancy between the truth and what the Company and the Exchange Act Individual Defendants told investors.  As shown by the Expert Firm's analysis, and as corroborated by the Seligman Report, the number of peripheral nerve repair surgeries for trauma and OMF is a mere fraction of what the Exchange Act Defendants claimed, and the Company's market for trauma and OMF is less than 10% of what they claimed. In light of this yawning gap, the inference that the Exchange Act Individual Defendants knew or were reckless in not knowing the truth is strong.

6.      **The Fact That Axogen Paid A Marketing Company to Produce the Brattain Article and That Axogen Repeatedly Cited That Article Without Disclosing That Fact Supports Scienter**

328.     The strong inference of the Exchange Act Individual Defendants' scienter is further bolstered by the fact that Axogen provided funding for the Brattain Article and then repeatedly cited that document to support its false and misleading statements without making note of this funding.  Nor did Axogen disclose that, as the Seligman Report revealed, the Brattain Article (i) was not published in a medical or scientific journal (let alone a peer-reviewed one), and (ii) was authored by a family medicine doctor, not a neurosurgeon or a certified statistician.  Disclosing these facts would have undermined the Defendants' false and misleading statements.  As the CEO and CFO of Axogen, Zaderej and Mariani repeatedly approved SEC filings and delivered numerous presentations citing the Brattain Article, and they were at least reckless in not knowing these factors and in failing to disclose them to investors..

7.      **Zaderej Made Highly Unusual Stock Sales Before the Truth Was Revealed**

329.     The scienter of Defendant Zaderej is further supported by her sales of Axogen common stock during the Class Period, which were suspicious in timing and amount.  Zaderej became CEO in May 2010.  Since that time, she did not sell *any* Axogen stock until November 13, 2018, when she sold 13,000 shares at an average price of $33.42, garnering proceeds of $434,460.  The very next day, she sold an additional 12,000 shares at an average price of $32.93, bringing in an additional $395,160, for ***total proceeds of $829,620***.  These proceeds from just two days of sales totaled ***144% of Zaderej's base salary*** for 2018.  On information and belief, these sales were not conducted pursuant to Rule 10b5-1 trading plans.  These insider stock sales strongly support the inference of Zaderej's scienter.

### 8.    The Abrupt Departure of Key Members of Senior Management

330.    The timing and circumstances of the departure of key members of the Company's senior management further supports an inference of scienter.  On January 22, 2019, promptly following the end of the Class Period and the revelation of the truth regarding Axogen's market size, Axogen announced that Chief Commercial Officer Jon Gingrich was leaving the Company. Gingrich joined Axogen only a year and a half prior, in July 2017, and was based in the Company's Alachua, Florida headquarters (as were Defendants Zaderej and Mariani), where, Zaderej stated on August 2, 2017, he was a member of the Company's executive leadership team and reported *directly* to her.  As Chief Commercial Officer, the size and scope of Axogen's market was squarely within Gingrich's portfolio, though the Company's grandiose market claims, including citations to the Noble Article, the Brattain Article, and the 2011 HHS Report, began before he joined the Company.  Gingrich's departure shortly after publication of the Seligman Report raises a strong inference that the truth regarding the Company's market was known at the Company's executive leadership level, which included the Exchange Act Individual Defendants, or at a minimum that the Exchange Act Individual Defendants were reckless in not knowing this truth.

331.    In addition, on January 7, 2019, Axogen announced that Shawn McCarrey, who served as Axogen's Senior Vice President of Sales beginning in February 2013, was leaving the Company that very day.  McCarrey was also based in the Company's headquarters, and his departure so soon after the release of the Seligman Report strengthens the strong inference that Zaderej knew or were reckless in not knowing the truth regarding the Company's market size as revealed by the Seligman Report.

### 9.    The Scienter of Zaderej and Mariani is Imputed to Axogen

332.    Axogen possessed scienter by virtue of the fact that the Exchange Act Individual Defendants, who acted with scienter as set forth above, had binding authority over the Company

as its CEO and CFO, respectively, and thus their knowledge or recklessness is imputed to the Company.  Additional allegations further establish Axogen's corporate scienter based on the state of mind of employees whose intent can be imputed to the Company.  It can be inferred that senior corporate executives at Axogen possess scienter.  For instance, throughout the Class Period, as yet unidentified Axogen employees prepared presentation materials setting forth false and misleading statements and omissions regarding the Company's market, revised these materials, and adjusted the false and misleading market claims upward, exacerbating their falsity.  These presentation materials were selected for repeated presentations to investors, including presentations made by Defendant Zaderej.  Furthermore, Defendant Zaderej delivered remarks, prepared by as yet unidentified Axogen employees, that set forth the false and misleading statements and omissions alleged herein in every quarterly earnings call during the Class Period.  As a result, it can be inferred the numerous Axogen employees, including executives sufficiently scienter to impute their scienter to Axogen (such as Gingrich and McCarrey, both of whom departed the Company promptly after the Seligman Report), were aware of the truth regarding the Company's market size, yet approved the false or misleading statements or permitted them to be made in the Company's SEC filings and investor presentations.

### E.    LOSS CAUSATION

333.    Lead Plaintiff and other Class members were damaged as a result of the Exchange Act Defendants' fraudulent conduct as alleged herein.  During the Class Period, the Exchange Act Defendants engaged in a scheme to deceive investors by issuing a series of material misrepresentations and omitting material facts relating to the market for the Company's core products.

334.    As a direct result of the Exchange Act Defendants' false and misleading statements of material fact and omissions of material fact, the price of Axogen's common stock was artificially

inflated throughout the Class Period until, as indicated herein, the relevant truth about Axogen was revealed at the end of the Class Period.  These false and misleading statements had the effect of preventing the market from knowing the full truth regarding the Company and of keeping the price of Axogen common stock artificially inflated throughout the Class Period.

335.    Lead Plaintiff and other Class members unknowingly and in reliance upon the Exchange Act Defendants' materially false or misleading statements and omissions purchased Axogen stock at artificially inflated prices on the Nasdaq.  But for the Exchange Act Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiff and other Class members would not have purchased Axogen stock at the artificially inflated prices at which it traded during the Class Period.

336.    On December 18, 2018, the Seligman Report was published.  As detailed in § III(E)(4), *supra*, the Seligman Report presented a lengthy and detailed analysis, supported by significant research (including reviews of scientific literature, consultation with subject matter experts, and interviews with former employees of the company and surgeons that perform nerve repairs), exposing the truth regarding the Company's market claims.

337.    On this news, the price of Axogen stocked dropped precipitously on high trading volume.  From a closing price of $27.53 per share on December 17, 2018, the day before release of the Seligman Report, Axogen's stock price fell 22% to close at $21.36 per share on December 18, 2018, with over 4,944,743 shares trading hands on December 18—compared to just 214,825 one week prior.  Axogen's stock price continued to fall, closing at $19.83 on December 19, $17.89 on December 20, and $17.09 on December 21, 2018, with unusually heavy trading on each of these days.

338.    The decline in the price of Axogen common stock from December 17 to December 21, 2018, was the direct result of the nature and extent of the revelations made to the market by the Seligman Report concerning the market for the Company's core nerve repair products.  The timing and magnitude of the decline in the price of Axogen common stock negates any inference that the losses suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the actionable conduct alleged herein.  Rather, the revelations of truth and the resulting market reaction, supports the reasonable inference that the market understood that Defendants' prior statements were false and misleading and omitted material information.

339.    As the truth was revealed, the price of Axogen common stock dropped quickly as the artificial inflation was removed, damaging Lead Plaintiff and other Class members.  The economic losses suffered by Lead Plaintiff and other Class members following the disclosure of the truth on December 18, 2018, were a direct and proximate result of the Exchange Act Defendants' material misrepresentations and omissions that artificially inflated the price of Axogen common stock and the subsequent decline in the price of that common stock when the truth concerning the Exchange Act Defendants' misrepresentations and omissions entered the marketplace.

**F.    LEAD PLAINTIFF AND THE CLASS ARE ENTITLED TO A PRESUMPTION OF RELIANCE**

340.    At all relevant times, the market for Axogen common stock was open and efficient for the following reasons, among others: (i) Axogen common stock met the requirements for listing, and was listed and actively traded on the Nasdaq under the ticker symbol "AXGN"; (ii) as a registered and regulated issuer of securities, Axogen filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information; (iii) Axogen

regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; (iv) Axogen was followed by numerous securities analysts employed by major brokerage firms, including Cantor Fitzgerald & Co., JMP Securities LLC, Leerink Partners LLC, Lake Street Capital Markets LLC, Wedbush Securities, Inc., William Blair & Company, L.L.C., Roth Capital Partners, LLC, and BTIG LLC, who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; (v) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Axogen's common stock; and (vi) without knowledge of the misrepresented or omitted facts, Lead Plaintiff and other members of the Class purchased or otherwise acquired Axogen common stock between the time Axogen made the material misrepresentations and omissions and the time the truth was revealed, during which period the price of Axogen's common stock was artificially inflated by Defendants' material misrepresentations and omissions.

341.    As a result of the foregoing, the market for Axogen common stock promptly digested current information regarding Axogen from all publicly available sources and the price of Axogen's stock reflected such information.  Based upon the materially false or misleading statements and omissions of material fact alleged herein, Axogen common stock traded at prices in excess of the true value of Axogen common stock during the Class Period.  Lead Plaintiff and other members of the Class purchased or otherwise acquired Axogen common stock relying upon

the integrity of the market price of Axogen common stock and other market information relating to Axogen.

342.   Under these circumstances, Lead Plaintiff and other members of the Class, as purchasers or acquirers of Axogen common stock at artificially inflated prices during the Class Period, suffered similar injuries and a presumption of reliance under the fraud-on-the-market doctrine applies.

343.   Further, at all relevant times, Lead Plaintiff and other members of the Class relied on Defendants to disclose material information as required by law.   Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired Axogen common stock at artificially inflated prices if Defendants disclosed all material information as required by law. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its business, Lead Plaintiff and other members of the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## VI.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

344.   The Private Securities Litigation Reform Act's statutory safe harbor and the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

345.   None of the statements complained of herein were forward-looking statements. Rather, each was a historical statement or statement of purportedly current facts and conditions at the time each statement was made.  Defendants' statements regarding the quantity of peripheral nerve repair procedures performed in the U.S. each year, and regarding the size of the market for

Axogen's products, were statements of historical or then-current facts and were material factors relevant to the Company's historical performance.

346.     To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof.  As set forth above, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants do not insulate Defendants from liability for their materially false or misleading statements or omissions.

347.     To the extent that the statutory safe harbor applies to any materially false or misleading statement alleged herein, or any portion thereof, Defendants are liable for any such materially false or misleading forward-looking statement because at the time such statement was made the speaker knew the statement was materially false or misleading, or the statement was authorized and approved by an executive officer of Axogen who knew that the forward-looking statement was materially false or misleading.

## VII.     CLASS ACTION ALLEGATIONS

348.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) individually and on behalf of a Class consisting of all persons and entities that purchased or otherwise acquired the publicly traded common stock of Axogen during the Class Period.

349.     Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of Axogen, members of Axogen's Board of Directors, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the

foregoing persons' legal representatives, heirs, successors or assigns; and (iv) any entity in which Defendants have or had a controlling interest, or any affiliate of Axogen.

350.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Axogen's securities were actively traded on the Nasdaq.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery from Defendants, Lead Plaintiff believes that there are at least hundreds, if not thousands, of members in the proposed Class.  Class members may be identified from records maintained by Axogen or its transfer agent, and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

351.    Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws that is complained of herein.

352.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

353.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:  (i) whether Defendants' acts and omissions as alleged herein violated the federal securities laws; (ii) whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts about Axogen's business, operations, and management; (iii) to what extent Class members have sustained damages; and (iv) the proper measure of damages.

354.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VIII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT V
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against The Exchange Act Defendants

355.     Lead Plaintiff incorporates by reference and realleges all preceding paragraphs relating to the Exchange Act claims, as well as §§ I, II, III(A)-(F), and VI, as if fully set forth herein.  This claim is brought against the Exchange Act Defendants pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

356.     During the Class Period, the Exchange Act Defendants used the means and instrumentalities of interstate commerce, the United States mails, and the facilities of the national securities exchanges to make materially false or misleading statements and omissions of material fact alleged herein to: (i) deceive the investing public, including Lead Plaintiff; (ii) cause the market price of Axogen common stock to trade above its true value; and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire Axogen common stock at artificially inflated prices that did not reflect the stock's true value during the Class Period.  In furtherance of their unlawful scheme, plan, or course of conduct, the Exchange Act Defendants took the actions alleged herein.

357.    While in possession of material adverse, non-public information, the Exchange Act Defendants, individually and in concert, directly or indirectly, by the use of means and instrumentalities of interstate commerce, the United States mails, and the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made false or misleading statements of material fact and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Axogen common stock, in violation of Section 10(b) and Rule 10b-5.  The Exchange Act Defendants are alleged as primary participants in the wrongful conduct alleged herein.

358.    The Exchange Act Defendants acted with knowledge or a reckless disregard for the truth of the materially misrepresented and omitted facts alleged herein, in that they failed to disclose such facts, even though such facts were readily available to them, if not known.  The Exchange Act Defendants' material misrepresentations and omissions were made knowingly and/or recklessly for the purpose and effect of concealing the truth regarding Axogen's operations, business, performance, and prospects from the investing public and supporting the artificially inflated price of its common stock.

359.    As set forth above, the dissemination of the materially false or misleading information and failure to disclose material facts artificially inflated or maintained artificial inflation already in the market price of Axogen common stock during the Class Period.  Relying directly or indirectly upon the materially false or misleading statements made by the Exchange Act Defendants and on the efficiency and integrity of the market in which the Company's common

stock trades, and upon the absence of material adverse information that was known to or recklessly disregarded by the Exchange Act Defendants but not disclosed by them, Lead Plaintiff and other members of the Class purchased or otherwise acquired Axogen common stock during the Class Period at artificially inflated prices.  As the previously misrepresented and/or concealed material facts eventually emerged, the price of Axogen common stock substantially declined, causing losses to Lead Plaintiff and other members of the Class.  These declines and the preceding disclosures are set forth above in Section III(F).

360.    At the time of the material misrepresentations and omissions alleged herein, Lead Plaintiff and other members of the Class were not aware of their falsity and believed them to be true.  Had Lead Plaintiff and other members of the Class known the relevant truth regarding Axogen's financial results, operations, business, and prospects, which was misrepresented and/or concealed by the Exchange Act Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired Axogen common stock at artificially inflated prices.

361.    By virtue of the foregoing, the Exchange Act Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their transactions in the Company's common stock during the Class Period.

### COUNT VI
### Violation of Section 20(a) of the Exchange Act
### Against the Exchange Act Individual Defendants

362.    Lead Plaintiff incorporates by reference and realleges all preceding paragraphs relating to the Exchange Act claims, as well as §§ I, II, III(A)-(F), and VI, as if fully set forth herein.  This claim is brought against the Exchange Act Individual Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

363.    Prior to and during the Class Period, the Exchange Act Individual Defendants, by virtue of their high-level positions, were privy to, and monitored, confidential and proprietary information concerning Axogen, its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.

364.    In their respective roles, the Exchange Act Individual Defendants had regular access to non-public information about Axogen's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations and connections with other of Axogen's corporate officers and employees, attendance at management meetings and meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to them in connection therewith.

365.    Each of the Exchange Act Individual Defendants was a controlling person of Axogen within the meaning of Section 20(a), as alleged herein.  By virtue of their high-level positions, and their participation in or awareness of the Company's day-to-day operations and finances, and/or knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Exchange Act Individual Defendants each had the power and authority to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the statements Lead Plaintiff alleges were materially false or misleading.

366.    Each of the Exchange Act Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of Axogen common stock during the Class Period, which included the dissemination of materially false or misleading financial statements and statements (both affirmative statements and statements rendered misleading because of material omissions) set forth above in Sections III(C)(1) and

III(D).  The scheme: (i) deceived the investing public regarding Axogen's business and the true value of Axogen common stock; and (ii) caused Lead Plaintiff and other members of the Class to purchase Axogen common stock at artificially inflated prices, which plummeted in value as the truth was revealed.

367.    The Exchange Act Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements Lead Plaintiff alleges were materially misleading prior to and/or shortly after these statements were issued and had the ability and ultimate authority to prevent the issuance of these statements or cause these statements to be corrected.  In particular, the Exchange Act Individual Defendants maintained direct and supervisory involvement in the day-to-day operations of the Company and therefore had, or are presumed to have had, the power to control or influence the particular public statements or omissions giving rise to the securities violations as alleged herein, and exercised the same.

368.    As set forth above, the Exchange Act Defendants violated Section 10(b) and Rule 10b-5, by their acts and omissions as alleged herein.  By virtue of the Exchange Act Individual Defendants' status as controlling persons and their respective participation in the underlying violations of Section 10(b) and Rule 10b-5, the Exchange Act Individual Defendants are liable pursuant to Section 20(a).  As a direct and proximate result of the Exchange Act Individual Defendants' culpable conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their transactions in Axogen common stock during the Class Period.

## IX.    JURY DEMAND

369.    Lead Plaintiff, on behalf of itself and the Class, hereby demands a trial by jury.

## X.    PRAYER FOR RELIEF

370.    **WHEREFORE**, Lead Plaintiff prays for relief and judgment, including:

1.   Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.   Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon, as allowed by law;

3.   Awarding Lead Plaintiff and the Class extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission);

4.   Awarding Lead Plaintiff and the Class their costs and expenses incurred in this Action, including reasonable attorneys' fees and experts' fees; and

5.   Awarding such other and further relief as may be just and proper.

DATED:  June 22, 2020                    Respectfully submitted,

**GRANT & EISENHOFER P.A.**

*/s/ Daniel L. Berger*
Daniel L. Berger (*pro hac vice*)
Jonathan D. Park (*pro hac vice*)
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (610) 722-8501
jeisenhofer@gelaw.com
dberger@gelaw.com
jpark@gelaw.com

John C. Kairis (*pro hac vice*)
Rebecca A. Musarra (*pro hac vice*)
123 Justison Street
Wilmington, DE 19801
Telephone: (302) 622-7000
Facsimile: (302) 622-7100
jkairis@gelaw.com
rmusarra@gelaw.com

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

**SAXENA WHITE P.A.**

Joseph E. White III (FL Bar No. 621064)
Lester R. Hooker (FL Bar No. 32242)
Adam D. Warden (FL Bar No. 0873691)
150 E. Palmetto Park Road, Suite 600
Boca Raton, FL  33432
Telephone: 561-394-3399
jwhite@saxenawhite.com
lhooker@saxenawhite.com
awarden@saxenawhite.com

*Local Counsel for Lead Plaintiff and Lead Counsel
for the Class*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 22, 2020, I presented the foregoing to the Clerk of the

Court for filing and uploading to the CM/ECF system.  This system will send electronic notice of

filing to all of the parties.

*/s/ Daniel L. Berger*
Daniel L. Berger